1 **John C. Ellis, Jr.**
California Bar No. 228082
2 **Ryan Fraser**
California Bar No. 272196
3 **Federal Defenders of San Diego, Inc.**
225 Broadway, Suite 900
4 San Diego, California 92101
Tel.: (619) 234-8467
5 Fax: (619) 687-2666
Email: john_ellis@fd.org, ryan_fraser@fd.org
6

7 **Attorneys for Kenneth Duane Summers**

8
UNITED STATES DISTRICT COURT
9
SOUTHERN DISTRICT OF CALIFORNIA
10
**(HONORABLE WILLIAM Q. HAYES)**
11

12 UNITED STATES OF AMERICA,          Case no. 15-CR-716-WQH

13          *Plaintiff,*               Hearing date: June 29, 2015
14                                     Hearing time: 2:00 p.m.
   v.                                  Courtroom 14B
15
16 KENNETH DUANE SUMMERS,            **Statement of Facts and**
                                     **Memorandum of Points & Authorities in**
17          *Defendant.*             **Support of Mr. Summers's Motions**

18

19          **1. Summary of Suppression Arguments**

20          Customs and Border Protection's ("CBP") Highway 86 checkpoint near

21 Westmorland, California, ("Checkpoint") violates the Fourth Amendment

22 because its narrow permissible mission of immigration control has crept into

23 drug interdiction and general law enforcement. All of the evidence in this case

24 has been obtained from a stop of Kenny Summers's car at that Checkpoint. It

25 must all be suppressed.

26
27
28
                                    1

Even if the Checkpoint were lawful, the warrantless search of Mr. Summers's trunk violated the Fourth Amendment. All evidence obtained in this case is also traceable to the trunk search. The unconstitutionality of the trunk search therefore independently requires suppression of all the evidence.

The warrantless search of Mr. Summers's phone constitutes another violation of his Fourth Amendment rights. The fruits of that phone search must be suppressed.

The statements Mr. Summers made after arrest must also be suppressed because he gave no clear and knowing waiver of his *Miranda* rights before custodial interrogation began.

## 2.   Statement of Facts[1]

### 2.1.   The Checkpoint

#### 2.1.1. Location

The Checkpoint lies 47.5 miles by highway from the nearest port of entry to the United States, south of the Salton Sea, and near the junction of California Highways 78 and 86. It's about a sixteen-mile drive along Highway 86 northwest from Westmorland. *See* Map of Checkpoint's Location, Ex. A. This Checkpoint is part of CBP's El Centro Sector.

#### 2.1.2. Layout

See Exhibit B for the layout of the Checkpoint and a view of the booth looking South, which is available with additional images and detail via Google Maps or Street View at

https://www.google.com/maps/place/Border+Patrol+Station/@33.125382,-115.854746,3a,75y,147.99h,77.43t/data=!3m4!1e1!3m2!1seE7OKwFkyhRpkf

---

[1] This Statement of Facts is based largely on discovery received from the government, which is not yet complete.

Mr. Summers reserves the right to adopt contrary positions on facts later.

2

Z6CPS6EA!2e0!4m6!1m3!3m2!1s0x0000000000000000:0xabc1d1d2ea7bfd3

6!2sBorder+Patrol+Station!3m1!1s0x0000000000000000:0xabc1d1d2ea7bfd3

6!6m1!1e1.

When operating, the Checkpoint diverts northwest bound traffic on Highway 86 under a canopy to the east side of the highway. Traffic must pass by a manned inspection booth under multiple surveillance cameras—this is the location of "primary inspection." Another area under camera surveillance is for "secondary inspection"; this area lies within a hundred feet of the booth to the northeast. Within a hundred feet of the booth to the east stand trailers for detention, investigation, and interrogation. The Checkpoint employs a canine program.

### 2.1.3. Purposes

According to the government, the stated purpose of this and other checkpoints is "securing the Nation's borders against all threats to our homeland," by "restrict[ing] the ability of criminal organizations to exploit roadways and routes of egress away from the border." CBP Checkpoints Pamphlet, http://www.cbp.gov/sites/default/files/documents/bp_checkpoints_2.pdf, last visited June 8, 2015, Ex. C. Finding non-terrorists who are in the United States illegally is not one of CBP's purposes at the Checkpoint, except insofar as they are a "threat[] to our homeland." *See id.*

According to one of CBP's January 2015 press releases, the agency understands itself generally to be "charged with keeping terrorists and terrorist weapons out of the country *while enforcing hundreds of U.S. laws.*" *See* Press Releases & News Reports, Ex. D, Press Release of Jan. 12, 2015 (emphasis added). "[E]nforcing hundreds of U.S. laws" in practice has come to include a substantial focus on seizing illegal drugs, including at the

3

Checkpoint in this case. About five months into 2015, the government has already issued press releases from at least ten drug seizures at the Checkpoint. *See* id. The government reports that last fiscal year, CBP's El Centro Sector seized over 445 pounds of methamphetamine and over 186 pounds of heroin. *Id.*

**2.1.4. Canine Program Furthers Drug Interdiction at the Checkpoint**

Part of the drug-interdiction effort at the Checkpoint is achieved by CBP's Canine Program, whose secondary purpose, after "terrorist detection and apprehension," is "detection and seizure of controlled substances and other contraband." *See* Customs and Border Protection Website, Canine Program, http://www.cbp.gov/border-security/along-us-borders/canine-program, last visited June 8, 2015, Ex. E. Detecting non-terrorists who are not allowed to be in the United States is not a purpose of the Canine Program. *See id.*

**2.2.   Night of February 28, 2015**

**2.2.1. Primary Inspection**

At 8:30 p.m. on February 28, 2015, Kenneth Summers and his sixteen-year-old son, both citizens, reached primary inspection at the Checkpoint. Mr. Summers sat behind the wheel of a 2007 Volkswagen Jetta. His son occupied the front passenger seat. Border Patrol Agent ("BPA") Stephen Stypinski was on duty at the primary inspection point.

BPA Stypinski stood about two feet outside of the inspection booth at the edge of the lone northbound lane, between two stop signs and within view of multiple Border Patrol cameras.

Even before the Jetta reached BPA Stypinski, another Border Patrol Agent, Aaron Miranda, was following the Jetta with his canine partner, Boeli, a dog that is trained to detect cocaine, marijuana, heroin, and methamphetamine,

15CR716-WQH

as well as human beings. *See* All Canine Discovery Produced to Date, Ex. F, *under seal*; Checkpoint Video, Ex. G.

BPA Miranda and Boeli walked behind the Jetta, keeping pace with it, as it approached the booth. *See* Ex. G. Just before the driver's window pulled even with BPA Stypinski, Boeli sniffed momentarily near the left edge of the trunk, then proceeded to the right edge of the trunk within three to four seconds. *Id.* Next, Boeli paused for about two seconds beside the trunk and to its right, and then moved on toward the front passenger seat. *Id.*

When Boeli alerts, among other things, his body "tenses up" and his ears "pull back." *See United States v. Pena-Figueroa*, case no. 13cr4407-DMS, Tr. Evid. Hr'g of May 21, 2014, doc. 61, at 232:15–232:6. Those behaviors are not to be seen on the video of Boeli sniffing of the Jetta, albeit low-quality imagery. *See* Ex. G.

BPA Stypinski began speaking to Mr. Summers at about the time Boeli was next to the right edge of the trunk. *See id.* As BPA Stypinski apparently asked Mr. Summers his citizenship and received the response that Mr. Summers was a United States citizen, *see* Stypinski Report, Ex. H, Boeli walked in a wide arc away from the right side of the Jetta, then curled around the back of the car toward BPA Stypinski. Ex. G. As Boeli passed the rear left edge of the Jetta and thus its trunk, BPA Miranda stopped behind the trunk, causing the leash to become nearly taught. *Id.* Boeli looked at BPA Miranda, who then motioned with his right hand toward the trunk next to the license plate. *Id.* BPA Miranda "requested ... that [Mr.] Summers open the trunk." Ex. H. BPA Stypinski then "asked [Mr.] Summers if he could open the trunk." *Id.* Mr. Summers made attempts to do so in response to the agents' instructions. *Id.* At this time, BPA Miranda himself "made multiple attempts to open the trunk." *Id.*

15CR716-WQH

### 2.2.2. Secondary Inspection

Immediately after BPA Miranda's attempts to open the trunk, BPA Stypinski ordered Mr. Summers to park in the secondary inspection area, which he did. *See* Ex. H. Mr. Summers was again ordered to open the trunk. He turned off the motor and pressed a button to release the trunk latch, which another agent, BPA Eric Hanna, apparently opened. *See* Ex. I, Hanna Report. BPA Hanna then found two persons within the trunk, who were later determined to be in the United States unlawfully. *See id.* BPA Hanna next ordered Mr. Summers out of his car. *Id.* He complied and BPA Hanna handcuffed his wrists behind his back and frisked him. *Id.* About this time, BPA Stypinski arrested Mr. Summers's son, as well. *Id.*

### 2.2.3. Phone Search

While Mr. Summers was still in custody, BPA Michael Ketels had him sign a consent form to search his cell phone. This consent was later revoked through counsel. The government searched the phone using forensic technology and has not produced discovery of any warrant for a phone search.

### 2.2.4. Custodial Interrogation

Two hours after his arrest, Mr. Summers remained in custody inside an interrogation room. BPA Ketels advised Mr. Summers of his rights to remain silent, consult with a lawyer before and during questioning, and to stop answering questions at any time. BPA Ketels also explained that an attorney could be appointed for Mr. Summers if he could not afford to pay for a lawyer himself and that his statements could be used against him. Mr. Summers said yes, he understood; and this exchange followed:

> BPA Ketels:       Are you willing to talk with us now without a lawyer present?
>
> Mr. Summers:    I don't know if that's a wise idea. I mean...

| | | |
|---|---|---|
| 1 | BPA Ketels: | Well, like I said, it's your call. And you |
| 2 | | understand your rights. You can answer |
| 3 | | questions and stop at any time if you want, but |
| 4 | | I just need you to know that those are your |
| 5 | | rights. And you do have the right to have a |
| 6 | | lawyer present if you want, or if you want to be |
| 7 | | here without one and answer some of our |
| 8 | | questions, it's your call. |
| 9 | Mr. Summers: | I don't know what to do. I just don't know. |
| 10 | BPA Ketels: | Well... |
| 11 | Mr. Summers: | I didn't realize the trouble I'm in until now. |
| 12 | BPA Ketels: | OK. I mean, and like I said... |
| 13 | Mr. Summers: | I mean, I didn't, it wasn't like I went to |
| 14 | | Mexico and picked anybody up... |
| 15 | BPA Ketels: | Yeah. |
| 16 | Mr. Summers: | Or anything like that. |
| 17 | BPA Ketels: | So, like I just said, if you want to answer a few |
| 18 | | of our questions at any time if you want to |
| 19 | | stop, it's your right to stop. Is that cool with |
| 20 | | you? |
| 21 | Mr. Summers: | Yeah. |
| 22 | BPA Ketels: | OK. So your full name is Kenny Duane |
| 23 | | Summers? |

24   Accusatory interrogation by BPA Ketels came next. There was no

25 clarification of Mr. Summers's expression that answering questions without

26 an attorney would be unwise.

27

28

15CR716-WQH

**2.3.    Pending Charge**

The case is now proceeding on a single-count indictment of March 18, 2014, which charges transportation of illegal aliens for financial gain and aiding and abetting in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), (v)(II), and (a)(1)(B)(i).

### 3.    General Suppression Principles

"The right of the people to be secure in their persons ... and effects, against unreasonable searches and seizures, shall not be violated ...." U.S. Const. amend. IV. Evidence and statements obtained as a product of police action in violation of this foundational safeguard of American liberty must be excluded as "fruit of the poisonous tree." *United States v. Crawford*, 372 F.3d 1048, 1054 (9th Cir. 2004) (citing *Brown v. Illinois*, 422 U.S. 590, 599 (1975); *Wong Sun v. United States*, 371 U.S. 471, 484–88 (1963)).

In this case, the government acted without a warrant.

> Searches conducted without a warrant, ... 'are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' *Katz v. United States*, 389 U.S. 347, 357 (1967). **The burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement is on the government.** *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001).

*United States v. Scott*, 705 F.3d 410, 416–17 (9th Cir. 2012) (emphasis added).[2]

---

[2] Because it is the government's burden to justify the actions challenged in these motions, no predicate factual findings are needed to grant the motions other than the undisputed facts of the occurrence of the warrantless searches, seizures, and interrogation in this case. *Cf.* CrimLR 47.1 g. 1. (explaining when declarations are required in support of criminal motions). The motions therefore should not be denied on the ground that no declaration is submitted with them.

15CR716-WQH

### 4.   All of the Evidence Must Be Suppressed
### Because It Derives From an Unconstitutional Checkpoint

Suppression is required here because all the evidence comes from a stop at a checkpoint whose purpose has expanded beyond consitutional bounds into drug interdiction and other areas of law enforcement unrelated to immigration.

In *City of Indianapolis v. Edmond*, 531 U.S. 32, 34 (2000), the Supreme Court invalidated "a highway checkpoint program whose primary purpose [was] the discovery and interdiction of illegal narcotics." Policing drug trafficking is an unconstitional use of a highway checkpoint because it amounts to an effort to "detect evidence of ordinary criminal wrongdoing." *See id.* at 38, 41–42 ("Because the primary purpose of the Indianapolis narcotics checkpoint program is to uncover evidence of ordinary criminal wrongdoing, the program contravenes the Fourth Amendment."). "Without drawing the line at roadblocks designed primarily to serve the general interest in crime control, the Fourth Amendment would do little to prevent such intrusions from becoming a routine part of American life." *Id.* at 42.

It is true that in *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976), the Supreme Court approved checkpoints that are narrowly focused on illegal immigration. There, the record showed that referrals for secondary inspection were being "made for the sole purpose of conducting a routine and limited inquiry into residence status." *Id.* at 560. The detention of travelers was limited to "'a brief question or two and possibly the production of a document evidencing a right to be in the United States.'" *Id.* at 558 (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 880 (1975)).

In contrast, the purpose of the Checkpoint at issue here is not merely to detect immigration violations. Instead, it serves generally to "secur[e] the

15CR716-WQH

Nation's borders against all threats to our homeland."CBP Checkpoints Pamphlet, Ex. C. Those broad threats include the flow of illegal drugs. This Checkpoint is set up to target drug traffic and other "threats" as much as illegal immigration. *See* Press Releases & News Reports, Ex. D. Its Canine Program is particularly focused on tasks other than immigration enforcement. *See* CBP Website, Canine Program, Ex. E. In these respects, the Checkpoint has outgrown its permissible purpose.

Dissenting in *United States v. Soyland*, 3 F.3d 1312, 1318 (9th Cir. 1993), Circuit Judge Alex Kozinski noted that "*Martinez-Fuerte* approved immigration checkpoints for a very narrow purpose—detecting, and thereby deterring, illegal immigrants ... [b]ut the record [in *Soyland*] suggest[ed] that these checkpoints may also be serving broader law enforcement objectives." *United States v. Soyland*, 3 F.3d 1312, 1318 (9th Cir. 1993) (Kozinski, J., dissenting). "If this is true, it subverts the rationale of *Martinez-Fuerte* and turns a legitimate administrative search into a massive violation of the Fourth Amendment." *Id.* at 1317 (Kozinski, J., dissenting).

Judge Kozinski's 1993 suspicion is today's reality at the Checkpoint in this case. *See* Press Releases & News Reports, Ex. D; CBP Checkpoints Pamphlet, Ex. C; CBP Website, Canine Program, Ex. E. *Martinez-Fuerte* therefore no longer justifies the suspicionless search and seizure of people and vehicles at the Checkpoint. And because the Checkpoint was a necessary and proximate cause of the searches and seizures that uncovered the incriminating evidence in this case, suppression is required. *See Wong Sun*, 371 U.S. at 484.

15CR716-WQH

### 5.   All of the Evidence Must Be Suppressed
### Because It Derives From an Unconstitutional Trunk Search

**5.1. No Warrant**

Every inquiry into a warrantless search proceeds from the premise that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009). In this case, the government did not obtain a warrant or receive effective consent prior to searching Mr. Summers's trunk. Because the search did not fall within one of the narrow exceptions to the warrant requirement, it violated his Fourth Amendment rights.

**5.2. No Voluntary Consent**

The government will likely claim that Mr. Summers consented to the trunk search. But it is the government's "heavy" burden to show that such consent was given unequivocally, specifically, freely and intelligently. *United States v. Chan-Jimenez*, 125 F.3d 1324, 1327–28 (9th Cir. 1997) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *United States v. Shaibu*, 920 F.2d 1423, 1426 (9th Cir. 1990), *amended by* 912 F.2d 1193 (9th Cir. 1990)). The Ninth Circuit has identified five factors to be considered in determining the voluntariness of consent to a search:

(1) whether defendant was seized within the meaning of the Fourth Amendment;

(2) whether the arresting officers had their guns drawn;

(3) whether *Miranda* warnings were given;

(4) whether the defendant was told he had a right not to consent; and

15CR716-WQH

(5) whether the defendant was told a search warrant could be obtained.

*United States v. Morning*, 64 F.3d 531, 533 (9th Cir. 1995), *abrogated in another respect by Georgia v. Randolph*, 547 U.S. 103, 108 (2006), (quoting *United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1988)); *see also Chan-Jimenez*, 125 F.3d at 1327 (same factors), 1327 n.3 ("Although the presence or absence of one of these factors is not dispositive of the voluntariness inquiry in any given case, many of this court's decisions upholding consent as voluntary are supported by at least several of the factors.").

Any ostensible consent here was not voluntary. Mr. Summers was seized, in that a reasonable person in his position "would have believed that he was not free to leave." *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (stating this test for seizure). He was stopped in a place completely dominated by law enforcement. The Checkpoint is a permanent fixture along what is otherwise a civilian artery of travel. It included an area designated for secondary inspection, a building used for detention, and was staffed by numerous uniformed law enforcement officers. One such officer was speaking to him while another stood behind his car ready, and ultimately attempting, to pull open the trnk. If a person attempts to pass the Checkpoint without permission, agents may give chase, employ spike strips, or use other methods to halt a person's continued passage along the highway. Fleeing a checkpoint is a federal felony. *See* 18 U.S.C. § 758.

Further supporting the conclusion that consent to open the trunk was not voluntary are the facts that Mr. Summers was required to follow, and did follow, the agents' instructions. At their instruction, he continued to try to open the trunk after being sent from primary to secondary inspection.

12

15CR716-WQH

And at primary inspection, BPA Miranda had attempted to open the trunk himself. When law enforcement is attempting to perform an act before receiving consent to it, this shows the suspect that his refusal to consent would not matter.

Moreover, Mr. Summers was not informed of his right to refuse consent.

He was not Mirandized before the trunk search.

He was not informed whether a search warrant could be obtained.

The only countervailing factor is that the agents' guns were not drawn, but none of the factors can be dispositive on its own. *See id.* at 533 (quoting *Castillo*, 866 F.2d at 1082). Considered together, these factors show that consent was not "free and voluntary."

**5.3. The Automobile Exception Does Not Apply**

Contrary to another argument anticipated by the government, the search of Mr. Summers's trunk does not fall within the automobile exception to the warrant requirement. "The automobile exception permits police to search a vehicle as long as the vehicle is 'readily mobile' and 'probable cause exists to believe it contains contraband.'" *United States v. Davis*, 530 F.3d 1069, 1084 (9th Cir. 2008) (citing *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam)). The government bears the burden of showing that the automobile exception applies, *see, e.g.*, *Scott*, 705 F.3d at 417, but here cannot fulfill the requirement of probable cause.

According to the arrest reports, BPA Miranda's canine, Boeli, alerted to Mr. Summers's trunk. Mr. Summers disputes this on the basis of review of video from primary inspection. On the same basis, Mr. Summers also disputes that Boeli alerted to the trunk on his own, rather than in response to BPA Miranda's cues.

15CR716-WQH

Mr. Summers also disputes that an alert by Boeli as handled by BPA Miranda, if it occurred, would constitute probable cause.

Moreover, the government should be prevented from relying on the dog's conduct as probable cause until the government has provided complete discovery regarding his qualifications and performance. *See United States v. Cedano-Arellano*, 332 F.3d 568, 571 (9th Cir. 2003). Although discovery received to date does include some of Boeli's test score sheets and his Border Patrol Canine Detection Team Certification, they are close to meaningless on their own.

For one, the description of the test methodology is not detailed enough to show that the test results support the inferences necessary to treat an alert by Boeli as probable cause. *See* Ex. F. The discovery produced allows no means of determining Boeli's rates of false-positive and false-negative alerts, whether in controlled tests or in the field. *See id.* It does not allow the defense to assess the degree of independence, if any, of the certification authority. *See id.* (In fact, insofar as the certification produced in discovery appears to have been created by CBP itself, it appears that Boeli may never have been independently certified. *See id.*)

The discovery produced to date does not show CBP's pass and fail rates for the time period when Boeli was certified. *See id.*

It does not include any description of testing standards or benchmarks. *See id.*

It does not show how or whether Boeli is rewarded for not alerting falsely. *See id.* It does not show whether or how Boeli is rewarded when he does alert. *See id.*

And even though the score sheets were produced subject to a protective order drafted primarily by the government, the sheets are redacted. *See id.* The

15CR716-WQH

markings on the score sheets also appear to use abbreviations and symbols extensively, and no translation key has been provided for those. *See id.*

This information is likely available in the form of "books, papers, documents, data, photographs, tangible objects, ... or copies or portions of any of these items." Because this information is material to preparing Mr. Summers's defense, Federal Rule of Criminal Procedure 16(a)(1)(E) entitles him to it.

Having provided such minimal discovery on Boeli's qualifications and performance, the government should not be allowed to use his ostensible alert as probable cause for the trunk search. *Cf. Cedano-Arellano*, 332 F.3d at 571 ("Cedano-Arellano argues that the materials at issue [described at page 570 of the opinion as the dog's "handler's log, all training records and score sheets, certification records, and training standards and manuals"] were crucial to his ability to assess the dog's reliability, a very important issue in his defense, and to conduct an effective cross-examination of the dog's handler. We agree.").

Therefore, the warrantless search of Mr. Summers's car is not justified by the automobile exception to the warrant requirement.

### 6.   Evidence Derived From Searching Mr. Summers's Phone Must Be Suppressed Because that Search Was Unconstitutional

The circumstances under which Mr. Summers ostensibly consented to search of his phone are unclear, and it is the government's "heavy" burden to show that consent was valid. *See, e.g., Chan-Jimenez*, 125 F.3d at 1327. After all, "courts indulge every reasonable presumption against waiver of fundamental constitutional rights." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (quotation marks and citation omitted); *see also Torres v. Commonwealth of Puerto Rico*, 442 U.S. 465, 474 (1979) (referring to the Fourth Amendment's prohibition of unreasonable searches and seizures as "fundamental"); *Chan-Jimenez*, 125 F.3d

15CR716-WQH

at 1327 (requiring that consent to search be given voluntarily, unequivocally, and specifically, and setting forth the five-factor test of voluntariness). Discovery received by the defense to date does not show that effective, voluntary consent was given; nor does it show that a warrant to search the phone was obtained.

### 7.   Mr. Summers's Responses to Custodial Interrogation Must Be Suppressed For Lack of a Clear and Knowing *Miranda* Waiver

A defendant's statements in response to custodial interrogation are subject to suppression unless the government carries a "'heavy burden'" to show a clear, knowing, and intelligent waiver of the privilege against self-incrimination and right to counsel. *See United States v. Rodriguez*, 518 F.3d 1072, 1076 (9th Cir. 2008) (quoting *Miranda v. Arizona*, 384 U.S. 436, 475 (1966)). Police conduct constitutes "interrogation" for purposes of *Miranda* if it is "reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Interrogation is "custodial" if a reasonable person under the circumstances would "have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

What is required when the intent to waive or invoke *Miranda* rights is unclear? "Prior to obtaining an unambiguous and unequivocal waiver [of *Miranda* rights], a duty rests with the interrogating officer to clarify any ambiguity before beginning general interrogation." *Rodriguez*, 518 F.3d at at 1080. Before a clear waiver, "the police have no right to question the suspect." *Id.* at 1079 (citing *Miranda*, 384 U.S. at 471).

The waiver must also be knowing. "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that

16

the *Miranda* rights have been waived." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citing *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).

In *Rodriguez*, the comment "I'm good for tonight" in response to the question whether the defendant would speak to law enforcement after *Miranda* warnings was neither a clear invocation of the right to silence nor an unambiguous waiver. *Id.* at 1080. It therefore obliged the interrogating officers to clarify what the defendant had meant. *Id.* The fact that the defendant answered questions by another office after a break in questioning effected no implied waiver, because any invocation of the right to silence must be "'scrupulously honored.'" *Id.* (quoting *Michigan v. Mosley*, 423 U.S. 96, 104 (1975)).

In this case, when BPA Ketels first asked Mr. Summers whether he would answer questions without an attorney, Mr. Summers replied, "I don't know if that's a wise idea." In context, this statement bears multiple possible meanings. Idiomatically understood, it could mean that Mr. Summers did not want to continue with questioning because he considered doing so unwise. Much like "I'm good for tonight," *cf. id.* at 1076, "I don't know if that's a wise idea" implied a lack of desire to proceed to interrogation. Therefore, as in *Rodriguez*, the comment obligated the interrogating officer to clarify. *See id.* at 1080.

"I don't know if that's a wise idea," followed shortly by "I don't know what to do. I just don't know..." also reflects a lack of comprehension of the decision Mr. Summers was being asked to make. Together they undermine severely his earlier one-word affirmation that he understood his rights.

To be sure, BPA Ketels did follow up, but he never obtained a clear, knowing, and intelligent waiver:

Mr. Summers:        I don't know what to do. I just don't know.

17

| | | |
|---|---|---|
| 1 | BPA Ketels: | Well... |
| 2 | Mr. Summers: | I didn't realize the trouble I'm in until now. |
| 3 | BPA Ketels: | OK. I mean, and like I said ... |
| 4 | Mr. Summers: | I didn't, it wasn't like I went to Mexico and |
| 5 | | picked anybody up ... |
| 6 | BPA Ketels: | Yeah. |
| 7 | Mr. Summers: | Or anything like that. |
| 8 | BPA Ketels: | So, like I just said, if you want to answer a few |
| 9 | | of our questions at any time if you want to |
| 10 | | stop, it's your right to stop. Is that cool with |
| 11 | | you? |
| 12 | Mr. Summers: | Yeah. |

This was as far as the colloquy went in clarifying Mr. Summers's *Miranda* decision, to the extent there was one. None of it shows what the government needs for admission: Mr. Summers's "full awareness of ... the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421.

Nor does this exchange show that Mr. Summers intended to waive *Miranda* and answer questions without a lawyer. An affirmative response to "if you want to answer a few of our questions at any time if you want to stop, it's your right to stop. Is that cool with you?" acknowledges only an acceptance of the right to cease questioning after it begins. It cannot reasonably be understood to resolve the ambiguity of Mr. Summers's understanding of his rights and expression of intentions. There was no unambiguous, knowing, and intelligent waiver of *Miranda*. The government cannot meet its "heavy burden." *See Rodriguez*, 518 F.3d at 1076 (quoting *Miranda*, 384 U.S. at 475).

15CR716-WQH

Because Mr. Summers was in custody and BPA Ketels nevertheless proceeded to ask questions that were reasonably likely to elicit incriminating responses without securing a clear and knowing waiver of *Miranda* rights, Mr. Summers's statements during custodial interrogation must be suppressed.

### 8.   Request for Evidentiary Hearing

The Court should not find that the government has met its heavy burden of justifying the warrantless searches and seizures in this case without a hearing that would allow Mr. Summers the opportunity to probe the government's evidence. Nor should the Court find a valid *Miranda* waiver without an evidentiary hearing to determine the admissibility of Mr. Summers's statements.

Mr. Summers requests an evidentiary hearing to resolve any factual disputes that the Court would not resolve in his favor from review of the written filings here. Where a factual determination is required, courts are obligated to make factual findings by Federal Rule of Criminal Procedure 12. *See United States v. Prieto-Villa*, 910 F.2d 601, 606-10 (9th Cir. 1990). "'[S]uppression hearings are often as important as the trial itself.'" *Id.* at 610 (quoting *Waller v. Georgia*, 467 U.S. 39, 46 (1984)).

### 9.   Request for Compulsion of Discovery

Under Rule 16, and to protect Mr. Summers's constitutional rights to a fair trial, to present a complete defense, and to confront the witnesses against him; *see* U.S. Const. amend. V, VI; Fed. R. Crim. P. 16; he supplements his previous discovery requests as follows:

Mr. Summers requests any and all statistics regarding the number of vehicles that have been searched by federal authorities at the Checkpoint, and the number of those that resulted in the seizure of narcotics. Additionally, Mr. Summers seeks information on the number and type of all immigration-

15CR716-WQH

related offenses discovered at the Highway 86 Checkpoint. Finally, Mr. Summers requests information on the overall number of arrests made or violations discovered at the Checkpoint, broken down by the type of violation. Mr. Summers seeks this information for the period beginning one year before his arrest and ending with May 29, 2015.

Mr. Summers requests any and all written or otherwise attainable information regarding the training of CBP, Border Patrol, and Department of Homeland Security ("DHS") agents at the Checkpoint in the detection or discovery of narcotics in vehicles, including any training offered to these agents by the Drug Enforcement Administration ("DEA") or other law enforcement agencies, and the existence of checkpoint-specific training, if any, given to El Centro Sector agents.

Mr. Summers requests any and all written policies or training manuals issued by CBP, Border Patrol, or DHS to their employees regarding the handling of vehicles suspected to be transporting illegal contraband across the Checkpoint and the persons within those vehicles, their referral to secondary inspection, the detention of individuals within those vehicles, and the search of those vehicles and their occupants.

Mr. Summers also requests any written or policy instructions from these agencies, whether given orally or in writing, regarding their definition of voluntary consent and procedures for obtaining consent to search a vehicle or phone. Mr. Summers also requests all discovery available regarding how the phone-search consent form in this case was signed.

Mr. Summers requests any and all of the above agencies' policies, whether written or oral, that convey the perceived objective of their checkpoints, including the role and objective of the checkpoints in the detection and seizure of illegal contraband. Mr. Summers requests that this include

15CR716-WQH

descriptions of positions of employment, performance goals, and other standards for measuring the conduct and performance of agents keyed to detecting evidence of illegal conduct other than immigration violations.

Mr. Summers requests information on the designation of all law-enforcement agents who were present at the checkpoint during the stop, detention, and subsequent search of the Jetta, including any cross-designation or previous employment with any other law enforcement agency.

Mr. Summers requests any and all possibly relevant information pertaining to BPA Miranda and Boeli, including but not limited to, dates of training, performance and accuracy, dates of employment with the Border Patrol or other federal agencies, date of birth, aliases, history, and all training and performance records. Mr. Summers's requests include the following topics and materials related to Boeli:

- Boeli's handler's log;
- Boeli's handler's reports;
- A description of what incentives exist for Boeli not to alert falsely and/or how his training reduces the likelihood of false alerts;
- BPA Miranda's standards for record keeping;
- Boeli's ability to alert on command;
- Training and any outstanding certification records;
- CBP's current canine training manual;
- Certification standards of the certifying authority the government seeks to rely on;
- A detailed description of the test methodology used in any certification process the government seeks to use in relying on Boeli's alleged alert as probable cause, as well as the respects in

21

which that methodology has changed in the past ten years, with
dates of change;

- Data showing Boeli's false-positive and false-negative alerts, in controlled tests and in the field;
- Records of any false-positive alerts by Boeli;
- Information regarding the independence of any authority who certified Boeli, including whether the certifying authority is employed by the government or contracts with the government and the frequency and term of such contracts;
- Pass and fail rates in certifications performed by the authority whose certificiation of Boeli the government seeks to rely on;
- Boeli's performance on certification tests and in the field *as compared with other CBP canines*;
- A key for translating abbreviations and symbols used in any of the above materials; and
- Boeli's age and medical history

Because this information regarding the canine unit in this case is material to preparing Mr. Summers's defense, Federal Rule of Criminal Procedure 16 entitles him to it. *See* Fed. R. Crim. P. 16(a)(1)(E) (documents and objects), (F) (reports of tests); *Cf. Cedano-Arellano*, 332 F.3d at 571.

Mr. Summers also requests that the government be ordered to produce or permit inspection or copying of **video footage of the Jetta before it reached the immediate area of the primary inspection booth**. If no such footage exists, Mr. Summers requests the policies prevailing at the Checkpoint on February 28, 2015, and during the pendency of this case with regard to the use of surveillance cameras, when the cameras should be operating, and how Checkpoint personnel respond to orders to preserve surveillance footage. Mr.

15CR716-WQH

Summers also requests discovery of the location of all of the CBP or government surveillance cameras within a half-mile along Highway 86 to the southeast of the Checkpoint. *See* Preservation Order of Mar. 19, 2015, ECF doc. 20; Fed. R. Crim. P. 16(a)(1)(E).

### 10. Request for Leave to File Further Motions

Mr. Summers requests leave to file further motions as needed. As new information surfaces due to the government providing discovery in response to these motions, an order of this Court, or evidence produced during the evidentiary hearing, defense counsel may find it necessary to file further motions, or supplement existing motions. Therefore, defense counsel requests the opportunity to file further motions based upon new information gained from discovery.

### 11. Conclusion

For the reasons given above, Mr. Summers moves the Court to grant these motions.


Respectfully submitted,


Dated: June 8, 2015            *s/ Ryan Fraser*
                              JOHN C. ELLIS, JR.
                              RYAN FRASER
                              FEDERAL DEFENDERS OF SAN DIEGO, INC.
                              ATTORNEYS FOR MR. SUMMERS

15CR716-WQH