```
 1                  UNITED STATES DISTRICT COURT

 2             FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   UNITED STATES OF AMERICA,        )
                                      )
 5        Plaintiff,                  ) No. 15-CR-0716-WQH
                                      )
 6             v.                     ) December 8, 2015
                                      )
 7   KENNETH DUANE SUMMERS,           ) 9:30 a.m.
                                      )
 8        Defendant.                  ) San Diego, California
     _____)
 9

10

11                 TRANSCRIPT OF EVIDENTIARY HEARING
                BEFORE THE HONORABLE WILLIAM Q. HAYES
12                   UNITED STATES DISTRICT JUDGE

     APPEARANCES:
13

14   For the Plaintiff:        United States Attorney's Office
                               By:  NICHOLAS PILCHAK, ESQ.
15                                  CHRISTINE RO, ESQ.
                               880 Front Street, Room 6293
16                             San Diego, California  92101

17   For the Defendant:        Law Offices of Timothy Scott, APC
                               By:  TIMOTHY A. SCOTT, ESQ.
18                                  NICHOLAS JIMENEZ, ESQ.
                               1350 Columbia, Suite 600
19                             San Diego, California 92101

20

21

22   Court Reporter:          Melinda S. Setterman, RPR, CRR
                               District Court Clerk's Office
23                             333 West Broadway, Suite 420
                               San Diego, California, 92101
24                             melinda_setterman@casd.uscourts.gov

25   Reported by Stenotype, Transcribed by Computer
```

2

1                    I N D E X

2    TESTIMONY:

3    WITNESS:          EXAMINATION BY:                    PAGE:

4    Steven Stypinski

5              Direct Examination by Mr. Pilchak..........6
             Cross-Examination by Mr. Scott.............20
6    Eric Hanna

7              Direct Examination by Ms. Ro...............26
             Cross-Examination by Mr. Scott.............32
8
     Aaron Miranda
9
             Direct Examination by Mr. Pilchak..........35
10            Cross-Examination by Mr. Scott.............76
             Redirect Examination by Mr. Pilchak........122
11   Kenneth Summers

12            Direct Examination by Mr. Scott...........129
13            Cross-Examination by Mr. Pilchak..........131

14   Andre Falco

15            Direct Examination by Mr. Scott...........137
             Cross-Examination by Ms. Ro...............162
16            Redirect Examination by Mr. Scott.........179
             Recross-Examination by Ms. Ro.............180
17
     EXHIBITS:
18
     NUMBER:          DESCRIPTION:
19
     1    Photo, aerial view, Highway 86 checkpoint
20   2    Photo, Highway 86 checkpoint, primary inspection
     3    Photo, Highway 86 checkpoint, preprimary area
21   4    Photo, Highway 86 checkpoint, secondary inspection
     5    Video, excerpt clips, Highway 86 checkpoint
22   6    Canine Certification, October 2014
     7    Canine Certifications, 2011, 2012, 2013
23   8    Canine Detection Team Certification judging standards
     9    Performance Standards for CBP detection handler courses
24   10   Detection Canine Student Performance Standards score
          sheets
25   11   Copy of book cover, Dog Training For Fun and Profit

01:25

```
 1        SAN DIEGO, CALIFORNIA, DECEMBER 8, 2015, 9:37 A.M.

 2                            * * * *

 3        THE CLERK:  Number one on calendar, 15-CR-716, United

 4   States of America vs Kenneth Duane Summers, on for evidentiary

 5   hearing.

 6        MR. PILCHAK:  Good morning, Your Honor.  Nicholas

 7   Pilchak and Christine Ro for the United States.

 8        MS. RO:  Good morning.

 9        THE COURT:  Good morning.

10        MR. SCOTT:  Good morning, Your Honor.  Tim Scott for

11   Mr. Summers, who is in court out of custody.  My colleague

12   Nicholas Jimenez, who is in route, will be coming shortly.

13        THE COURT:  Call your first witness.

14        MR. PILCHAK:  Your Honor, before we call our first

15   witness, there are two housekeeping matters that we would like

16   to raise.  One is the United States learned just this morning

17   that the canine detector dog that we'll be discussing this

18   morning, whose name is Boeli, has terminal cancer, and it is a

19   very serious condition.  We just learned about that this

20   morning, and I just wanted to put on the record that we've

21   advised defense counsel of that before we started the hearing

22   this morning because we just learned of that fact.

23        THE COURT:  All right.  How will that impact anything

24   that we're doing today though?

25        MR. PILCHAK:  In our view it wouldn't, but in case
```

1  someone has a different view, I wanted it on the record that we

2  made --

3          THE COURT:  All right.  Mr. Scott, I don't see how it

4  impacts it.  It is unfortunate, but I don't see how it impacts

09:38  5  the legal issues.

6          MR. SCOTT:  I feel bad for the poor dog.  I don't

7  think it is a legal issue.

8          THE COURT:  I do as well.

9          MR. PILCHAK:  Thank you, Your Honor.  The other matter

09:38  10  is that we'll be asking the Court to receive some of the

11  exhibits that were produced under protective order in this case

12  under seal for purposes of today's proceeding, simply so that

13  they are not publically accessible exhibits in this Court

14  record, but we would like them maintained under seal for any

09:38  15  appeal in this matter to be available for review by the

16  appellate court.

17          THE COURT:  So you want them filed but you don't want

18  me to consider them in making the ruling?

19          MR. PILCHAK:  No.  We would like you to consider them,

09:38  20  Your Honor, but we don't want them part of the public record.

21  Just as a sealed sentencing document would be available for the

22  Court to consider and available for any appellate court to --

23          THE COURT:  How would I ever refer to them in the

24  order?

09:39  25          MR. PILCHAK:  Well, you wouldn't be able to refer to

1    the specifics in the documents in the order, I suppose.

2              THE COURT:  Right.  I wouldn't at all.

3              MR. PILCHAK:  Well, I mean, I would imagine much like

4    a sentencing where there may be sentencing documents submitted

09:39   5    under seal, the Court could say, for example, I received 25

6    letters pertaining to the mental health but not describe the

7    specific diagnoses or conditions.

8              THE COURT:  I understand the concept, but, I guess, I

9    don't know how it is that you want me to rely on the documents

09:39   10   under seal, so why don't we wait.  I'll give you a chance at

11   the end of the presentation.  Then you can tell me how you want

12   me to consider the documents that are under seal, and it may be

13   that it is, you know, it can be done in summary fashion, that

14   it just doesn't really matter that I wouldn't need to refer to

09:39   15   any of the specifics in the documents, so we will take it as it

16   comes.

17             MR. PILCHAK:  Very well, Your Honor.

18             THE COURT:  Okay.

19             MR. PILCHAK:  The United States calls Border Patrol

09:39   20   Agent Steven Stypinski.

21             THE COURT:  Please come forward, sir.

22             THE CLERK:  Please raise your right hand.

23        (Oath administered.)

24             THE WITNESS:  So help me God.

09:40   25             THE CLERK:  Please take the stand.  Please state your

|  |  |  |
|---|---|---|
|  | 1 | full name for the record and spell your last name. |
|  | 2 | THE WITNESS:  Steven Mark Stypinski, |
|  | 3 | S-T-Y-P-I-N-S-K-I. |
|  | 4 | STEVEN STYPINSKI, |
| 09:41 | 5 | DIRECT EXAMINATION |
|  | 6 | BY MS. RO: |
|  | 7 | Q.  Good morning. |
|  | 8 | A.  Good morning. |
|  | 9 | Q.  What is your current occupation and assignment? |
| 09:41 | 10 | A.  US Border Patrol, Indio station. |
|  | 11 | Q.  And how long have you been a US Border Patrol agent? |
|  | 12 | A.  Just short of 14 years. |
|  | 13 | Q.  How long have you been assigned to the Indio station? |
|  | 14 | A.  The entire time. |
| 09:41 | 15 | Q.  And on a regular course of business what are your duties at |
|  | 16 | the Indio station? |
|  | 17 | A.  We have two immigration checkpoints at the Highway 86 and |
|  | 18 | 78, and we also have another smaller checkpoint on Highway 111. |
|  | 19 | We also work the surrounding areas. |
| 09:41 | 20 | Q.  Is Highway 86 a permanent checkpoint? |
|  | 21 | A.  Yes. |
|  | 22 | Q.  Does that mean it is always open? |
|  | 23 | A.  I've seen pictures of it that date back to the '50s. |
|  | 24 | Q.  Okay.  Showing -- if you could -- if I could direct your |
| 09:41 | 25 | attention to what has been marked as Government Exhibit |

```
         1   Number 1, there is a binder right in front of you.

         2   A.  Sure.  The aerial view?

         3   Q.  Yes.  And I'll ask you questions on what it is.  Are you at

         4   Exhibit 1?

09:42    5   A.  Yes.

         6   Q.  What is that an exhibit of?

         7   A.  It is an aerial view of the Highway 86 Checkpoint.

         8   Q.  How do you know that?

         9   A.  You can see the intersection of Highway 78.  I can easily

09:42   10   recognize the shoot, how the cone patterns come in.  There is a

        11   small trailer just south -- it is like a white, small trailer,

        12   that houses a camera system, to photo identify the license

        13   plates.

        14           MS. RO:  I'll stop you now.

09:42   15           Your Honor, if I may introduce Government Exhibit 1

        16   into evidence.

        17           THE COURT:  Any objection?

        18           MR. SCOTT:  No objection.

        19           THE COURT:  All right.  Received.

09:42   20       (Exhibit 1 was admitted.)

        21   BY MS. RO:

        22   Q.  And is this a fair and accurate depiction of what you just

        23   described?

        24   A.  Yes.

09:43   25   Q.  Directing your attention to Government Exhibit 2, do you
```

1      see that?  Are you on that page?

2      A.   Yes.

3      Q.   And what is that an exhibit of?

4      A.   That would be the view of a driver approaching the Primary

09:43   5      Inspection, kind of where the Preprimary starts.

6      Q.   And how do you recognize that?

7      A.   It is the same as I've seen for years and years and years.

8      Q.   This is a fair and accurate depiction of what you've seen

9      year after year of the Primary Inspection area?

09:43  10      A.   Yes, uh-huh.

11           MS. RO:  Your Honor, if I may introduce Government

12      Exhibit 2 into evidence.

13           THE COURT:  Any objection?

14           MR. SCOTT:  No objection.

09:43  15           THE COURT:  Received.

16      (Exhibit 2 was admitted.)

17      BY MS. RO:

18      Q.   And that is what you just described?

19      A.   Correct.

09:43  20      Q.   If I can direct your attention to Government Exhibit

21      Number 3 in the binder, what is that?

22      A.   This is a camera view of pretty much the opposite,

23      180 degrees of what we just saw.

24      Q.   And how do you recognize that?

09:44  25      A.   It is -- it is the same as every day that I show up to the

9

1    Highway 86 Checkpoint.

2    Q.   And would that also be a fair and accurate depiction of the

3    Preprimary inspection area?

4    A.   Yes.

09:44   5         MS. RO:  If I may introduce Exhibit Number 3 into

6    evidence.

7              THE COURT:  Any objection?

8              MR. SCOTT:  No, Your Honor.

9              THE COURT:  Received.

12:36  10        (Exhibit 3 was admitted.)

11   BY MS. RO:

12   Q.   Is that the photograph you just described?

13   A.   Correct.

14   Q.   And what are your duties specifically at the Highway 86

09:44  15   Checkpoint at the Preprimary inspection area?

16   A.   The Preprimary inspection area is for canine handlers.  It

17   is so that the dog can smell the cars as it approaches the

18   Preprimary inspection -- Primary Inspection area.  The person

19   with the dog would obviously be the canine handler, and then

09:45  20   the passes -- as the vehicle passes and then the Primary agent

21   would take over questioning immigration.

22   Q.   And what would the duties at the Primary Inspection be?

23   A.   Immigration, to figure out the immigration status of all

24   the occupants of the vehicle.

09:45  25   Q.   And what about Secondary?

1    A.   Secondary is if you have any additional questions, that --

2    because of the volume of traffic that goes through the Highway

3    86 Checkpoint, you would Secondary them in order to continue

4    the investigation.

09:45    5    Q.   And directing your attention to Government Exhibit

6    Number 4, what is that an exhibit of?

7    A.   That is a picture of Secondary Inspection.

8    Q.   How do you recognize that to be the Secondary Inspection

9    area?

09:46   10    A.   It is exactly as it looks.

11    Q.   Is it a fair and accurate depiction of what you --

12    A.   Yes.

13         MS. RO:   Your Honor, if I may introduce Exhibit

14    Number 4 into evidence.

09:46   15         THE COURT:   Any objection?

16         MR. SCOTT:   No, Your Honor.

17         THE COURT:   Received.

18    (Exhibit 4 was admitted.)

19    BY MS. RO:

09:46   20    Q.   So this is a fair and accurate depiction of the Secondary

21    Inspection area?

22    A.   Yes, it is.

23    Q.   Do you know approximately how many vehicles go through the

24    Highway 86 Checkpoint on, let's say, a daily basis?

09:46   25    A.   Just short of 5,000, average.  1.8 annually with, I

|        |    |                                                                         |
|--------|----|-------------------------------------------------------------------------|
|        | 1  | believe, a six percent increase annually.                               |
|        | 2  | Q.   Okay.  And approximately how much time do you spend on each         |
|        | 3  | vehicle that passes through the checkpoint, if you know?                |
|        | 4  | A.   Yeah.  I believe I remember reading a memo that on an easy          |
| 09:46  | 5  | day, a low traffic day, 10 seconds a car was the average.               |
|        | 6  | Q.   Okay.  And were you --                                             |
|        | 7  | A.   That is excessive though.  You can't do that on every car.         |
|        | 8  | Q.   And were you working as a Border Patrol agent at the               |
|        | 9  | Highway 86 Checkpoint on February 28th, 2015?                           |
| 09:47  | 10 | A.   Yes, I was.                                                        |
|        | 11 | Q.   And were you working on that date at approximately 8:30 PM?         |
|        | 12 | A.   Yes.                                                               |
|        | 13 | Q.   And on that date and time were you working at the Primary,         |
|        | 14 | Preprimary, or Secondary Inspection area?                               |
| 09:47  | 15 | A.   Primary Inspection area.                                          |
|        | 16 | Q.   Do you know if there are any surveillance videos at the            |
|        | 17 | checkpoint?                                                              |
|        | 18 | A.   Yes.                                                               |
|        | 19 | Q.   Does it record audio?                                              |
| 09:47  | 20 | A.   Not that I know of.                                                |
|        | 21 | Q.   I am going to show you what has been marked as Government           |
|        | 22 | Exhibit 5.  It is the actual CD and is not in your binder.              |
|        | 23 |      Your Honor, if I may approach the witness?                         |
|        | 24 |           THE COURT:  Yes.                                               |
| 09:48  | 25 | BY MS. RO:                                                               |

1   Q.   Showing you what has been premarked as Government

2   Exhibit 5, what is that an exhibit of?

3   A.   That is the DVD, CD of the videos taken from Highway 86

4   Checkpoint.  I notice my initials.

09:48    5   Q.   So you recognize this because these are your initials?

6   A.   Yes.  Yes, they are.

7   Q.   So how have you viewed this video DVD?

8   A.   Yes.

9   Q.   And what is the video of?

09:48   10   A.   It is, I believe, three different camera angles of the

11   incident.

12   Q.   Is it a fair and accurate depiction of the three camera

13   angles on that date and time you just spoke about?

14   A.   Yes.

09:48   15         MS. RO:  Would the Court like to see the actual CD?

16         THE COURT:  No.  I accept your representation, and

17   that is Exhibit --

18         MS. RO:  Exhibit Number 5, Your Honor.

19         THE COURT:  All right.

09:48   20         MS. RO:  Your Honor, I wanted to show the witness

21   clips that is on this CD, but they are actually on Sanction.

22   Would the Court or defense counsel have an objection if we use

23   the Sanction?

24         THE COURT:  No, that is fine.  Are you showing us the

09:49   25   entire CD?

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | MS. RO:  Yes.  There are three clips on the CD.              |
|       | 2  | THE COURT:  So you are going to show us everything           |
|       | 3  | that is on Exhibit 5?                                         |
|       | 4  | MS. RO:  Yes, Your Honor.                                     |
| 09:49 | 5  | BY MS. RO:                                                    |
|       | 6  | Q.  So we're going to set up Camera 13, and we're going to play |
|       | 7  | that.                                                         |
|       | 8  | Do you recognize the individual on the screen?               |
|       | 9  | A.  Yeah.  I am -- I am doing the Preprimary -- Primary       |
| 09:49 | 10 | position right there.                                        |
|       | 11 | Q.  That is you?                                              |
|       | 12 | A.  Uh-huh.                                                   |
|       | 13 | Q.  Okay.  If we could continue playing.  And if we could stop |
|       | 14 | right here.  Thank you.                                       |
| 09:50 | 15 | And do you recognize this vehicle?                           |
|       | 16 | A.  Yes, I do.                                                |
|       | 17 | Q.  What is that?                                             |
|       | 18 | A.  That is the black Jetta that the defendant was driving.  |
|       | 19 | Q.  We'll play it a little bit to the 31:02 mark.  Right here |
| 09:50 | 20 | is good.  Thank you.                                          |
|       | 21 | And did you make contact with the driver?                   |
|       | 22 | A.  Yes, I did.                                               |
|       | 23 | Q.  Please take a look around the courtroom.  Do you see the |
|       | 24 | driver in court today?                                        |
| 09:50 | 25 | A.  Yes.                                                      |

```
          1    Q.  Can you please identify where that person is sitting and

          2    what item of clothing that person is wearing.

          3    A.  He has a blue striped shirt, open collar.

          4          MS. RO:  Your Honor, may the record reflect that the

09:50     5    witness has identified the defendant, Mr. Summers?

          6          THE COURT:  Yes.

          7    BY MS. RO:

          8    Q.  What are you asking him at that point?

          9    A.  I always state, US Border Patrol.  I would have asked him,

09:50    10    of what country is he a citizen.  I may or may not have asked

         11    to have him roll down the window.  Hey, would you -- could you

         12    roll down the window?  And then I would have asked him -- I

         13    might have asked him of what country is he a citizen first, or

         14    I might have asked him to roll down the window first.  I don't

09:51    15    remember.

         16    Q.  When you are asking him these things, are you yelling, your

         17    voice?

         18    A.  No.

         19    Q.  Are you demanding him --

09:51    20    A.  Absolutely not.

         21    Q.  -- what citizenship status?

         22       How many people do you see in the vehicle at that point?

         23    A.  There is two, the front -- the front driver, Mr. Summers,

         24    and his son in the passenger seat, front passenger seat.

09:51    25    Q.  Front passenger seat.
```

1     If we could continue playing it, and stop at the 31:03

2 mark.

3     At this point -- actually, if you could play it a little

4 bit more.  I apologize.  At this point -- if can you stop

09:52  5 here -- what are you asking the defendant to do?

6 A.  It probably would have been the point -- I am not

7 100 percent sure if Miranda had already asked me if he could

8 open his trunk.

9 Q.  Okay.  Would it help if I replayed it a little further?

09:52 10 A.  Yeah, I -- I -- my point of view is just pretty much

11 looking at the driver, so I don't really remember where exactly

12 Miranda was when he asked me, hey, can you have him open the

13 trunk?

14 Q.  Okay.  But around this time you did --

09:52 15 A.  Uh-huh, yeah.

16 Q.  -- ask the defendant to open his trunk?

17     And how did you ask him?

18 A.  I don't remember the exact words.  It was probably

19 something like, Can you open the trunk, can I search the trunk,

09:52 20 along those lines.

21 Q.  And at that point did you raise your voice?

22 A.  No.

23 Q.  Demand him to open the trunk?

24 A.  I probably haven't raised my voice at the 86 checkpoint in

09:52 25 probably 10 or 15 years.

1    Q.   Do you have a gun, a firearm when you are at the

2    checkpoint?

3    A.   Yes, I do.

4    Q.   Did you point your gun or firearm at him?

09:53  5    A.   Absolutely no, no -- I haven't -- I haven't pulled my gun

6    out at the Highway 86 Checkpoint since 2005.  It has always

7    been in the holster.  I don't unholster it.  It just sits

8    there.

9    Q.   Okay.  And do you recall if the defendant said anything or

09:53  10   do anything to respond to you in regards to the trunk?

11   A.   Yeah.  He moved toward the lower passenger -- front

12   driver's door.  I have a trunk release on mine.  That is where

13   mine is.  When I asked him to open the trunk, he motioned

14   toward the -- where my trunk release is in my cars.

09:53  15   Q.   Okay.  And let me just play the rest of the video to the

16   20:31:33 mark.  Let me stop right there actually.

17       Do you see -- who is that a photo of -- a video of besides

18   you right there?

19   A.   It is Aaron Miranda and his canine partner.

09:54  20   Q.   And at that point what is going on in that video?

21   A.   I am pretty much just looking ahead.  At this point I

22   believe Agent Miranda had asked me, can you have him open the

23   trunk?  And it looks like Miranda is trying to see if there is

24   a rear trunk release or if there is a locking mechanism on the

09:54  25   trunk.

1    Q.   Okay.  If we could just continue to play it.  If we could

2    stop right there.

3         So what we just observed, is it fair to say that is when

4    you saw the defendant reach to the side trying to -- what

09:55  5    looked -- appeared to you to be opening the trunk?

6    A.   He did.  He already did it multiple times.

7    Q.   And you mentioned that it looked like or appeared that

8    Agent Miranda was trying to open the trunk.

9    A.   Uh-huh.

09:55  10   Q.   Is it possible to forcefully open the trunk just from the

11   outside?

12   A.   Not without tools.  Not too long ago I had to -- when a

13   vehicle was secondaried, the passengers kicked the rear

14   taillights out, and -- wanting to get out of the trunk, and it

09:55  15   took us about at least a half hour, 45 minutes of attempting to

16   -- with tools at the checkpoint to open the trunk because the

17   driver had disabled the interior opening mechanism.

18   Q.   So --

19   A.   -- and the trunk release.

09:56  20   Q.   So without someone from inside the car to release the

21   trunk, there is no way for someone on the outside to try to

22   physically manually open the trunk themselves?

23   A.   No.  I tried with the crowbars and -- that way.

24   Q.   Okay.  If we could put up Camera 14, and as it is playing

09:56  25   to the -- for a while.

          1        What is this a visual of?

          2   A.   This is a video from the checkpoint, another camera view.

          3   Q.   Okay.

          4   A.   Canine Miranda's dog just went to the trunk of the vehicle.

09:56     5   The driver approached Primary and --

          6   Q.   I'm sorry to interrupt you.  We're going to stop the clip

          7   right here.

          8        And so a person on -- it would be my right, I think it --

          9   it would be your right as well, is that you?

09:57    10   A.   Yes.

         11   Q.   And the person on the left holding what appears to look

         12   like a canine, is that Agent Miranda?

         13   A.   Yes, it is.

         14   Q.   And the vehicle in question right now, is that the

09:57    15   defendant's vehicle but just at a different angle?

         16   A.   Yeah, it appears to be.

         17   Q.   Did Agent Miranda and the canine stop or alert at the two

         18   previous vehicles before this?

         19        MR. SCOTT:  Objection, lack of foundation.

09:57    20        THE COURT:  Overruled.  You can answer.

         21        THE WITNESS:  Okay.  I can't -- I was a canine handler

         22   for three years, and there is no way I could tell.  I mean,

         23   obviously, the dog sniffed the vehicle, but the only person

         24   that can say the dog alerted is either the handler or a

09:58    25   certified instructor.  I would say the dog looked like he

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 09:58 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 09:58 | 10 |

1   smelled the trunk which he didn't on the other previous

2   vehicles.

3   BY MS. RO:

4   Q.  I'll stop you there.  I should have asked that question

5   differently.

6        Did Agent Miranda ask you to ask other vehicles to stop and

7   open their trunk based on an alert that he perceived from his

8   canine dog?

9   A.  No, absolutely not.

10  Q.  And I am going to show you Camera 15, and what is that a

11  visual of?

12  A.  Secondary Inspection.  That is the black Jetta driven by

13  Summers.

14  Q.  Okay.  And we can stop -- actually, who is this individual

15  walking over, if you know?

16  A.  Looks like Miranda, but it is a horrible video.

17  Q.  Okay.  So you don't know from this video?

18  A.  I would say Miranda -- I'm sorry.  Hanna.

19  Q.  Hanna, okay.  We can stop the video here.

20       But that is of the Secondary Inspection there?

21  A.  Yeah, yeah.  That would be Hanna.  Sorry.

22            MS. RO:  No further questions on direct.

23            THE COURT:  All right.  Cross-examination, Counsel.

24            MR. SCOTT:  Yes, Your Honor.

25                        CROSS EXAMINATION

1    BY MR. SCOTT:

2    Q.   Good morning, sir.

3    A.   Good morning.

4    Q.   I want to kind of set the scene.  I've put on the screen

09:59  5    what I believe is Government Exhibit 2.  Is that --

6    A.   Yes, it is.

7    Q.   All right.  And you recognize that as a depiction looking

8    at the Primary Inspection area, the Highway 86 Checkpoint?

9    A.   Yes, it is.

10:00  10   Q.   And where the two gentleman are standing there to the left

11   of the red truck, that is approximately the area where you were

12   standing when you encountered Mr. Summers; is that correct?

13   A.   More or less.

14   Q.   You may have been closer to where the back most person was

10:00  15   behind the stop sign; is that right?

16   A.   Yeah.  I try to generally stand around the stop sign.

17   Q.   All right.  Now, those stop signs were there when

18   Mr. Summers approached the checkpoint; is that right?

19   A.   Yes.

10:00  20   Q.   Now, you would agree with me that by definition when a

21   person approaches that stop sign, they are required to stop at

22   it?

23   A.   Yes.

24   Q.   A person is not free to sort of wave their hand at you and

10:00  25   blow through the checkpoint, are they?

1   A.   It has happened a lot, but generally speaking most -- the

2   majority of the people stop.

3   Q.   Well, they are supposed to stop?

4   A.   Not all vehicles stop.  Some are waved for -- because of

10:01   5   traffic.

6   Q.   All right.  Suffice it to say that when you are standing

7   there and not waving somebody through, they are supposed to

8   stop?

9   A.   Yes.

10:01   10   Q.   All right.  You were in full uniform the day you

11   encountered Mr. Summers?

12   A.   Yes.

13   Q.   That median that is on the right-hand side was present that

14   day as well?

10:01   15   A.   The big white one?

16   Q.   Yes, sir.

17   A.   Yes, sir, uh-huh.

18   Q.   A person couldn't go around the checkpoint if they chose

19   to?

10:01   20   A.   You could go around the checkpoint through the cones.

21   There is, I don't know, a ton of cones leading up to the

22   Highway 86 Checkpoint.  You can see them from the aerial view

23   in Exhibit Number 1.  That has happened a lot.  It hasn't

24   happened a lot in the immediate past.

10:01   25   Q.   Fair to say people aren't supposed to do that either?

```
        1   A.   No.

        2   Q.   It has happened but --

        3   A.   A lot.

        4   Q.   -- but they are not supposed to?

10:01   5   A.   No.

        6   Q.   All right.  Now, you said that when you first encountered

        7   the car, you introduced yourself as a Border Patrol officer or

        8   agent?

        9   A.   Yeah, yes.

10:02  10   Q.   Why do you do that?

       11   A.   That is what I was taught.

       12   Q.   All right.  So you make clear that you are --

       13   A.   US Border Patrol.

       14   Q.   And that you have authority to be there; right?

10:02  15   A.   Yes.

       16   Q.   And then sometimes you ask them to roll the window down?

       17   A.   Yeah.  I try to on most cases, time concerning.

       18   Q.   And in this case, did you asked Mr. Summers to roll the

       19   window down?

10:02  20   A.   Yeah.

       21   Q.   In fact, then you pointed at the back window and had

       22   Mr. Summers roll down the back window as well; right?

       23   A.   Uh-huh.

       24        THE COURT:  Is that a "yes"?

10:02  25        THE WITNESS:  Yes.
```

1  BY MR. SCOTT:

2  Q.  After you introduced yourself as a Border Patrol agent, you

3  also asked him about his citizenship?

4  A.  Correct.

10:02  5  Q.  Are you a US citizen or words to that effect?

6  A.  I would probably say, 99 percent of the time, of what

7  country are you a citizen?

8  Q.  Okay.

9  A.  That is how I was taught to do it.

10:03  10  Q.  All right.  So by whichever words you chose, you inquired

11  about his citizenship?

12  A.  Uh-huh, yes.

13  Q.  And he answered you?

14  A.  Yes.

10:03  15  Q.  And then you said that Miranda asked you to have him open

16  the trunk; right?

17  A.  Correct.

18  Q.  Now, the words that Miranda used, did he say, have him open

19  the trunk or have him pop the trunk?  Was it words to that

10:03  20  effect?

21  A.  I don't remember.  It would have been, can you have him

22  open the trunk, something along those lines.

23  Q.  All right.  And you interpreted that as Miranda asking you

24  to get him to open the trunk?

10:03  25  A.  Just asking him to open the trunk, sure.

1    Q.   So you said to Mr. Summers what exactly, pop the trunk?

2    A.   I don't remember the exact words.

3    Q.   May it have been the words, can you pop the trunk?

4    A.   I don't say "pop" too often, so it could have been, can you

10:04   5    open the trunk, may you open the trunk -- probably not "may" --

6    something along those lines.

7    Q.   Okay.  Is it fair to say, sir, can we agree that you didn't

8    say, sir, may I have consent to look in your trunk?  That

9    didn't happen, did it?

10:04  10    A.   I might have said can I -- can we search the trunk, but

11    that -- I would never have asked for -- do I have consent for.

12    That is just not something that I normally --

13    Q.   And to be fair, as you sit here probably you didn't say,

14    may I search the trunk?  As you sit here, it is more likely you

10:04  15    said, can you open the trunk, or words to that effect; is that

16    fair to say?

17    A.   Correct.

18    Q.   Okay.  You didn't say -- can we agree that you didn't say,

19    now, it is your choice, you can say no.  You didn't warn

10:04  20    Mr. Summers about that, did you?

21    A.   About what?

22    Q.   Did you ever tell Mr. Summers, you know, you don't have to

23    open the trunk if you don't want to?

24    A.   No, I didn't say that.

10:05  25    Q.   All right.  Did Mr. Summers ever argue with you?

1   A.  After he stated, US citizen, he didn't say anything.

2   Q.  Is it fair to say he pretty much did what he was told or

3   tried to apparently?

4           MS. RO:  Objection, Your Honor, misstates the

10:05   5   testimony of being told.

6           THE COURT:  Overruled.  You can answer.

7           THE WITNESS:  What was the question?

8   BY MR. SCOTT:

9   Q.  Did he appear to try to do what he was told?  Did he try to

10:05   10   pop the trunk?

11   A.  In hindsight, no.

12   Q.  Okay.  What did it look like to you?

13   A.  It looked like he was going for the trunk release.

14   Q.  Okay.  Did he -- okay.  And did he answer all the questions

10:06   15   that you asked him?

16   A.  I believe so.  I think the only question I asked him was,

17   what country are you a citizen, and can you open the trunk, and

18   -- probably multiple different versions.

19   Q.  What was the last part?

10:06   20   A.  Multiple.  I asked him a couple times, did it open --

21   Q.  What do you mean you tried multiple different versions?

22   A.  Well, when he -- when he -- when Agent Miranda asked me to

23   have him open the trunk, I would have responded after he went

24   down.  I could have said, did it open, or is it broken?  I

10:06   25   don't remember what I said.

|  |  |
|---|---|
|  | 1 |
|  | 2 |
|  | 3 |
|  | 4 |
| 10:07 | 5 |
|  | 6 |
|  | 7 |
|  | 8 |
|  | 9 |
| 10:07 | 10 |
|  | 11 |
|  | 12 |
|  | 13 |
|  | 14 |
| 10:08 | 15 |
|  | 16 |
|  | 17 |
|  | 18 |
|  | 19 |
| 10:08 | 20 |
|  | 21 |
|  | 22 |
|  | 23 |
|  | 24 |
| 10:08 | 25 |

1    Q.  All right.  Fair to say you asked him more than once to

2    open the trunk?

3    A.  Might have, yeah.

4              MR. SCOTT:  Okay.  That's all I have.  Thank you.

5              THE COURT:  Any redirect, Counsel?

6              MS. RO:  No, Your Honor.

7              THE COURT:  May the witness be excused?

8              MS. RO:  Yes, Your Honor.

9              THE COURT:  You may step down, Agent.  Thank you, sir.

10              THE WITNESS:  Thank you.

11              THE COURT:  Please call your next witness.

12              MS. RO:  The United States will call Agent Eric Hanna.

13              THE CLERK:  Please raise your right hand.

14         (Oath administered.)

15              THE WITNESS:  Yes.

16              THE CLERK:  Please take the stand.  Please state your

17    full name for the record and spell your last name.

18              THE WITNESS:  May I sit?

19              THE COURT:  Yes.

20              THE WITNESS:  Eric Adam Hanna, H-A-N-N-A.

21                      ERIC HANNA,

22                  DIRECT EXAMINATION

23    BY MS. RO:

24    Q.  Good morning, Agent Hanna.

25    A.  Good morning.

1    Q.   Where do you work?

2    A.   Indio station, United States Border Patrol.

3    Q.   Are you a Border Patrol agent at the Indio station?

4    A.   That is correct.

10:08  5    Q.   And how long have you been a Border Patrol agent?

6    A.   This next March will be 10 years.

7    Q.   And how long have you been assigned to the Indio station?

8    A.   Nearly the duration of those 10 years.

9    Q.   And on a regular course of business, what are your duties

10:08  10   at the Indio station?

11   A.   Our Primary responsibilities are the operation of the two

12   immigration checkpoints.

13   Q.   And where are those two immigration checkpoints?

14   A.   They are located approximately 45 miles in a generally

10:09  15   southerly direction from Indio.

16   Q.   And what would that checkpoint -- do they have a specific

17   name for the checkpoint?  For example, is it on the Highway 86

18   Checkpoint?

19   A.   Yeah, we determine each one based upon the highway that

10:09  20   they are on.  So one would be considered Highway 86 Checkpoint.

21   The other would be called Highway 111 Checkpoint.

22   Q.   And what are your duties specifically at the Highway 86

23   Checkpoint?

24   A.   We perform immigration inspections of the vehicles that are

10:09  25   moving north from the border area.

1   Q.  And are there -- are they separated into different

2   inspection points, for example, Primary, Preprimary and

3   Secondary inspections?

4   A.  They are.  The initial agent that you would speak with is

10:10   5   considered Primary Inspection, and if a further inspection

6   would be needed, then they would be referred over to Secondary

7   Inspection.

8   Q.  And you've worked at each inspection area before in your

9   career?

10:10   10   A.  Yes, I have.

11   Q.  And on February 28th, 2015, were you working as a Border

12   Patrol agent at the Highway 86 Checkpoint?

13   A.  Yes, I was.

14   Q.  And on that date were you working at approximately 8:00 PM

10:10   15   in the evening?

16   A.  Yes, I was.

17   Q.  And on that date and time were you working at Preprimary,

18   Primary or Secondary Inspection?

19   A.  I would have been in a Secondary Inspection type of

10:11   20   operation.

21   Q.  Okay.  And I am going to play for you what has already been

22   introduced as Government Exhibit 5.  It is specifically Camera

23   15.

24       Pause right there.

10:11   25       What is this area a visual depiction of?

```
       1   A.   That is an image of our Secondary Inspection area.

       2   Q.   Okay.  And we'll play it until the 47 second mark.

       3        Can you see who that individual is that is walking in that

       4   direction towards the vehicle?

10:11  5   A.   Yes.

       6   Q.   And who is that of?

       7   A.   It appears to be me.

       8   Q.   If we could play -- if we could stop right there.

       9        Were you running towards the vehicle?

10:12  10  A.   I was not.

       11  Q.   Do you have a firearm or a taser, any type of weapons when

       12  you are on your shift?

       13  A.   I did.

       14  Q.   Were you running and had your gun out or drawn out in any

10:12  15  capacity from what you just observed?

       16  A.   No.

       17  Q.   And is it unusual for a vehicle to be parked in that

       18  direction when they are asked to go to Secondary?

       19  A.   It certainly is not typical.

10:12  20  Q.   And are -- is it safe to say that what has been marked the

       21  white lines, those are the designated parking areas for

       22  vehicles that are directed to Secondary?

       23  A.   Yeah.  The spots are clearly designated.

       24  Q.   If we could play the video clip to 32:05.

10:13  25       And did you make contact with the individual in that
```

1    vehicle?

2    A.   With the driver.

3    Q.   The driver, yes.   Please take a look around the courtroom.

4    Do you see the driver of that vehicle today?

10:13    5    A.   I do.

6    Q.   And can you identify what -- where that person is sitting

7    and what item of clothing that person is wearing?

8    A.   The individual is sitting over at this table wearing a blue

9    striped shirt.

10:13    10           MS. RO:   Your Honor, may the record reflect that the

11   witness has identified the defendant?

12           THE COURT:   He has.

13   BY MS. RO:

14   Q.   Did you speak with the defendant?

10:13    15   A.   I did.

16   Q.   What did you tell the defendant, or what did you speak

17   about with the defendant?

18   A.   I would have initially greeted the driver, and then it is

19   my general practice to ask if they are able to open the trunk

10:13    20   from there.

21   Q.   Did you draw your gun when you asked him to open the trunk?

22   A.   No.

23   Q.   Draw a taser of any sort?

24   A.   No.

10:14    25   Q.   Did you demand him to open the trunk?

1    A.   No.

2    Q.   And what is your general practice when you ask people at

3    Secondary to open their trunk?

4    A.   It is in a form of a request, along the lines of, are you

10:14    5    able to open the trunk from there?

6    Q.   And do you recall how the defendant reacted or responded to

7    your question?

8    A.   The response was the raising of what appeared to be the key

9    fob.

10:14   10    Q.   Okay.  We'll play the video clip until 32:09, just four

11    more seconds.  Okay.  Stop.

12         And you stepped away from the driver's side of the window;

13    correct?

14    A.   I did.

10:15   15    Q.   At that point in time did you put handcuffs on him?

16    A.   No.

17    Q.   Did you arrest him at any point before the trunk was open?

18    A.   No.

19    Q.   And if we could continue playing to the 25 second mark.

10:15   20         So at this point you see him using the key fob?

21    A.   That is correct.

22    Q.   And if we could stop right here.

23         And did you manually open the trunk in some way when you

24    were walking to the back of the vehicle?

10:15   25    A.   The trunk was released automatically, and it raised on it's

1    own.

2    Q.   So it was released from the driver?

3    A.   Correct.

4    Q.   And what did you observe at that point?

10:15   5    A.   When I stepped to the rear, that is when I observed two

6    persons lying in the trunk area.

7    Q.   And what did you do next after you observed the two people

8    inside the trunk?

9    A.   I walked back up to the driver's side door.

10:16   10   Q.   And we'll play it so you can observe that as well.

11   A.   I ordered the driver out of the vehicle.  The driver

12   complied, and I then placed handcuffs from the rear, and then I

13   would have performed a quick Terry frisk for weapons.

14   Q.   Okay.  We'll stop right there.

10:16   15       So at that point you ordered him and you arrested him at

16   that point; correct?

17   A.   That is correct.

18   Q.   And any time you before you saw the two individuals in the

19   trunk did you arrest him?

10:16   20   A.   No.

21             MS. RO:  No further questions.

22             THE COURT:  Cross-examination, Counsel.

23             MR. SCOTT:  Yes, Your Honor.

24                       CROSS-EXAMINATION

10:16   25   BY MR. SCOTT:

1    Q.   Good morning, sir.

2    A.   Good morning.

3    Q.   A couple times on direct you said "my general practice is"

4    or "I usually would have," phrases like that.  You understand

10:17   5    what I am --

6    A.   Yes.

7    Q.   -- what I am speaking of?

8         Are you using those phrases because there are many, many

9    events that happen at the checkpoint and you sort of have a

10:17   10   general practice that you apply to each?

11   A.   I think that is fair to say.

12   Q.   Are you using that language because you don't remember the

13   exact words that were used on this particular occasion and so

14   you are relying on the general practice?

10:17   15   A.   Without being able to recall the exact words, I can fill --

16   I can be confident that they were close to what I testified to

17   earlier.

18   Q.   Okay.  So I thought I heard you just say, without

19   remembering the exact words.  Do you remember the exact words

10:17   20   as you sit here today?

21   A.   As I said, it was -- my practice is asking in the form of a

22   request:  Are you able to open the trunk from there, or are you

23   able to open the trunk?

24   Q.   Okay.  Do you remember -- do you have a specific memory of

10:18   25   the exact words that you said, or are you relying on your

1  general practice, that is the question?

2  A.  I am relying on general practice.

3  Q.  Okay.  Now, so to go to the general practice, it would have

4  been, in your view, are you able to open the trunk, or can you

10:18   5  open the trunk from there, or words to that effect; is that

6  fair?

7  A.  Fair.

8  Q.  Now, to be fair, doesn't that sort of presuppose that he is

9  supposed to be opening the trunk?

10:18  10  A.  I wouldn't think so because it is in the form of a request

11  and a question.

12  Q.  Well, the question is as you put it, are you able to do it

13  from there, are you physically able to get the trunk open;

14  right?

10:19  15  A.  Yes.

16  Q.  Would you agree with me that you never presented him with

17  the option and said, you know, you don't have to open the trunk

18  if you don't want to, sir?  You never said words like that, did

19  you?

10:19  20  A.  That is correct.

21  Q.  All right.  You never used the words consent, may I have

22  consent to open the trunk or, anything like that?

23  A.  That is correct.

24  Q.  All right.

10:19  25          MR. SCOTT:  All right.  That is all I have.

1           Thank you, sir.

2           THE COURT:  Any redirect, Counsel?

3           MS. RO:  No, Your Honor.

4           THE COURT:  May the witness be excused?

10:19   5           MS. RO:  Yes.

6           THE COURT:  You may step down, Agent.  Thank you, sir.

7           Please call your next witness.

8           MR. PILCHAK:  The United States calls Border Patrol

9   Agent Aaron Miranda.

10:19   10          Your Honor, does your binder have a copy of the

11  exhibit list on the front?

12          THE COURT:  Yes.

13          MR. PILCHAK:  Thank you, Your Honor.

14          THE CLERK:  Please raise your right hand.

10:20   15      (Oath administered.)

16          THE WITNESS:  I do.

17          THE CLERK:  Please take the stand.  Please state your

18  full name for the record and spell your last name.

19          THE WITNESS:  Aaron Miranda, M-I-R-A-N-D-A.

10:20   20                      AARON MIRANDA,

21                      DIRECT EXAMINATION

22  BY MR. PILCHAK:

23  Q.  Good morning, Agent Miranda.

24  A.  Good morning.

10:21   25  Q.  Where are you employed, please?

1    A.   I am with the United States Border Patrol in Indio,

2    California.

3    Q.   How long have you worked with Border Patrol?

4    A.   Just under 10 years.

10:21  5    Q.   And I think you said you are assigned in Indio.  Where do

6    you typically work in Indio Sector?

7    A.   The Highway 86 Checkpoint, near Westmoreland, California.

8    Q.   Do you work anywhere else?

9    A.   I do.  Sometimes I work the 856 Checkpoint on 111 on the

10:21  10   other side of the Salton Sea.  Mainly I spend my time there at

11   the Highway 86 Checkpoint.

12   Q.   Okay.  Did you receive training to become a Border Patrol

13   agent?

14   A.   I did.

10:21  15   Q.   Can you describe that training for the Court?

16   A.   Yes.  It is a five-month course.  I think they changed it

17   up over the years, but, you know, you go over firearms, you

18   know, law.  You also go through, like, Spanish, all kinds of

19   things that you do.

10:21  20   Q.   Do you receive training on interacting with subjects at the

21   checkpoint?

22   A.   Yes, you do.

23   Q.   What is eliciting consent at the checkpoint?

24   A.   Yes.

10:22  25   Q.   Do you have a different role in Border Patrol now besides a

1   Border Patrol field agent?

2   A.   Yeah.   I am a canine handler as well.

3   Q.   How long have you been a canine handler?

4   A.   Around five years.

10:22   5   Q.   And when an agent becomes a canine handler, do you receive

6   additional training?

7   A.   Yeah.   There is a -- in El Paso, the canine facility there,

8   there is an eight-week course that you take.

9   Q.   And in this eight-week course what sorts of subjects are

10:22   10   covered?

11   A.   Well, we run different aids with the dogs.   It is concealed

12   humans, marijuana, heroin, methamphetamines, cocaine, and all

13   the derivatives of those drugs, and they are placed in

14   different locations, and on a daily basis we're running

10:22   15   different scenarios with those odors.

16   Q.   So there is practical training with the dogs?

17   A.   Correct.

18   Q.   Is there a classroom component as well?

19   A.   Yes, yes.   There is a test that you have to take, and you

10:23   20   go over all the material, all that stuff.

21   Q.   Does that facility or training process have a name, by the

22   way?

23   A.   Well, it used to be NCF, and I think now they call it --

24   they just call it the Canine Facility El Paso, I believe,

10:23   25   like --

```
        1   Q.   And to back up a little bit, before you went to the

        2   training, were you selected as a canine handler?

        3   A.   Yes, I was.

        4   Q.   Can you describe the process of being selected as a canine

10:23   5   handler?

        6   A.   Yeah.  I had to submit a memo, and there is -- I don't know

        7   how many people applied, like, maybe 18 people, and then they

        8   went through the memos, and you had to go through an interview,

        9   and then they selected that way.

10:23  10   Q.   Okay.  Do you currently work with a canine?

       11   A.   I do.

       12   Q.   What is the name of that dog?

       13   A.   His name is Boeli.

       14   Q.   B-O-E-L-I?

10:23  15   A.   That's correct.

       16   Q.   When did you start working with Boeli?

       17   A.   About five years ago.

       18   Q.   What kind of dog is Boeli?

       19   A.   She is a German Shorthaired Pointer.

10:23  20   Q.   And do you know if there was a process for Boeli to be

       21   selected as a canine?

       22   A.   Yes, there is.

       23   Q.   What do you know about the process, if anything?

       24   A.   I know a little bit about it.  I know that they look for

10:24  25   different traits in dogs, and they have to go through certain
```

1    different scenarios as well to get selected for them to come

2    in.

3    Q.   So it is a competitive process for you and a competitive

4    process for the dog?

10:24   5    A.   Correct.

6    Q.   Did you participate in training with Boeli in particular?

7    A.   Yes.

8    Q.   And has -- is that the sort of training that we just

9    discussed with the training aids and the practical

10:24   10   environments?

11   A.   Correct.

12   Q.   Okay.  Now, has Boeli in the field in live -- what would

13   you call it, deployment at the checkpoint?  Do you have a word

14   to describe when you are out doing your job as opposed to doing

10:24   15   training?

16   A.   Out in the field, I suppose.

17   Q.   And in the field has Boeli always worked with you?

18   A.   That's correct.

19   Q.   So Boeli has never worked with another handler?

10:24   20   A.   No.

21   Q.   And have you always worked with Boeli as a canine handler?

22   A.   Correct.

23   Q.   So you never worked with another dog?

24   A.   No, I have not.

10:25   25   Q.   Okay.  I want to talk a bit more specifically about what

1    you and Boeli are trained to do.  What is it specifically that

2    Boeli is trained to find or detect?

3    A.   Like I said, it is concealed humans, also marijuana,

4    methamphetamines, cocaine, heroin, and all the derivatives of

10:25    5    those odors.

6    Q.   And how does Boeli find those things?

7    A.   Well, they train up the dogs, you know, at the -- in the El

8    Paso.  I don't know exactly how they go about training those

9    odors.  They place them -- I don't know how the beginning of it

10:25   10    is, but I know that they -- they -- they -- the toy to them is

11    what they are looking for at the end of the day, so they relate

12    the smell of the odors to the toy.

13    Q.   All right.  So to be more basic, Boeli is finding things by

14    their odor?

10:25   15    A.   Correct.

16    Q.   And you discussed the number of different odors that Boeli

17    is trained to detect, and one of them is concealed people;

18    correct?

19    A.   Correct.

10:26   20    Q.   What does "concealed people" mean?

21    A.   It is a human that he can't see but he can smell.

22    Q.   Okay.  And where is Boeli trained to detect those odors

23    including concealed people?

24    A.   In numerous different situations he's been trained on.

10:26   25    Q.   And is one of those situations vehicles?

1    A.   Yes.

2    Q.   Is one of those vehicles situations trunks of vehicles?

3    A.   Yeah, that's correct.

4    Q.   And what about moving vehicles, does Boeli train on moving

10:26    5    vehicles as well?

6    A.   Well, yeah.  They come in through the checkpoints, yes,

7    correct.

8    Q.   Okay.  How do you know when Boeli has come across one of

9    these odors that he is trained to find?

10:26   10    A.   Well, it is a -- just the way he changes his posture, his

11    demeanor.  His breathing changes.  He tenses up, starts

12    breathing out his nose, closes his mouth.  His whole body

13    changes up.

14    Q.   Is there is a word to describe that change in behavior?

10:27   15    A.   It is an alert.

16    Q.   Okay.  And you just described the conduct or the behavior

17    by Boeli that amounts to an alert.  Are you trained to

18    recognize that?

19    A.   Correct.

10:27   20    Q.   Can you yourself as far as you know make Boeli alert?

21    A.   No.

22    Q.   Do you know why that is?

23    A.   You know, I am not -- I wouldn't even know how to do that,

24    no.

10:27   25    Q.   Okay.  Is there something in addition to an alert called an

1    indication?

2    A.    Yes.

3    Q.    What is an indication?

4    A.    An indication is when he is trying to find the strongest

10:27    5    point of odor.

6    Q.    Why is Boeli trained to indicate in addition to just to

7    alerting?

8    A.    So that he can find exactly where the odor is coming from.

9    Q.    What does Boeli do when he indicates the strongest source

10:27   10    of an odor?

11    A.    He'll -- his indication is a little different.  He'll try

12    and sit, but he is a different kind of breed of dog, so he'll

13    start back peddling and is barking because he is ready for me

14    to give him his toy.

10:28   15    Q.    That behavior is different from the alert behavior?

16    A.    Correct.

17    Q.    The alert behavior is with the tensing up and the

18    breathing.  Can you remind me of the rest of it?

19    A.    Yeah.  His body tenses up.  His mouth will close, and, you

10:28   20    know, he just -- you could just see him really tense up because

21    he just got that first smell of the odor, which, you know, gets

22    him pretty excited so.

23    Q.    Okay.  Now, is an indication, which is the second thing

24    that sometimes happens, required for you to find an alert?

10:28   25    A.    No.

1    Q.   So it is possible to call an alert without calling an

2    indication?

3    A.   Yes.

4    Q.   Are you familiar with something called a false indication?

10:28    5    A.   I am.

6    Q.   What is a false indication?

7    A.   A false indication would be in a controlled environment, so

8    like, it is, say, that there is a vehicle in training that the

9    instructor knows there's never been anybody in there that has

10:28    10   done any kind of drugs or anything like that, at that point

11   they know it is a false indication because they know for a fact

12   that there is no odors in that vehicle.

13   Q.   Why do you say it is only possible to do a false indication

14   in a controlled environment?

10:29    15   A.   Well, because there is no way of knowing what odors are in

16   someone's vehicle, so I mean, someone could have smoked

17   marijuana a week ago, and that odor is what the dog is

18   smelling.

19   Q.   Is that because dogs' sense of smell is better than ours?

10:29    20   A.   Correct.

21   Q.   Do you have any idea how much better?

22   A.   You know, I don't know the exact, but I know it is a lot

23   better.  I don't know the exact.

24   Q.   Okay.  You mentioned earlier the training that you and

10:29    25   Boeli have to detect the odor of concealed people in vehicles.

1    Do you remember that?

2    A.   I do.

3    Q.   And you mentioned one of the places you train is at the

4    checkpoint with moving vehicles; is that right?

10:29   5    A.   Yes.

6    Q.   I have some questions about detecting concealed people in

7    vehicles, though.   Most cars have probably never had drugs in

8    them; correct?

9    A.   Well, I -- correct.

10:30   10   Q.   Or at least some cars?

11   A.   Some.

12   Q.   Some cars have never had drugs in them, but all cars have

13   had people in them, haven't they?

14   A.   Yes.

10:30   15   Q.   How is it possible then for Boeli to distinguish cars with

16   people in them from cars with concealed people in them?

17   A.   You know, I don't -- like I don't -- I am not an

18   instructor, so I don't really know how they do the training or

19   how he does it.   It amazes me too, but it works.

10:30   20   Q.   Let me break that down.   So you don't know, obviously, what

21   is going on in Boeli's head?

22   A.   No, I don't.

23   Q.   Silly question, but we can't ask Boeli?

24   A.   No, we cannot.

10:30   25   Q.   What do you base your testimony that he can do it on?

```
 1   A.   On the alert.
 2   Q.   Okay.  What in your -- and first of all, you said you've
 3   been working with Boeli for about five years?
 4   A.   Correct.
 5   Q.   Do you have any idea how many hours you and Boeli have in
 6   the field together?
 7   A.   We're talking 10 hours a day, five days a week for
 8   five years.
 9   Q.   I am terrible with math, so let me say, is it safe to say
10   that you've done at least a thousand hours a year in the field?
11   A.   Yes.
12   Q.   So over five years, is it a conservative estimate to say
13   that you have 5,000 hours in the field with Boeli?
14   A.   Yeah, that's correct.
15   Q.   Based on your 5,000 hours of field experience, at least,
16   with Boeli, what in your experience tells you that he is able
17   to detect concealed people in vehicles?
18   A.   What makes me -- I'm sorry.  Can you say it again?  I lost
19   my focus for a second.
20   Q.   Sure.  Based on all that experience, what allows you to
21   testify that Boeli can find concealed people?
22   A.   We have done it in the past.  We trained on a biweekly
23   basis, and he's always been on the spot with it.
24   Q.   Let me ask you this, you said you spend most of your time
25   working at the checkpoint; right?
```

1    A.   Right.

2    Q.   Do you know how many cars on an average day go through the

3    checkpoint?

4    A.   I don't have that number, no.

10:32    5    Q.   I believe there was some testimony earlier that it is in

6    the thousands.  Does that sound about right to you?

7    A.   Sounds about right.

8    Q.   Does Boeli alert to all of these thousands of cars that

9    come through the checkpoint?

10:32   10    A.   No, he did not.

11    Q.   In a typical day, and I know that may be a little

12    difficult, but if you could average them out, about how many

13    alerts do you call from Boeli in a typical day at the

14    checkpoint?

10:32   15    A.   In a typical day maybe -- I mean, it could be anywhere from

16    two to six or seven.

17    Q.   Two to six or seven in a whole day?

18    A.   Yeah.

19    Q.   Out of thousands of cars coming through the checkpoint?

10:32   20    A.   Right.

21    Q.   Okay.  Switching gears.  Is a certification required for a

22    canine and handler team to work in the field for the Border

23    Patrol?

24    A.   Yes, there is.

10:32   25    Q.   Okay.  Are you and Boeli certified?

```
         1   A.   Yes, we are.

         2   Q.   And have you been certified for the whole time that you've

         3   worked in the field?

         4   A.   That's correct.

10:32    5   Q.   There is a binder at your elbow.  If you look under Tab 6

         6   in that binder.

         7   A.   Okay.

         8   Q.   Do you see Tab 6?

         9   A.   Yes, I do.

10:33   10   Q.   What is the -- what is that?

        11   A.   That is the detection team certification, the yearly

        12   certification you have to take.

        13   Q.   What is the date on that?

        14   A.   The date is January 10th, 2011.

10:33   15   Q.   And if you flip to page two, are there two signatures at

        16   the bottom?

        17   A.   I'm sorry.  The second page in the --

        18   Q.   Yeah.  Does your 6 have a second page?

        19   A.   There is a second page.  I am trying to see if there is any

10:33   20   signatures on it.

        21        MR. PILCHAK:  Permission to approach, Your Honor?

        22        THE COURT:  Yes.

        23        THE WITNESS:  That signature there?  That is my second

        24   page.

10:33   25        MR. PILCHAK:  This is 7.
```

1          THE WITNESS:  I'm sorry.  My bad.  Okay.  Yes.

2          MR. PILCHAK:  Just for the record, I think you had

3   Exhibit 7 by mistake.

4   BY MR. PILCHAK:

10:33   5   Q.   Looking at Exhibit 6, do you see signatures on the bottom

6   of the second page?

7   A.   I do.

8   Q.   And first of all, is this also a certification?

9   A.   Yes, it is.

10:33  10   Q.   Okay.  And the signatures on the second page, is one of

11  them yours?

12  A.   Yes, it is.

13          MR. PILCHAK:  All right.  Move to admit 6, Your Honor.

14          THE COURT:  Any objection?

10:34  15          MR. SCOTT:  No objection.

16          THE COURT:  Received.

17      (Exhibit 6 was admitted.)

18          MR. PILCHAK:  And I would ask, this is one of the

19  documents, due to the detail on the second page, that we would

10:34  20  ask be conditionally admitted subject to the Court's position

21  on sealing later.

22          THE COURT:  All right.

23          MR. PILCHAK:  Thank you.

24  BY MR. PILCHAK:

10:34  25   Q.   The date on this is October 1, 2014, right?

```
       1   A.   That's correct.

       2   Q.   Do you know for how long one of these certifications is

       3   good for?

       4   A.   For a year.

10:34  5   Q.   So would this certification have been in force on

       6   February 28th, 2015?

       7   A.   Yes.

       8   Q.   And now look at Exhibit 7, please.

       9   A.   Okay.

10:34 10   Q.   Seven has a couple of pages.

      11   A.   Okay.

      12   Q.   What is Exhibit 7?

      13   A.   It is a United States Border Patrol Canine Detection Team

      14   Certification.

10:34 15   Q.   Is that for your team?

      16   A.   Yes.

      17   Q.   Is that for the years 2011, 2012, and 2013?

      18   A.   Yes.

      19        MR. PILCHAK:  Your Honor, we move to admit 7 under the

10:35 20   same conditional admission subject to the sealing.

      21        THE COURT:  Any objection?

      22        MR. SCOTT:  Not at this time.  I would like voir dire,

      23   which I can do on cross, though.

      24        THE COURT:  All right.

12:36 25      (Exhibit 7 was admitted.)
```

1          MR. PILCHAK:  All right.

2          MR. SCOTT:  If it is not too late, I would like to

3    make that caveat on Exhibit 6 as well.

4          THE COURT:  All right.

10:35    5          MR. SCOTT:  Thank you.

6    BY MR. PILCHAK:

7    Q.   Now, what is required for a canine handler to be certified,

8    Agent Miranda?

9    A.   Well.  They have to go -- they have to do all of these

10:35   10   different search areas and find them all with the dog.

11   Q.   Okay.  So let's look at 6, for example, on the second page

12   of Exhibit 6, do you see that?

13        There are a number of different search types listed on the

14   second page of Exhibit 6.

10:35   15   A.   Yes.

16   Q.   Are those the different search types that you were

17   referring to?

18   A.   Yes.

19   Q.   So you have to perform these searches in order to be

10:35   20   certified?

21   A.   That's correct.

22   Q.   And how do you have to perform on these searches?

23   A.   You have to average a score of 3.5 or lower.

24   Q.   Okay.  So each search is scored?

10:36   25   A.   Yes, it is.

1   Q.   And it is scored on a couple of different categories;

2   right?

3   A.   That's correct.

4   Q.   How does this scoring work?

10:36   5   A.   It is on a one through six scale, and yeah, you just got to

6   be able to get a 3.5 or lower.

7   Q.   Okay.  So the lowest score, a one is the best, and a six is

8   the worst; is that right?

9   A.   That's correct.

10:36   10   Q.   And so all of these scores, I think you said, have to

11   average out to 3.5 or better?

12   A.   Correct.

13   Q.   Have you ever failed one of these certifications before?

14   A.   No, I have not.

10:36   15   Q.   What happens if you do fail a certification?

16   A.   You go through a 40-hour remedial, and two new instructors

17   will give you the same test, and if you fail that, then that is

18   it.  You are out of the program.

19   Q.   Okay.  But you've never been to remedials then?

10:36   20   A.   No, I have not.

21   Q.   All right.  I want to ask you a bit more about these forms.

22   There is for each search line something called substance, and

23   then there is a one or two letter code in each box.  Do you see

24   those?

10:37   25   A.   Yes.

1    Q.   What are those codes for?

2    A.   Well, the substance is, I am assuming it is the actual

3    drugs or humans that they are --

4    Q.   So it refers to the thing that was hidden?

10:37   5    A.   Correct.

6    Q.   What is the "P" substance, if you know?

7    A.   "P"?

8    Q.   If you would look at the second line.

9    A.   People, maybe.

10:37   10    Q.   Well, in your certification training and testing, have you

11    located concealed persons before?

12    A.   Yes.

13    Q.   And have you also located the trained odors that you are

14    trained to detect -- or that Boeli is trained to detect?

10:37   15    A.   Yes, sir.

16    Q.   Are some of those odors marijuana?

17    A.   Yes, sir.

18    Q.   Cocaine?

19    A.   Yes, sir.

10:37   20    Q.   Heroin?

21    A.   Yes, sir.

22    Q.   Methamphetamine?

23    A.   Yes.

24    Q.   And do you see the codes in the substance column of "MJ"?

10:37   25    A.   Yes.

1    Q.   "C" as in Charlie?

2    A.   Yes.

3    Q.   "H"?

4    A.   Yes.

10:37    5    Q.   And "ME"?

6    A.   Yes.

7    Q.   What is your understanding of what those codes mean?

8    A.   "ME" would be meth; people, person; "MJ" would be

9    marijuana; "C," cocaine; "H," heroin.

10:38   10    Q.   All right.  And let me ask you as well, there is on the

11   page that I believe we're all looking at, it says 460 in the

12   lower right-hand corner.  There is a line, search type,

13   occupied building, and the environment column says blank.  Do

14   you see that in the middle of the page?

10:38   15    A.   I am looking at the occupied building?

16   Q.   Yes.  And the first one, environment, blank substance, NA?

17   A.   Okay.  Yes.

18   Q.   What is that?

19   A.   That is an actual search where there is nothing.  It is

10:38   20   like a clean area.

21   Q.   So sometimes they send you and Boeli in to try to find

22   things and there is nothing to find?

23   A.   Correct.

24   Q.   So to get a good score on that test, what do you and Boeli

10:38   25   have to do?

1    A.   I have to search the area and decide that there is nothing

2    in that one and let them know that the area is clear.

3    Q.   And so just to look at the line, the scores are 3, 3, and

4    4.  Do you see those?

10:39   5    A.   Yes.

6    Q.   Are those generally passing scores for that exercise?

7    A.   Yes.

8    Q.   So to get the passing scores, does that mean that you and

9    Boeli did not falsely indicate when there was nothing -- or

10:39   10   falsely alert when there was nothing to find?

11   A.   Correct.

12   Q.   Let me ask you about all the exercises that you do in the

13   annual certification.  During those exercises, do you know

14   where all the things are hidden that you and Boeli are trying

10:39   15   to find?

16   A.   No.

17   Q.   Do you have a term for that?  Is it called a blind test?

18   A.   Yes.

19   Q.   Why is it important to do the testing that way?

10:39   20   A.   That way there is no cueing the dog, or it is just not good

21   for you to know because then you are instead of continually

22   doing a search, you are actually trying to get him to search

23   one certain area, you know.

24   Q.   So in your view, is it better practice to conduct the

10:40   25   searches blind?

1    A.   Yes.

2    Q.   Are all the searches that you do in these annual

3    certifications conducted blind?

4    A.   Yes, they are.

10:40   5    Q.   Now, is this the only -- well, let me ask one other

6    question first.  During this certification training, do you

7    know whether you and Boeli are also trained on whether Bo,

8    sorry, Boeli is going to alert to other things that are

9    associated with your target odors, like plastic baggies or

10:40   10   bondo or things that are frequently found together with the

11   odors he is trained to detect?

12   A.   Well, we train -- in our environments when we train, they

13   try to do that kind of training so they don't do that in the

14   field.

10:40   15   Q.   Is there a name for that kind of training?

16   A.   Yeah, it is -- what is the word I am looking for?  I can't

17   actually think of the word at the moment of what that is

18   called -- conflict training.  Sorry, there it is.

19   Q.   Okay.  And why is that conflict training important?

10:41   20   A.   It is so that they don't do that in the field, and they get

21   used to smelling those odors when -- when there is no drugs

22   present, so --

23   Q.   Is there such a thing as conflict training for concealed

24   persons?

10:41   25   A.   No.

1    Q.   Okay.  If you -- let's see.  We already discussed failing a

2    certification test.  Let me direct your attention then --

3    A.   I'm sorry.  We have to do searches where there is a driver

4    in the car and people in the cars, and, you know, when there

10:41    5    are blanks as well, just to have that conflict training, so

6    that could be something to do with humans as well.

7    Q.   Can you explain to me how that would work, the conflicts?

8    A.   Well, they are smelling the odors of humans, but they are

9    not hidden or anything so -- it is a blank search and there is

10:41    10    nothing there.

11    Q.   Okay.  Are there standards for the certifications that you

12    participate in?

13    A.   Yes.

14    Q.   Can I direct your attention to Exhibit 8 in your binder?

10:42    15    Are you at 8?

16    A.   Yes.

17    Q.   What is this document?

18    A.   US Customs Protection Canine Detection Team Certification

19    Judgment Standards.

10:42    20    Q.   Now, does this document have the same numeric scoring that

21    we were just discussing?

22    A.   Yes, it does.

23    Q.   And some of the same categories that were on the

24    certification records we were looking at, like intent and

10:42    25    response?

       1   A.   Yes.

       2          MR. PILCHAK:   The Government moves to admit 8

       3   conditionally under the same request as 6 and 7.

       4          THE COURT:   Any objection to 8?

10:42  5          MR. SCOTT:   I am going to object as to lack of

       6   foundation with this witness.

       7          THE COURT:   Overruled.   You can voir dire this witness

       8   as well on this.

       9          MR. SCOTT:   Thank you, Your Honor.

10:42  10      (Exhibit 8 was admitted.)

      11   BY MR. PILCHAK:

      12   Q.   All right.   If you flip to the last page of 8, Agent

      13   Miranda, there is a scoring header at the bottom of the page.

      14   Do you see that?

10:42  15   A.   Yes.

      16   Q.   And does that recite what kind of score is required to pass

      17   the certification?

      18   A.   Yes, it does.

      19   Q.   What is the score required?

10:43  20   A.   3.5.

      21   Q.   All right.   And let me turn your attention now to

      22   Exhibit 9.

      23   A.   Okay.

      24          THE COURT:   Mr. Scott, is it fair to say there is no

10:43  25   objection on authenticity with respect to 6, 7, and 8?

1          MR. SCOTT:  That's correct, Your Honor.  I question

2    whether this witness has the personal knowledge required to

3    make it an exception to the hearsay requirement -- or the

4    exception to the hearsay rule and business record and all that,

10:43   5    but I am sure that it is what the Government says it is.

6    BY MR. PILCHAK:

7    Q.   Are you looking at Exhibit 9, Agent Miranda?

8    A.   Yes, I am.

9    Q.   All right.  Exhibit 9, what does it appear to you to be?

10:43  10    A.   It is a performance standard.

11    Q.   And who is it a performance standard for?

12    A.   For the canine handler.

13    Q.   Are there standards that are set for Border Patrol or

14    Customs and Border Protection canine handlers in the

10:44  15    performance of their duties and in participating in

16    certification?

17    A.   Yes, sir.

18    Q.   Are those certifications contained in written documents?

19    A.   Yes.

10:44  20    Q.   Are the records kept by the canine program, if you know, in

21    the ordinary course of their business?

22    A.   Yes.

23    Q.   Is Exhibit 9 one of those canine handler performance

24    standard documents that pertains to the certification and the

10:44  25    training we were just discussing?

```
  1   A.   Yes.

  2          MR. PILCHAK:  The Government moves to admit 9 with the

  3   same conditional request with respect to the seal.

  4          THE COURT:  Any objection to 9?

  5          MR. SCOTT:  Just the same, same objections.

  6          THE COURT:  There is no objection as to authenticity,

  7   that it is what it purports to be?

  8          MR. SCOTT:  Correct, Your Honor.

  9          THE COURT:  All right.  Conditionally received.

 10          MR. PILCHAK:  Thank you, Your Honor.

 11      (Exhibit 9 was admitted.)

 12   BY MR. PILCHAK:

 13   Q.   On the bottom of the first page of 9 and the top of the

 14   second page of 9, Agent Miranda do you see the same scoring

 15   regimen that we've been discussing for a few minutes now?

 16   A.   Yes, I do.

 17   Q.   And that is the one to six scoring; is that correct?

 18   A.   Yes.

 19   Q.   And now once you and Boeli are certified, are you

 20   authorized to work as a canine detection team forever?

 21   A.   For the year, but we also have green sheets that we, you

 22   know, train on --

 23   Q.   Okay.

 24   A.   -- biweekly.

 25   Q.   And describe that process for the Court.
```

10:44 (line 5)
10:44 (line 10)
10:44 (line 15)
10:45 (line 20)
10:45 (line 25)

1    A.  It is sort of to prepare yourself for the actual

2    certification at the end of the year, so they are running you

3    through all these different courses to get you prepared for

4    your annuals at the end of the year.

10:45   5    Q.  Okay.  Is it possible to fail a green sheet exercise?

6    A.  No, it is not.

7    Q.  Okay.  What is the result of the green sheet exercise?  Do

8    you get anything that you use in your daily work?

9    A.  Yeah.  It is -- they, you know, things I can work on and

10:45   10   stuff like that is what it is focused on.

11   Q.  Would you characterize that as feedback?

12   A.  Yes.

13   Q.  Do you regularly receive that?

14   A.  Yes.

10:45   15   Q.  How often are these exercises conducted?

16   A.  Biweekly.

17   Q.  Does that mean every two weeks?

18   A.  Every two weeks.

19   Q.  I get "biweekly" wrong sometimes.

10:46   20       Is there a record created of each green sheet exercise?

21   A.  Yes, there is.

22   Q.  Okay.  And I apologize if you already said this, but do you

23   make an effort to incorporate that feedback to get better at

24   your job?

10:46   25   A.  Yes, I do.

1    Q.   I would like to direct your attention to Tab 10 in your

2    binder.  It is the last one.  It is very large.

3    A.   Okay.

4    Q.   A number of pages underneath, if you could just flip

10:46   5    through a few of them to get a sense of them.

6    A.   Okay.

7    Q.   What are those?

8    A.   These are the green sheets.

9    Q.   And who do these green sheets pertain to?

10:46   10    A.   They are my green sheets.

11    Q.   Okay.  If you look at the first page and the last page,

12    what time period do they cover?

13    A.   The first one is really dark.  It is hard for me to --

14    Q.   If you can do it.  All right.  Let me ask a different --

10:46   15    A.   2015 is this first one here.

16    Q.   I think you said these green sheets pertain to you and

17    Boeli; is that right?

18    A.   Correct.

19    Q.   Okay.  And are these the biweekly exercises we were

10:47   20    discussing a moment ago?

21    A.   Yes, sir.

22    Q.   What sorts of information are generally reflected on green

23    sheets?

24    A.   It is the actual searches we do that day and what the

10:47   25    instructor saw that I needed to work on for the day.

1   Q.   Okay.  And let me ask you, are these green sheets regularly
2   kept in connection with the exercises you just described?
3   A.   Yes.
4             MR. PILCHAK:  The Government moves to admit 10
10:47  5   conditionally under the same request as before.
6             THE COURT:  Any objection?
7             MR. SCOTT:  Same objection, not as to authenticity.
8             THE COURT:  When you say not as -- so if the document
9   is authentic and there is no dispute as to authenticity, and
10:47 10  are they being offered as public record, the report, under
11  803(8)?
12            MR. PILCHAK:  Yes, Your Honor.
13            MR. SCOTT:  That is what is missing.  I don't think
14  that he can lay the foundation.
10:47 15           THE COURT:  Foundation for what?
16            MR. SCOTT:  The content of the hearsay, how it is
17  scored, what the numbers mean.
18            MR. PILCHAK:  Permission to respond?
19            THE COURT:  Sure.
10:48 20           MR. PILCHAK:  I think he has laid the foundation for
21  the numeric scoring, how the exercises are conducted, for
22  generally how the records are kept.  I anticipate that
23  Mr. Scott's cross will be, for example, the comments weren't
24  written to Agent Miranda, and I'm sure he'll testify to that.
10:48 25           But for him to lay the foundation generally that this

```
          1    is a record, I don't think that it is required that he be a

          2    records custodian.

          3            THE COURT:  I will overrule the objection at this

          4    point, and Mr. Scott, you can cross-examine on that issue.

12:36     5        (Exhibit 10 was admitted.)

          6    BY MR. PILCHAK:

          7    Q.  Looking at these sheets generally, Agent Miranda, do they

          8    contain same kinds of substance codes that we were discussing

          9    earlier?

10:48    10    A.  Yes, they do.

         11    Q.  If I could direct your attention to -- they all have

         12    numbers in the lower right-hand corner -- if you flip to page

         13    543, and I certainly hope they are all in order.  Let me know

         14    when you are there.

10:49    15    A.  It was 543, correct?

         16    Q.  Correct?

         17    A.  Yes, I am there.

         18    Q.  First of all, is each line a separate search on these

         19    records?

10:49    20    A.  Yes.

         21    Q.  Okay.  The first search line on 543, can you tell what sort

         22    of item you and Boeli were looking for?

         23    A.  It is "HE," so heroin, I believe.

         24    Q.  Let me ask you this, if you look at the substance column,

10:49    25    what code is in the substance column?
```

```
         1   A.   It is person.  Sorry.

         2   Q.   How can you tell it is a person?

         3   A.   It has a "P" for the substance.

         4   Q.   Is there the location that the item that you and Boeli were

10:49    5   looking for?  Is that noted on the green sheet as well?

         6   A.   Yes, it is.

         7   Q.   Okay.  What is the location for that first line search?

         8   A.   Trunk.

         9   Q.   And so taking the "P" and the trunk together, what kind of

10:49   10   search was this?

        11   A.   A concealed human search.

        12   Q.   Okay.  And then we discussed earlier some of the other

        13   codes.  If you look at the third line of this record, for

        14   example, what is the substance in the third line of this

10:50   15   record?

        16   A.   Ice, methamphetamine.

        17   Q.   We talked about training with blanks a moment ago.  Do you

        18   recall that?

        19   A.   Yes, I do.

10:50   20   Q.   Let me ask you to flip the page to 549.  It is just a few

        21   pages down.

        22   A.   Okay.

        23   Q.   Do you see the third line search on that record?

        24   A.   Yes.

10:50   25   Q.   And what is the substance for that search?
```

1    A.   It is a blank.

2    Q.   And, again, what does that mean?

3    A.   It means it is a clean environment with no -- none of the

4    odors he's trained to detect.

10:50    5    Q.   Based on the scoring and all the different categories for

6    that search, can you tell how you and Boeli performed with

7    respect to the blank search?

8    A.   Yeah.  It was definitely passing scores, all threes across

9    the board.

10:51    10    Q.   And where it says alert, for example, zero, how do you

11    interpret that?

12    A.   That he didn't show any indications of an alert.

13    Q.   All right.  I asked you some questions earlier about cars

14    coming through the checkpoint in your every days experience and

10:51    15    the number of cars that Boeli alerts to.  I have to ask again,

16    if Boeli is alerting to people in vehicles, why doesn't he

17    alert to every car that comes through the checkpoint?

18    A.   Well, I can -- I can only -- I don't exactly know how they

19    do it.  I mean, that is how they are trained.  I am not in

10:51    20    the -- I am not in that part of the training, you know.  It is,

21    like, I train with him to find these odors, so I am not

22    100 percent sure how they get them to, you know, train up on

23    these odors.

24    Q.   Well, in there, again, you don't know what is going on in

10:51    25    the dog's head; is that right?

1    A.   Correct, also.

2    Q.   Let me ask you this, in your five years of experience with

3    Boeli in the field, has Boeli discovered concealed people other

4    than on February 28th, 2015?

10:52   5    A.   Yes, he has.

6    Q.   About how many other concealed people has he found?

7    A.   Concealed people, I believe it is about 20.

8    Q.   20 people?

9    A.   Yes.

10:52   10   Q.   Do you have any idea how many of them were in the trunk of

11   a vehicle?

12   A.   I believe about six or seven.

13   Q.   Okay.  Where were some of the others located, if you

14   recall?

10:52   15   A.   Out in the field, in the desert, in brush, places like

16   that.

17          MR. PILCHAK:  Your Honor, at this time I am going to

18   switch gears with Agent Miranda and turn to the date in

19   question.

10:52   20          Would Your Honor like to take a break or keep going?

21          THE COURT:  We can keep going.

22          MR. PILCHAK:  Thank you.

23   BY MR. PILCHAK:

24   Q.   Directing your attention to February 28th of this year,

10:52   25   Agent Miranda, were you and Boeli working?

1    A.   Yes, we were.

2    Q.   Where were you working?

3    A.   At the Highway 86 Checkpoint near Westmoreland, California.

4    Q.   All right.  At about 8:30 in the evening, what position

10:52    5    were you and Boeli working, if you remember?

6    A.   We were on Preprimary.

7    Q.   What is Preprimary?

8    A.   Preprimary is at the checkpoint, where the agent is

9    conducting his immigration inspection, and we're in the lane of

10:53   10    cars waiting to be, you know, spoken to that man.  Me and Boeli

11    are searching those vehicles as they come by.

12    Q.   Thank you for describing that.  I would like to show you a

13    portion of Government Exhibit 5.  It has three video

14    surveillance clips on it from the date in question that is

10:53   15    already in evidence.

16        If we could get clip 14 paused on the first frame.  It will

17    appear on the monitor in front of you.  If you could pause it

18    there.

19        So what are we looking at in Government Exhibit --

10:53   20    Government Exhibit 5, Camera 14?

21    A.   Right there you are looking at the individual on the right

22    is the Primary agent.  He is the one conducting the immigration

23    inspection there, and that is the Highway 86 Checkpoint where

24    all the vehicles come through Primary.

10:53   25    Q.   If you use your finger, you can make a mark on the monitor.

| | |
|---|---|
| 1 | Can you show the Court where the Preprimary area you were |
| 2 | discussing is? |
| 3 | A.   Yeah.   Right now the wind is going -- where I am standing |
| 4 | here, the wind is going in this direction, so this whole area |
| 10:54  5 | is Preprimary because the vehicles are coming up through the |
| 6 | shoot here, so me and Boeli are here downwind. |
| 7 | Q.   Okay.   And let me stop you on one of the facts in there. |
| 8 | You mentioned that you and Boeli are on this screen.   I didn't |
| 9 | ask that question.   Where are you and Boeli on this? |
| 10:54  10 | A.   I'm sorry.   Right here. |
| 11 | Q.   Okay.   And you circled what appears to be a person and a |
| 12 | dog in roughly the center of Government Exhibit 5. |
| 13 |     And just to read into the record, the time stamp on the |
| 14 | beginning of this video is 20:30:27. |
| 10:54  15 |     What time of day is that, in your understanding? |
| 16 | A.   That is 8:00, 8:30 PM. |
| 17 | Q.   Okay.   So you and Boeli are in the center in what location |
| 18 | again? |
| 19 | A.   Preprimary. |
| 10:54  20 | Q.   What are you and Boeli doing in Preprimary? |
| 21 | A.   Well, right now we're there downwind, you know, trying to |
| 22 | pick up some odors that Boeli is trained to detect. |
| 23 | Q.   And why are you downwind? |
| 24 | A.   It gives the dog a better chance to pick up those odors. |
| 10:55  25 | Q.   Okay.   Let's play clip 14, Exhibit 5.   Let's pause it |

1  there, please.  All right.  So we paused it at 8:30 and

2  49 seconds.

3      What has Boeli done at this point in the video?

4  A.  He started going towards the vehicle right there.

10:55  5  Q.  And what do you remember about that vehicle?  What kind of

6  vehicle was it?

7  A.  A black Jetta.

8  Q.  How did it first come to your attention on February 28th,

9  2015?

10:56  10  A.  At that point right there is when Boeli started going for

11  it.

12  Q.  Okay.  And what is your interpretation of Boeli's behavior

13  at that point?

14  A.  At that point he seemed very interested in that vehicle to

10:56  15  me.

16  Q.  Okay.  Let's keep playing the video, please.  Just to

17  complete the record, we'll watch the end of the video, the clip

18  of Camera 14 from Government Exhibit 5.  I am not sure whether

19  on the prior examination it was played through to the end.  It

10:56  20  is a short clip.

21      Agent Miranda, while we're watching the clip, who is the

22  other person who is present outside of the vehicle?

23  A.  Agent Stypinski.

24  Q.  Thank you.  All right.  So that was the end of the clip

10:57  25  which was at 8:31 and 49 seconds, if I read it correctly.

1          If we could, let's have clip 13 or Camera 13 from

2     Government Exhibit 5, and let's pause it on the first frame.

3          Agent Miranda, what is this view showing?

4     A.   It is also the Highway 86 Checkpoint, and it's Primary

10:57   5     right there, and those are the vehicles pulling up to Primary.

6     Q.   Okay.  Did Boeli do either a trained alert or a trained

7     indication to the Jetta that you were just discussing on

8     February 28th?

9     A.   Yes, he did.

10:57  10     Q.   Which or both?

11     A.   He alerted to the vehicle.

12     Q.   Okay.  I would like to continue watching this clip.  If you

13     can inform the Court when that occurs, and then we'll pause the

14     video at that point.

10:58  15     A.   Okay.

16     Q.   All right.  Pause it, please.

17          So the time stamp for the moment that you identified is

18     20:30:58; is that correct?

19     A.   Yes.

10:58  20     Q.   What behavior did Boeli exhibit at that point that leads

21     you to believe that he alerted?

22     A.   At that point he -- his mouth closed, his body tensed, and

23     just his whole demeanor changed.

24     Q.   Okay.  At that point did you conclude that he had alerted?

10:58  25     A.   Yes.

```
       1    Q.  Did you inform anybody else about that?

       2    A.  No.

       3    Q.  What, if anything, did you do?

       4    A.  I continued the search to see if I could get him to

10:58  5    pinpoint it.

       6    Q.  All right.  Let's play the video, please.

       7        All right.  Let's pause it there.  The time stamp is 8:31

       8    and 31 seconds.

       9        And for a few seconds of the video, previous to this, what

10:59 10    does it appear that you are doing with the vehicle?

      11    A.  It appears that I am trying to lift the trunk there.

      12    Q.  And what happened leading up to that?

      13    A.  I asked Sty if he could ask the driver to look in the

      14    trunk.

10:59 15    Q.  Let me pause you on that.  Who did you ask?

      16    A.  Stypinski.

      17    Q.  That is the Primary agent?

      18    A.  Right.

      19    Q.  And what did you actually asked him?

11:00 20    A.  I asked him if he could ask the driver if we could look in

      21    the trunk.

      22    Q.  Do you know what Agent Stypinski did or said?

      23    A.  He asked the driver if we could look inside the trunk.

      24    Q.  Did you hear Agent Stypinski say that?

11:00 25    A.  Yes.
```

1   Q.   How far away were you from Agent Stypinski when you heard

2   him say that?

3   A.   Five feet.

4   Q.   Are you sure that he asked the driver to open the trunk as

11:00   5   opposed to told him?

6   A.   Yes.

7   Q.   Could you hear what the driver -- well, could you hear

8   whether the driver said anything in response?

9   A.   I just saw his gestures of nodding his head and trying to

11:00   10   open the trunk, so I assumed he said yes.

11   Q.   How could you see that from where you were standing?

12   A.   Because I have -- I could see right into the vehicle

13   through the back there.

14   Q.   So what did you see the defendant do?

11:00   15   A.   Nodding his head and reaching down to try and open the

16   trunk.

17   Q.   Okay.  And after you saw him do that, what did you do?

18   A.   While he was opening the trunk, I noticed that the actual

19   trunk wasn't lifting up, so I was trying to help it along, open

11:01   20   it up.

21   Q.   Okay.  Were you trying to get the trunk open yourself if

22   the latch hadn't been opened from inside?

23   A.   No, sir.

24   Q.   In your experience is it generally possible to open the

11:01   25   trunk from the outside of a car if it hasn't been unlocked or

1    opened from the inside?

2    A.   I've never been able to do something like that, no, nor

3    ever tried.   I don't see how you would.

4    Q.   So what was the result of you putting your hand on the back

11:01    5    of the car?

6    A.   Nothing.   It wouldn't open.

7    Q.   Okay.   Was the defendant's vehicle referred to Secondary

8    Inspection?

9    A.   Yes, it was.

11:01    10    Q.   Who sent him to Secondary Inspection?

11    A.   Well, I asked Stypinski to put him into Secondary, and

12    Stypinski asked him to go to Secondary.

13    Q.   Why did you ask Stypinski to do that?

14    A.   Because of the alert.

11:01    15    Q.   And did Stypinski ask or tell the defendant to go to

16    Secondary?

17    A.   I am pretty sure he asked him to.

18    Q.   Okay.   Do you remember the words he used?

19    A.   I can't.   I don't remember the actual words he used.

11:01    20    Q.   And did the defendant, in fact, go to Secondary Inspection?

21    A.   Yes, he did.

22    Q.   All right.   Let's play the clip, please.

23         All right.   So that is the end of clip 13.

24         What happened when the defendant's vehicle went to

11:02    25    Secondary?

1    A.   Agent Hanna went over there to, you know, see if he could

2    take a look in the trunk.

3    Q.   Did you go to Secondary Inspection?

4    A.   No, I did not.

11:02    5    Q.   Why not?

6    A.   Well, because in my experience as a canine handler a lot of

7    times people come through as decoys, so they'll put, like,

8    someone in the vehicle, put like, you know, a little bit of

9    marijuana in it, and next thing you know, the canine handler

11:03    10    leaves the Primary Inspection or the Preprimary Inspection,

11    then they bring in the drugs.

12    Q.   So your dog just alerted to this vehicle, and you didn't

13    escort it to Secondary?

14    A.   That's correct.

11:03    15    Q.   Did you tell Agent Hanna or anyone else something about the

16    defendant's vehicle before -- or as it was going to Secondary?

17    A.   Yes, I did.

18    Q.   What did you say?

19    A.   I asked him if he could please look in the trunk because I

11:03    20    got an alert from Boeli.

21    Q.   Do you know what Hanna did or said to the defendant?

22    A.   At that point I don't, no.

23    Q.   What were you doing while the defendant's vehicle was in

24    Secondary before the trunk opened?

11:03    25    A.   I was at Preprimary searching the vehicles that were coming

```
          1    through.

          2    Q.  Did the defendant's trunk finally open?

          3    A.  Yes, it did.

          4    Q.  Where were you when that happened?

11:03     5    A.  Still at Preprimary.

          6    Q.  At that point did you go to Secondary Inspection?

          7    A.  Yeah.  Once I realized that there was multiple people

          8    involved and Hanna was over there by himself, I went over there

          9    to see if I could do anything.

11:03    10    Q.  But by the time you got there, the trunk was already open?

         11    A.  That's correct.

         12    Q.  At any point during your interaction with the defendant or

         13    his Jetta on February 28th, 2015, did you ever draw your

         14    weapon?

11:04    15    A.  No, I did not.

         16    Q.  Did you ever raise your voice?

         17    A.  No, I did not.

         18    Q.  Did you ever threaten the defendant?

         19    A.  No, I did not.

11:04    20    Q.  Did you even interact with the defendant --

         21    A.  No.

         22    Q.  -- directly?

         23    A.  No, I didn't.

         24    Q.  Did anyone else do any of those things, meaning raise their

11:04    25    voice, draw their weapon, or as far as you could see threaten
```

```
         1    the defendant?

         2    A.   No.

         3    Q.   Did Boeli bark or snarl at the defendant?

         4    A.   No.

11:04    5    Q.   Did he jump up on the defendant's car?

         6    A.   No, he didn't.

         7              MR. PILCHAK:  No further questions, Your Honor.

         8              THE COURT:  All right.  Counsel, we'll take a

         9    15-minute break at this time.

11:04    10             MR. SCOTT:  Thank you, Your Honor.

        11        (Recess ensued from 11:04 a.m. to 11:22 a.m.)

        12             THE COURT:  All right.  You may begin your

        13    examination, Counsel.

        14                       CROSS-EXAMINATION

11:23   15    BY MR. SCOTT:

        16    Q.   Good morning, sir.

        17    A.   Good morning.

        18    Q.   In general, when you are working your dog at the

        19    checkpoint, is it true that you are sort of going up and down

11:23   20    the lanes downwind from passing cars?

        21    A.   That's correct.

        22    Q.   And the idea is that you are trying to see if the dog

        23    catches some sort of a scent that it has been trained to

        24    detect?

11:23   25    A.   Yes.
```

         1   Q.   Now, you generally position yourself downwind?

         2   A.   Yes, I do.

         3   Q.   You do that quite deliberately to help the dog catch these

         4   scents?

11:23    5   A.   Yes.

         6   Q.   And downwind, of course, means that positioned such that

         7   the wind is blowing toward you and the dogs with the cars in

         8   between?

         9   A.   Correct.

11:23   10   Q.   There is a thing called a scent cone; correct?

        11   A.   Yes.

        12   Q.   Can you tell us what a scent cone is?

        13   A.   It is the cone where the odor is emitting out and when the

        14   dog comes in and out of the scent cone.  It would be when he

11:24   15   goes into the scent cone is when he gets into the odor.  Coming

        16   out of the scent cone would be coming out of the scent cone, so

        17   it sort of shoots out like that.

        18   Q.   Correct me if I'm wrong, if I am the dog, would the nose be

        19   the finest point on the angle of the cone that you are

11:24   20   describing?

        21   A.   Yeah, I would imagine so.

        22   Q.   And then the cone spreads out in cone shape towards

        23   wherever the odor is emitting from?

        24   A.   Correct.

11:24   25   Q.   So, for example, if an odor is coming from the jury box to

1    my right here, the odor would be broadest at the jury box, and

2    the cone would be drawing down towards the dog?

3    A.   Correct.

4    Q.   All right.  You said that, obviously, the reason dogs are

11:24    5    used is because they are -- they have is a heightened sense of

6    smell, at least compared to people?

7    A.   Yes, sir.

8    Q.   Have you heard the statistic that it may be as much as

9    10,000 times as powerful as human scent or do you know?

11:25   10    A.   I don't know.

11    Q.   Have you heard any numbers or comparisons like that?

12    A.   If I did, I don't remember the exact numbers.

13    Q.   Okay.  Suffice it to say dramatically better than human

14    scent --

11:25   15    A.   Yes.

16    Q.   -- or the human sense of smell?

17    A.   Yes.

18    Q.   When a dog is downwind and catches the odor of something

19    that it was trained to smell, it is trained to go and try to

11:25   20    find the source of the odor; correct?

21    A.   Yes.

22    Q.   The dogs training is, once it catches that scent, to go and

23    try to go and what is called pinpoint it; correct?

24    A.   Correct.

11:25   25    Q.   Find exactly where the odor is coming from?

```
          1    A.   Yes, sir.

          2    Q.   Yes?

          3    A.   Yes, sir.

          4    Q.   All right.  And when the dog finds the exact source of the

11:25     5    odor that it is coming from, the dog is then trained to do

          6    something called indicate; correct?

          7    A.   Correct.

          8    Q.   So let me talk to you briefly about the distinction between

          9    alerting and indicating.  Okay.  That is a distinction that is

11:25     10   clear in your mind; correct?

          11   A.   Yes.

          12   Q.   Is it fair to say that the behavior for alerting is what

          13   you described as a change in respiration and kind of a change

          14   in body language of the dog; is that fair?

11:26     15   A.   Right.

          16   Q.   And that, quote-unquote, alerting happens as soon as the

          17   dog picks up the scent that it was trained to detect?

          18   A.   Yes, correct.

          19   Q.   So that is sort of the very first indication that the dog

11:26     20   is picking up that scent?

          21   A.   Yes.

          22   Q.   Is the quote -- what you describe as an alert?

          23   A.   Yes.

          24   Q.   But then the dog is trained to go further; correct?

11:26     25   A.   Correct.
```

1  Q.   And the dog is supposed to trace the scent to its source;

2  right?

3  A.   Yes.

4  Q.   And then it is supposed to do something when it finds the

5  source?

6  A.   Correct.

7  Q.   When the dog finds the source, it is supposed to,

8  quote-unquote, indicate; correct?

9  A.   Yes.

10 Q.   Now, most dogs are trained to indicate by sitting; correct?

11 A.   Correct.

12 Q.   Your dog maybe does something a little different, right?

13 A.   Yes.

14 Q.   We'll talk about that in a little while.

15 A.   Okay.

16 Q.   But you have -- is it true that in your view you and the

17 people that trained this particular dog are the only people who

18 can tell if the dog is alerting, as you are defining alerting?

19 A.   Like me and anybody that has had the training -- well, I

20 mean, there are instructors that don't work with Boeli.  I am

21 sure that they could see and tell what is going on with the dog

22 as well.

23 Q.   What about people not trained to read this particular dog?

24 A.   No.

25 Q.   All right.  But the indicating, I mean, that is a pretty

1      objective test, right?  The dog either sits or it doesn't,

2      right?

3      A.   Correct.

4      Q.   So with a -- a third person would be more able to tell if

11:27    5      the dog sat or didn't sit, right?

6      A.   Well, yes.

7      Q.   Or in Boeli's case, I think your testimony is that the way

8      that Boeli indicates is to back up and bark at the source?

9      A.   Correct.

11:28   10      Q.   And obviously that is something that a third person could

11      observe pretty clearly?

12      A.   Yes, sir.

13      Q.   Okay.  Now, your dog's nose is so acute that you have

14      actually had experience with him detecting trace cocaine on a

11:28   15      dollar bill; right?

16      A.   Yes.

17      Q.   Now, obviously, there wasn't cocaine actually on the bill

18      at that time, but it must have been at some time?

19      A.   Remnants, yes.

11:28   20      Q.   Perhaps somebody had used the dollar bill as a straw to

21      ingest cocaine --

22      A.   Perhaps.

23      Q.   -- or it had been involved in a drug deal or something?

24      A.   Perhaps.

11:28   25      Q.   But the dog is sharp enough, its nose is, to be able to

1   find trace cocaine on a bill in somebody's pocket or whatever?

2   A.   Correct.

3   Q.   You've testified that a dog -- your dog is trained not just

4   on narcotics but on derivatives; correct?

11:29   5   A.   Yes, sir.

6   Q.   What are some derivatives that the dog is trained to find?

7   A.   You know, like ecstasy, molly, like acid, anything that has

8   those derivatives of those drugs.

9   Q.   Well, those -- my understanding is that those actually are

11:29   10   drugs in their own right?

11   A.   Absolutely, but they have traces of those drugs in them.

12   Q.   Is the dog also trained to detect the components of drugs,

13   for example, pseudoephedrine, which is -- which part of

14   methamphetamine -- a component of methamphetamine, at least as

11:29   15   I understand it?

16   A.   You know, I am not 100 percent sure on that, but yeah, I

17   believe so, yeah.

18   Q.   And pseudoephedrine, for example, is something in cold

19   medicine?

11:29   20   A.   Correct.

21   Q.   It is actually a legal over-the-counter substance?

22   A.   Yes, sir.

23   Q.   For all you know, the dog could at times alert to

24   pseudoephedrine because it is a component of methamphetamine;

11:29   25   is that accurate?

```
 1    A.   You know, I am not sure.   You know, I've never had my dog
 2    alert to something like that, but I don't know as far as
 3    training, if that is something that he would alert to.
 4    Q.   So you don't know one way or the other?
 5    A.   No, I don't.
 6    Q.   But you have been told specifically that the dog is trained
 7    to alert to derivatives of drugs?
 8    A.   Correct.
 9    Q.   What about cutting agents, is the dog trained to detect
10    cutting agents?
11    A.   Like what, like?
12    Q.   Something that would make a certain amount of drugs go
13    further, baking powder, for example?
14    A.   No.
15    Q.   No.   Powdered sugar?
16    A.   No.
17    Q.   Nothing like that?
18    A.   No.
19    Q.   The dog is able to find something like, say, cocaine
20    because it has become familiar with the smell of cocaine;
21    right?
22    A.   Yes.
23    Q.   And cocaine apparently has a unique smell; right?
24    A.   Yes.
25    Q.   Now, you would agree with me that cocaine hidden in the
```

|  |  |  |
|---|---|---|
| | 1 | dashboard smells the same as cocaine sitting on the backseat? |
| | 2 | A.   Yes. |
| | 3 | Q.   And cocaine, you know, concealed in the trunk smells the |
| | 4 | same as cocaine in somebody's front pocket in the driver's |
| 11:31 | 5 | seat.  Would you agree with me on that? |
| | 6 | A.   Yes. |
| | 7 | Q.   It is the smell that the dog is reacting to? |
| | 8 | A.   Yes. |
| | 9 | Q.   Not the placement of the cocaine? |
| 11:31 | 10 | A.   Yes. |
| | 11 | Q.   Now, in addition to cocaine and methamphetamine and maybe |
| | 12 | derivatives, the dog is also trained to smell human beings; is |
| | 13 | that right? |
| | 14 | A.   Concealed humans, yes. |
| 11:31 | 15 | Q.   Now, would you agree with me that humans smell different |
| | 16 | than one another?  Not every human being smells the same. |
| | 17 | A.   I would agree with you on that. |
| | 18 | Q.   All right.  You know, perhaps Ms. Ro smells different than |
| | 19 | myself, just as a silly example. |
| 11:32 | 20 | A.   Yeah, I am sure she does. |
| | 21 | Q.   But the dog -- how does it work?  The dog somehow is able |
| | 22 | to smell some commonality that all people have? |
| | 23 | A.   I trained with my dog on these odors, but the actual |
| | 24 | training that goes into him knowing the difference is something |
| 11:32 | 25 | that the, you know, instructors do that and stuff.  I don't |

1   know how the dog would know the difference, but they just do.

2   It is pretty amazing.

3   Q.   Is there a way that a dog can be trained to smell only

4   people that don't have papers to come into the United States?

11:32   5   A.   No, sir.

6   Q.   To your knowledge are dogs trained to smell people of a

7   particular nationality or ethnicity, as opposed to other

8   people?

9   A.   No, sir.

11:32   10   Q.   So, you know, whether somebody happens to be Mexican or

11   American or Canadian, it smells like a human being to the dog?

12   A.   Yes, sir.

13   Q.   Now, sir, we've established that cocaine in the gas tank

14   smells the same as cocaine sitting in the front seat in

11:33   15   somebody's pocket; correct?

16   A.   Yes.

17   Q.   Now, you have some experience with people trying to enter

18   this country illegally, concealed people; right?

19   A.   Yes.

11:33   20   Q.   And I am sure that you've been trained that people can be

21   hidden in a variety of ways in a vehicle; right?

22   A.   Yes.

23   Q.   You know that sometimes people are in the trunk like this

24   case; right?

11:33   25   A.   Yes, sir.

1   Q.   Sometimes people are underneath the backseat perhaps in a

2   nonfactory compartment.   You've heard of that?

3   A.   Perhaps.

4   Q.   You've maybe even heard of people being concealed in a

11:33   5   false gas tank underneath the car.   You at least have heard of

6   that?

7   A.   I never seen anything like that, but I think I have heard

8   of that before.

9   Q.   You know that people have been concealed in quarter panels

11:33   10   of cars over the years.   You've at least heard of that?

11   A.   Heard of it.

12   Q.   And basically anywhere you could stuff a human being,

13   somebody has tried to hide there at one point or another?

14   A.   If it is something that they think that they could probably

11:34   15   get away with, sure.

16   Q.   Now, Agent Miranda, to be fair, a person concealed in a

17   nonfactory compartment under the seat isn't going to smell

18   different than a person sitting in the diver's seat, are they?

19   A.   No.   They'll smell the same to us, I am sure, yeah.

11:34   20   Q.   And to a dog too; right?

21   A.   Well, you know, I -- yeah, I don't know how they do it, so

22   I couldn't really answer for the dog.

23   Q.   Okay.   So we can agree, though, that based on everything

24   that you've been taught, trained, and so forth, that the smell

11:34   25   of a human being doesn't change based on where they happen to

          1    be hiding?

          2    A.   Yeah, that would be correct.

          3    Q.   Or not hiding?

          4    A.   Correct.

11:34     5    Q.   The smell is the smell?

          6    A.   Right.

          7    Q.   You've also in your experience as a dog handler or just as

          8    an agent at the checkpoint, searched a variety of cars over the

          9    years, I assume?

11:35    10    A.   Yes.

         11    Q.   And you know that people -- that there is a kind of a wide

         12    spectrum of how people keep their cars; is that fair to say?

         13    A.   Yes.

         14    Q.   Some people's cars are spotless?

11:35    15    A.   Yes.

         16    Q.   And some people's are the opposite of spotless?

         17    A.   Correct.

         18    Q.   But most peoples are somewhere in between?

         19    A.   Yes.

11:35    20    Q.   So you've seen food wrappers inside of cars?

         21    A.   Yes, I have.

         22    Q.   You've seen people's laundry inside of cars?

         23    A.   Yes, I have.

         24    Q.   Gym bags?

11:35    25    A.   Yes.

1    Q.   Dry cleaning?

2    A.   Yes.

3    Q.   And I could go on and on.  I mean, basically people

4    sometimes have all kinds of things in their cars?

11:35   5    A.   Yes.

6    Q.   You would agree with me that all of those things emit the

7    smell of human beings?

8    A.   That they'll have traces of human being, yes.

9    Q.   Much like the trace of cocaine on the dollar bill that we

11:35   10   talked about earlier?

11   A.   Correct.

12   Q.   We were talking about alerting versus indicating before;

13   right?

14   A.   Yes.

11:36   15   Q.   Now, as far as you are concerned -- and I am not asking

16   you, you know, as a lawyer or your legal opinion, but based on

17   your training and practice, okay, when you perceive what you

18   understand to be that initial alert, in your mind you have

19   probable cause to look in the trunk or the car or whatever.  Is

11:36   20   that an accurate statement?

21   A.   Yes.

22   Q.   And that is what you've been taught?

23   A.   Yes.

24   Q.   And that is the practice at the checkpoint to the best of

11:36   25   your knowledge?

1    A.   Yes.

2    Q.   You don't have to wait for this formal indication of

3    sitting or backing up and barking before in your mind you've

4    got probable cause to search; is that true?

11:36    5    A.   I would never do that.  I would go -- if I couldn't get

6    permission from the driver, I would then have my dog search the

7    outside of the vehicle and try to get him to indicate, see if

8    he would indicate to the vehicle.  Those were -- those would be

9    the steps I would take.

11:37    10    Q.   Now, I thought you told us on direct examination that you

11    can't make a dog indicate?

12    A.   No.  I would take him over there to see if he will indicate

13    to the vehicle is what I am saying.  Sorry if I misspoke.

14    Q.   To back up for a step, in your mind the alert gives you

11:37    15    leave to search if you want to; is that fair to say?

16    A.   Gives me probable cause.

17    Q.   Okay.  Now, we talked about this indication being for Boeli

18    he backs up and barks; right?

19    A.   Yeah.  He tries to sit, but the breed, they just want to

11:37    20    back up.

21    Q.   He is -- to be fair, he is supposed to sit for his

22    indication; right?

23    A.   Correct, he does, but he just can't hold it.  He is too

24    excited, so he just pushes back on a sit.

11:37    25    Q.   He has been trained to sit?

1    A.   Correct.

2    Q.   And over the years there's been some feedback that Boeli

3    needs to sit when he is indicating; correct?

4    A.   Correct.

11:38   5    Q.   In fact, sometimes there's been the recommendation to you

6    and to Boeli to do what are called sit indication drills;

7    correct?

8    A.   Yes.

9    Q.   So as part of your regular training and maintenance, you've

11:38   10   been told specifically, have the dog do sit indication drills

11   so he can indicate properly?

12   A.   Yes.

13   Q.   And it is fair to say that he just kind of never really got

14   there in terms of sitting consistently.  He still backs up and

11:38   15   barks still to this very day?

16   A.   Yes.

17   Q.   And so you've sort of, as I understand it, just kind of

18   accepted the fact that he is not going to sit properly, he is

19   going to back up and bark, and that will be Boeli's indication?

11:38   20   A.   I've -- I wouldn't know if I accepted it.  It is just the

21   way he is, you know, so yeah, I guess I have accepted it.

22   Q.   So it -- so the dog has never really mastered doing what it

23   is supposed to do to indicate, and you've just sort of

24   identified this different behavior as his idiosyncratic

11:39   25   indication; is that a fair statement?

1    A.   Well, like I said, he does do the sit, but he is so excited

2    that he just pushes back and barks, and I've done a lot of

3    drills to try and stop him from doing that, but he still does

4    it.

11:39  5    Q.   Okay.  Now, we looked at the video, and we'll look at it

6    here more in a second.

7    A.   Okay.

8    Q.   But you just saw the video here in court.  I think it is

9    Government Exhibit 5.

11:39  10   A.   Yes.

11   Q.   And you'll agree with me that Boeli never sat in this case?

12   A.   That's correct.

13   Q.   He didn't do the sit indication?

14   A.   That's correct.

11:39  15   Q.   He didn't try to do the sit indication?

16   A.   No, he did not.

17   Q.   And he didn't even get so excited that he was backing up

18   and barking rather than sitting.  He didn't do that either?

19   A.   No.

11:40  20   Q.   So what you're hanging your hat on, so to speak, is this

21   preliminary alert behavior that we were talking about at the

22   beginning?

23   A.   Correct.

24   Q.   Now, when Boeli was at the back of the Jetta, it -- as I

11:40  25   understand your testimony, he was smelling a smell that he had

1    been trained to detect; correct?

2    A.   Yeah.   When he -- when he -- when I -- when he tilted his

3    head, went down back that way, yes.

4    Q.   So it is your testimony that he smelled the people that

11:40   5    were just on the other side of that metal wall of the trunk?

6    A.   No.

7            MR. PILCHAK:   Objection, misstates the testimony.

8            THE COURT:   Overruled.

9            MR. SCOTT:   I can ask a different --

11:40   10           THE COURT:   Rephrase the question.

11   BY MR. SCOTT:

12   Q.   Is it your testimony that Boeli was apparently interested

13   in the trunk of the Jetta because he could smell people just on

14   the other side of that trunk wall?

11:41   15   A.   Well, at that point I didn't know what he was indicating --

16   or what he was alerting to.   I just know that he was alerting

17   in that area.   As far as it being humans or drugs, I had no

18   idea what it was.

19   Q.   Now, just a second later Boeli and yourself walked around

11:41   20   the passenger side of that same car; correct?

21   A.   Correct.

22   Q.   And you -- so you were standing with the car on your left

23   and the dog was next to you; right?

24   A.   Yes.

11:41   25   Q.   Now, sir, there was a human being just on the other side of

1    that metal wall, too, was there not?

2    A.   Yes, sir.

3    Q.   The -- there was a passenger in the passenger seat of that

4    car?

11:41  5    A.   Yes, sir.

6    Q.   Wouldn't Boeli have smelled the human being just on the

7    other side of that metal wall at that time?

8    A.   Yes, he would.

9    Q.   All right.   Now, Boeli's a terrific dog, but he is not

11:42  10   tall; correct?

11   A.   He is pretty tall.

12   Q.   Well, maybe for a dog?

13   A.   Yeah.

14   Q.   But he is not tall enough that he can look down into a

11:42  15   Jetta without getting on his hind legs?

16   A.   No, but I am pretty sure he could see into the Jetta at

17   that point.

18   Q.   That is your testimony?

19   A.   Well, I think so, from where we were and then pulling up, I

11:42  20   am sure that he could see the driver and the passenger.

21   Q.   Okay.   So let's get to it.   Is it your testimony that the

22   dog is looking to see if there is people and then matching that

23   up with the smell in the air?

24   A.   No.   I am just answering your question.   I wasn't trying to

11:42  25   say that.

1    Q.   Okay.

2    A.   I am saying that he could have seen them is all I am saying

3    with his height.

4    Q.   What is your testimony in terms of how he distinguishes the

11:42  5    smell of people who are riding as regular passengers and the

6    smell of people elsewhere?

7    A.   I think I said earlier as well, I can't speak for the dog.

8    I don't know how they do it.  I just know they do it on a

9    regular basis at work.

11:42  10   Q.   Has any handlers ever explained to you how they do it?

11   Have the trainers explained to you how they do it?

12   A.   No.  And I don't know how they train them on it either,

13   so --

14   Q.   How does the dog tell it is a gym sock in the trunk versus

11:43  15   a person in the trunk?

16   A.   I don't know.

17   Q.   Now, you went over some of the Government's exhibits, I

18   believe it was 6 and 7, that had numbers and columns.  Do you

19   remember that?

11:43  20   A.   Yes.

21   Q.   Threes and twos and fours; right?

22   A.   Yes, sir.

23   Q.   And you said that you have an understanding today that you

24   have to meet a certain cut off with those numbers; correct?

11:43  25   A.   Yes, sir.

1   Q.   Now, this is not the first time that you've testified as a

2   canine handler here in federal court; correct?

3   A.   That's correct.

4   Q.   You testified back in the spring of 2014?

11:43   5   A.   Yes, sir.

6   Q.   In actually two different cases; correct?

7   A.   Yes, sir.

8   Q.   One in front of Judge Sabraw?

9   A.   Yes, sir.

11:43   10   Q.   And one in front of Judge Curiel?

11   A.   Yes.

12   Q.   Now, would you agree with me that in your testimony last

13   year, you testified under oath that you didn't really -- nobody

14   had trained you on those numbers and symbols in the training

11:44   15   records?

16   A.   Yeah, I said that.

17   Q.   And that was true at the time?

18   A.   Yes.

19   Q.   Have you since acquired a new level of knowledge, or are --

11:44   20   you pretty much know what you knew back then?

21   A.   Well, after the Court and the questions, I went back and

22   asked a few questions about the numbers and what they meant and

23   stuff like that afterwards, just to be more knowledgeable on

24   that.

11:44   25   Q.   So maybe somebody -- somebody told what you these letters

1    mean?

2    A.   Right.  I asked instructors, like, just to be sure what

3    they were.

4    Q.   Would you agree with me that last spring you wouldn't have

11:44   5    been able to say that "P" means people or "H" means heroin?

6    A.   I believe last spring, it was my first time in court, and I

7    didn't want to assume anything, so I -- I probably could have

8    answered it a little differently, but I didn't want to assume.

9    I wanted to be 100 percent sure, and I wasn't 100 percent sure,

11:45   10   so I didn't want to speculate that is what they meant.

11   Q.   You are 100 percent sure now because you've gone over it

12   with somebody in the interim?

13   A.   Yeah.  I am more comfortable with it.  I wouldn't say I am

14   100 percent exactly on what everything means in those papers.

11:45   15   I am not an expert on the papers, no.

16   Q.   Is it fair to say that it is actually an instructor who is

17   filling out the threes and fours and all that as they are

18   watching you do your drills with the dog?

19   A.   Yes, sir.

11:45   20   Q.   And they don't sit there and go over each number with you

21   when you are done, do they?

22   A.   No.  They go over pretty much the notes.  They -- while

23   they are training, what they write down is they are pretty much

24   talking to you about it while you are doing it.

11:45   25   Q.   So you get some verbal feedback, you know, you may want to

```
        1   do this kind of drill, here is something that you could have
        2   done better, this was a good job, sort of just an informal
        3   feedback like that?
        4   A.  Yes.
11:45   5   Q.  And then you learn whether, you know, you passed or failed;
        6   is that right?
        7   A.  There is no pass or fail on that, but yeah, at the yearly
        8   certification, yeah, it is either you pass or fail, but the
        9   green sheets, there is no pass or fail.
11:46  10   Q.  So the green sheets are basically exclusively just oral
       11   feedback to you that, you know, this was good; this, you need
       12   to better work on?
       13   A.  It is training.
       14   Q.  And they don't sit there and go through the number scales
11:46  15   with you for these green sheets?
       16   A.  No.
       17   Q.  And have you been trained on what behaviors will result in
       18   a three rating versus a four rating, for example?
       19   A.  No, I have not.
11:46  20   Q.  So you don't know what is in an instructor's mind when they
       21   are filling out these numbers on these sheets?
       22   A.  No.
       23   Q.  Or what that signifies, in terms of, you know, the exact
       24   level of competence of the dog?
11:46  25   A.  No.
```

```
 1   Q.   And would the same be true for the certification process at
 2   year end?
 3   A.   What part?
 4   Q.   Well, there is also a series of numbers on the
 5   certification at the end of the year; correct?
 6   A.   Correct.  They -- they actually go over more stuff on that
 7   one, because, you know, if you don't pass, I am sure they go
 8   over a lot more.
 9   Q.   Okay.  But do you have some training on what behaviors
10   result in what numbers for that certification process at year
11   end?
12   A.   No.
13   Q.   This is the one dog you've ever worked with, is that my
14   understanding?
15   A.   Yes, sir.
16   Q.   Is that true?
17   A.   Yes, sir.
18   Q.   Have you ever -- you haven't worked with other dogs then.
19   Have you ever trained other dogs?
20   A.   On Border Patrol level, no.
21   Q.   Maybe, you know, a family dog or something like that?
22   A.   Correct.
23   Q.   But you've never trained a working dog for -- like as a
24   narcotic dog or a concealed person finding dog?
25   A.   No, sir.
```

1   Q.   Okay.   Have you ever been formally recognized as an expert

2   in court?

3   A.   No.

4   Q.   Do you ever give speeches or lectures to other law

11:48   5   enforcement personnel about how to work their working dogs?

6   A.   No, I do not.

7   Q.   Have you ever written books or articles about narcotic

8   detector dogs or detector dogs?

9   A.   No, I have not, sir.

11:48   10   Q.   Now, you testified that there is this year end

11   certification; correct?

12   A.   Yes.

13   Q.   That certification is actually by Customs and Border Patrol

14   itself, right?

11:48   15   A.   That's correct.

16   Q.   They have some sort of canine unit or a canine certifying

17   body, or how does that work?   What is your understanding of

18   what that entity is that does the certifying?

19   A.   The person that is grading me?

11:49   20   Q.   Yeah.

21   A.   They are actual instructors.   They go through a whole

22   different program after becoming canine handlers to become

23   instructors.

24   Q.   Are you familiar with POST standards or POST training?

11:49   25   A.   I am not 100 percent sure.

```
 1   Q.   Have you ever heard of Police Officer Standards and

 2   Trainings?

 3   A.   Maybe.  I am not familiar with them, though, no.

 4   Q.   Do you know whether you -- whether your team or you

 5   individually are a member of a police canine association, for

 6   example?

 7   A.   I am not 100 percent sure on that, no.

 8   Q.   Do you belong to any outside non-Border Patrol entities or

 9   organizations having to do with working dogs?

10   A.   As far as different certificates besides of the one of our

11   yearly standard?

12   Q.   Right.

13   A.   No.  That is the only certificate that I have with my dog.

14   Q.   All right.  No third party does that?

15   A.   No, sir.

16   Q.   And that is true for all of the working dogs at Customs and

17   Border Patrol at least to the best of your knowledge?

18   A.   To the best of my knowledge -- well, actually different,

19   different dogs have different certifications, so I can only

20   speak for my certification with Boeli, but there is --

21   Q.   What are the other certifications?

22   A.   Cadaver dogs.  There are bomb dogs.  There are all

23   different dogs that have different certifications, but as far

24   as Boeli and I are concerned, we only have the one

25   certification.
```

11:49 (line 5)
11:49 (line 10)
11:50 (line 15)
11:50 (line 20)
11:50 (line 25)

1    Q.   Okay.  Do you keep deployment records of your dogs searches

2    actually on the job?

3    A.   I'm sorry.  Do you mean like our green sheets?

4    Q.   Well, your green sheets, as I understand them, are training

11:50    5    exercises; is that right?

6    A.   Right.

7    Q.   Do you keep any records that documents what your dog is

8    doing while actually on the job in each given shift?

9    A.   Yeah.  There is -- there are certain documents, but I

11:51    10   don't -- I haven't kept any.  Like, are you talking about,

11   like, a sheet to say what happened on that day?

12   Q.   Well, let's say -- let's say your dog alerts five times

13   during one of your shifts, okay, hypothetically.

14   A.   Okay.

11:51    15   Q.   So you are working, you got a regular, what, eight-hour

16   shift?

17   A.   Yes, well 10-hour shift.

18   Q.   Okay.  10-hour shift with a break or whatever, and the dog

19   alerts five times, let's say.

11:51    20   A.   Okay.

21   Q.   At the end of the day, is there some piece of paper

22   somewhere or some chart or report that gets filled out that

23   says -- that contains the information, these are the five

24   alerts and this is the result of those five alerts?

11:51    25   A.   That I have -- no.

1    Q.   Is there a different way that you are able to keep some

2    sort of statistics for how often the dog alerts while on the

3    job and then what the dog found for each of those alerts?  Do

4    you keep stats like that?

11:52   5    A.   Like on my -- yeah, well, you have a record of all the

6    files that you've done, so as far as, you know, what the dog

7    has caught and what he hasn't caught, that kind of thing.

8    Q.   So if I understand it, you generate a report?

9    A.   Correct.

11:52   10   Q.   And you'll write an ROI or memorandum of investigation if

11   the dog finds drugs or people; right?

12   A.   Correct.

13   Q.   But are you keeping statistics for when the dog alerts, but

14   then there turns out not to be anything there?

11:52   15   A.   No, I am not.

16   Q.   Why not?

17   A.   I don't know why, sir.

18   Q.   Isn't it important to know what the dog's error rate is?

19   A.   Well, I don't see it as an error rate, you know, when -- I

11:52   20   don't see it as an error.

21   Q.   Can you explain that?  How can the dog not have an error?

22   A.   Well, if I secondary a vehicle and I don't find something,

23   it doesn't mean that someone didn't have something in there

24   prior, so there is no way for me to say it is an error just

11:53   25   because I -- or maybe at some point I just didn't find it, and

1    I searched and I searched, but I just couldn't find what he was

2    alerting to.

3    Q.  And there has been certainly times that has happened, that

4    the dog alerts and you don't find anything.  That happens;

11:53   5    right?

6    A.  Yes, sir.

7    Q.  And as I understand your testimony, when that happens, you

8    sort of chalk it up to the idea that, well, there must have

9    been drugs in here at some point, or there must have been some

11:53  10    odor that he was trained to detect at some point, it just is

11    not here anymore?  Is that --

12    A.  Yes.

13    Q.  Well, so do you at least allow for the possibility that the

14    dog might alert and you couldn't find anything because there

11:53  15    wasn't anything and never was?

16    A.  I don't believe that to be true.

17    Q.  Why can you say that?

18    A.  Well, I -- just because I've seen the dog, and I've seen

19    what he alerts to, and you know, nine times out of ten, I'll

11:53  20    find, you know, like, an infinitesimal amount of something.  If

21    I sit there and go through the carpet or something, I'll find

22    something that, you know, he's actually alerting to.

23    Q.  When you say nine times out of ten, do you mean that sort

24    of colloquially or figuratively, or do you mean it literally?

11:54  25    A.  Well, I don't have the exact numbers so.

```
 1   Q.   Okay.  You told us on direct examination that your dog has

 2   found about 20 human beings over the years?

 3   A.   Yes.

 4   Q.   And about five or seven -- five to seven of those were in

 5   vehicles.  Did I hear you correctly?

 6   A.   Correct.

 7   Q.   And the rest were, like, out in the brush somewhere?

 8   A.   Yes.

 9   Q.   So in a five-year career, this dog has found five to seven

10   people concealed in cars?

11   A.   Correct.

12   Q.   How many narcotics busts has the dog been responsible for

13   during that same five-year period of time?

14   A.   I don't know.  I would say about 12.

15   Q.   Okay.  So in five years we've got five to seven people you

16   just said; right?

17   A.   Yes, sir.

18   Q.   And about 12 narcotics busts?

19   A.   Yes, sir.

20   Q.   Now, sir, you also testified on direct examination that

21   every day is different, but there are alerts virtually every

22   day; right?

23   A.   Yes, sir.

24   Q.   Sometimes it is two alerts during a shift?

25   A.   Yes, sir.
```

1    Q.   And sometimes it is seven alerts in a shift?

2    A.   Correct.

3    Q.   How many days do you work in a year, five days out of every

4    week?

11:55   5    A.   Yes, sir.

6    Q.   So five days times, say, 50 weeks; is that right?

7    A.   Yes, sir.

8    Q.   Okay.  So that is like 250 shifts a year give or take?

9    A.   Yes, sir.

11:55   10   Q.   And you've been on the job five years?

11   A.   Yes, sir.

12   Q.   Okay.  All right.  So 250 times five is like 1,250 shifts

13   that you and the dog have worked.  Does that sound about right?

14   A.   Yes, sir.

11:56   15   Q.   And can we take -- if sometimes it is two, sometimes it is

16   seven, can we say he alerts three times a shift, just to be

17   fair?

18   A.   Sure.

19   Q.   You would agree with me that is nearly 4,000 alerts over

11:56   20   the course of a career; correct?

21   A.   Yes, sir.

22   Q.   But he's found five to seven human beings, and 12 narcotics

23   busts over that time; right?

24   A.   Yes, sir.

11:56   25   Q.   You would agree with me that those numbers are not anywhere

1    near nine out of ten times; true?

2    A.   Well, no, I am saying that -- a lot of people will in

3    California smoke marijuana.  I could -- like, a lot of them I

4    could even like smell it in there, but that is him alerting.

11:56   5        There is an infinitesimal amount, but it is not like a

6    false alert or anything like that.  I forget exactly what you

7    said.

8    Q.   So you are basing the nine out of ten times on the fact

9    that you understand that a lot of people smell marijuana?

11:56   10   A.   Smell marijuana?

11   Q.   Or smoke marijuana, excuse me.

12   A.   Yes.  In finding remnants in the carpet of vehicles of

13   cars.  That is where my nine out of ten came from.

14   Q.   Okay.  You were asked some questions on direct about how it

11:57   15   was that Boeli was selected to be a working dog?

16   A.   Yes, sir.

17   Q.   And I believe you said that you understand that there is

18   some sort of criteria and some sort of a process; right?

19   A.   Yes, sir.

11:57   20   Q.   But that is basically what you know about it.  You don't

21   know a lot more about the criteria that go into the selection?

22   A.   No, I don't.

23   Q.   Or, you know, what strengths or weaknesses they are looking

24   for?

11:57   25   A.   Right, correct.

```
        1   Q.   Do you know anything about the kind of breeding they look
        2   for?
        3   A.   No, no.
        4   Q.   Or the kind of breed distinct from their lineage?
11:58   5   A.   No.
        6   Q.   The Government asked you a question, they were going
        7   through the training records, and showed you an example of a
        8   blank -- a blank training run.  Do you remember being asked
        9   questions about a blank on a training record?
11:58  10   A.   Yes, I do.
       11   Q.   And I believe it was like a warehouse environment where
       12   apparently there was nothing there; right?
       13   A.   Okay.
       14   Q.   Do you remember talking about that?
11:58  15   A.   I don't remember the location, but I remember the blanks he
       16   was asking me about.
       17   Q.   Okay.  But there's been times -- let's just set aside the
       18   where it is, but there's been times where you and the dog have
       19   searched a given area, whether it be a warehouse or a car or
11:58  20   something that nothing was in; right?
       21   A.   Right.
       22   Q.   And the success of that run was that the dog didn't alert
       23   to nothing; right?
       24   A.   Correct.
11:59  25   Q.   That is how you passed; right?
```

1    A.   Correct.

2    Q.   But wouldn't there have still been the smell of people in a

3    car that was empty, for example?

4    A.   I am sure that there would be remnants of that, yes.

11:59   5    Q.   Just like the remnants of marijuana that you talked about?

6    A.   Of people, yes.

7    Q.   I mean the dog detecting those trace smells, like the

8    cocaine on the dollar bill; right?

9    A.   I'm sorry.   I didn't understand the question.

11:59   10    Q.   Let me ask this question --

11    A.   Okay.

12    Q.   -- if you are running your dog in, let's say, an empty car,

13    the dog is -- there is going to be some trace smells of humans.

14    Would you agree with that?

11:59   15    A.   I do agree with that.

16    Q.   And the dog wouldn't be able to see the human; right?

17    A.   No, he wouldn't.

18    Q.   So why wouldn't the dog alert to a concealed human if he

19    can smell human but can't see one?

11:59   20    A.   I -- like I said earlier, I don't know how he does it.   I

21    don't know.

22    Q.   Have you ever asked anybody how he does it?

23    A.   You know, I haven't.   I mean, I train with the dog.   We

24    find the humans, and no, I haven't asked anybody.

12:00   25    Q.   Okay.   I am going to show you what has been marked as

1    Defendant's Exhibit 1.

2        And I'll just represent to Your Honor and to the Government

3    this is the disk that was disclosed in discovery in sort of the

4    native format from the surveillance checkpoint.

12:00   5        THE COURT:  How is this different than the exhibit

6    that the Government -- is it more complete?  What is the

7    difference?

8            MR. SCOTT:  There is some different scenes that the

9    Government didn't show.  I think the Government had three

12:00   10   clips, and I am going to show some different clips.

11           THE CLERK:  We already have an Exhibit 1.

12           THE COURT:  Do we have an Exhibit 1 already?

13           MR. SCOTT:  Yes, there is an exhibit binder in front

14   of Your Honor.

12:01   15           THE COURT:  But we already have -- the Government has

16   introduced 1 through 10.

17           MR. SCOTT:  Can I call it Defense Exhibit 1?  I can

18   call it Defense A, if the Court prefers.

19           THE COURT:  How many do you have?

12:01   20           MR. SCOTT:  I have nine.

21           THE COURT:  Why don't we use letters for yours.

22           MR. SCOTT:  Okay.  That's fine.

23           THE COURT:  If somebody is referring to one, we'll

24   know it is just one.

12:01   25           MR. SCOTT:  Okay.

1          THE COURT:  So why don't we say this will be A.

2          MR. SCOTT:  Very good.

3          THE COURT:  And so when you have in your exhibits

4    marked 1 through 9, I'll just put those in letter order.

12:01   5          MR. SCOTT:  Okay.  That can be A through I

6    respectively.  That's fine, Your Honor.

7    BY MR. SCOTT:

8    Q.  So Defendant's Exhibit A, if we could please cue up

9    Defendant's Exhibit A to Camera 13, and the time would be

12:01  10   20:27:30.

11       Okay.  Now before we get started there, you have that on

12   Defendant's Exhibit A in front of you on the screen?

13   A.  Yes.

14   Q.  You recognize that as the Highway 86 Checkpoint?

12:02  15   A.  Yes, I do.

16   Q.  The white pickup truck in the foreground is by the Primary

17   Inspection booth?

18   A.  Yes.

19   Q.  Now, behind the white truck at the top of the screen, that

12:02  20   is what is described as the Secondary lot; correct?

21   A.  Correct.

22   Q.  And you see that there is a dark sedan there with the trunk

23   open; correct?

24   A.  I do.

12:02  25   Q.  Okay.  The time is 20:27:29; right?

```
       1    A.   Yes.

       2    Q.   That was before the Jetta pulled into the screen, which was

       3    at 20:30:52?

       4    A.   Okay.

12:02  5    Q.   Correct?

       6    A.   Yes.

       7    Q.   So this was before that happened?

       8    A.   Yes, it was.

       9    Q.   All right.  Now, I want you to -- we're going to play some

12:03  10   of the video, and then I want you to watch the Secondary area

      11    at the top of the screen?

      12    A.   Okay.

      13    Q.   Okay.  Let's pause it.  Back it up a hair.

      14         Can I inquire?  Can everybody see okay without enlarging

12:03  15   it, or is it better to enlarge it?

      16         You have to get the strip off the middle if you are going

      17    to enlarge it.  There you go.  So let's play, please.

      18         Okay.  Is that you and your dog going out at the top right

      19    there?

12:04  20   A.   Yes, sir.  Sorry.  Yes, sir.

      21    Q.   Okay.  Keep watching it, please.  Keep going.  Okay.

      22         That is the dog coming around the trunk; right?

      23    A.   Yes, it is.

      24    Q.   The dog's tail is wagging?

12:04  25   A.   Yes.
```

1    Q.   And the dog just got up on its hind legs to look in the

2    trunk; right?

3    A.   Yes.

4    Q.   We can pause it there.

12:04    5        Would you agree with my characterization that the dog was

6    sort of almost pulling you out to that car as you appeared from

7    the right-hand side of the screen?

8    A.   Yeah.  He saw the agent there, so he wanted to see what the

9    agent was looking at.

12:04    10   Q.   You would agree that the dog was interested?

11   A.   Yeah.  He was interested in the agent and what he was

12   doing, yes.

13   Q.   The dog was excited?

14   A.   Yeah.  He is an excited dog.

12:05    15   Q.   All right.  Now, would you describe that as an alert?

16   A.   No.

17   Q.   Okay.  So I understand you to be saying that the dog was

18   reacting to the human's behavior; is that right?

19   A.   I believe so, yes.

12:05    20   Q.   Do you know whether or not anything was found in that

21   trunk?

22   A.   I don't remember, no.  I don't think so.

23   Q.   Okay.  Let's fast forward to 20:30:52.  That is fine.

24       Okay.  Now, in the bottom of the screen this is the Jetta

12:05    25   that we've been talking about; right?

```
 1    A.   Yes.
 2    Q.   But simultaneously at the top of the screen, that car seems
 3    to be driving away; right?
 4    A.   Correct.
 5    Q.   And if we could start at the next screen there.
 6         The fact that that car is driving off sort of suggests that
 7    nothing was found there; correct?
 8    A.   Correct.
 9    Q.   But it is your testimony that that wasn't an alert when the
10    dog was pulling you out to that car, rather the dog was just
11    reacting to the human's behavior?
12    A.   Correct.  I believe I was coming out of my vehicle at that
13    point, coming out to there, so he was running, saw a car over
14    there, wanted to see what was going on, and I allowed him to.
15    Q.   Okay.  Because -- I mean, although he is very -- although
16    he is trained and I am sure a good dog, dogs are still dogs;
17    right?
18    A.   Correct.
19    Q.   And they react to things that they are interested in?
20    A.   Correct.
21    Q.   Whether it is a human looking in a trunk and it wants to
22    see what is going on; right?
23    A.   I don't understand.  Like, if there is someone just laying
24    in there, and he is looking at the person laying in the trunk?
25    Q.   No.  In this instance the agent was looking inside an open
```

```
 1   trunk?
 2   A.   Correct, yes.
 3   Q.   And the dog apparently reacted to that?
 4   A.   Yes.
 5   Q.   So I -- I take it that is not a false alert or anything?
 6   A.   No.
 7   Q.   And just so we're crystal clear on the record, there is no
 8   such thing as a false alert in your book?
 9   A.   No.
10   Q.   I'll ask a better question.  Is there any such thing as a
11   false alert?
12   A.   No, there is not.
13   Q.   Categorically, no matter what?
14   A.   No.
15   Q.   How would you know if there was a false alert?
16   A.   Exactly.  So how could you call it a false alert if you are
17   not 100 percent sure it is a false alert?
18   Q.   So it is kind of like proving a negative?
19   A.   Right.  How do you prove that?
20   Q.   So as far as you are concerned they don't exist?
21   A.   No.
22   Q.   Okay.  So let's go back to 20:30:52.  All right.
23        Okay.  This is the dog sniffing the back trunk; correct?
24   A.   Correct.
25   Q.   And the dog pauses at the right back bumper; correct?
```

12:07 (line 5)
12:07 (line 10)
12:07 (line 15)
12:07 (line 20)
12:08 (line 25)

1    A.    Correct.

2    Q.    And then continues; right?

3    A.    Yeah.   I tell him, yes.

4    Q.    Okay.   Now, I think we covered this earlier, but to be

12:08    5    clear, the dog didn't do what you've described as an

6    indication; right?

7    A.    Correct.

8    Q.    The dog was doing that preliminary alert indication that

9    suggested or showed that it was picking up a scent it had been

12:09   10    trained to detect; right?

11    A.    Correct.

12    Q.    But had not yet pinpointed that?

13    A.    Correct.

14    Q.    And hadn't indicated yet to suggest that it had found the

12:09   15    source?

16    A.    Correct.

17    Q.    Now, if we can start at 20:31:03.

18          Now, you are circling back here; right?

19    A.    Yes, sir.

12:09   20    Q.    Okay.   Now, pause it.

21          Now, the next thing that happens you are going to reach for

22    the trunk handle?

23    A.    Correct.

24    Q.    Can we just maybe play it, play it and pause it a couple

12:09   25    times.

```
 1        So right now you are already reaching for the trunk?
 2   A.  Correct.
 3   Q.  And the dog seems to be interested in what you are doing;
 4   correct?
 5   A.  Yes, he is interested, yes.
 6   Q.  Now, would you agree with me that the dog appears to be
 7   reacting to your behavior, much like the dog was up in the
 8   Secondary lot a few moments ago?
 9   A.  At this point -- can you rewind it and show me again, let
10   me look at his behavior?
11   Q.  Certainly.
12   A.  And I'll let you know.
13        No.  I -- I disagree.  As soon as I spun back around, you
14   could see him go to that rear headlight and then start working
15   the scene before I was even pulling on that.
16   Q.  Is that right?  Okay, okay.  And then you continued pulling
17   on the handle?
18   A.  Yeah.  As he was trying to open it from the inside, I was
19   trying to help it along.
20   Q.  Okay.  Now, if we can go back to the beginning of this
21   clip -- go ahead and play.
22        Now, at this point are you telling the agent -- let's go
23   frame by frame, if that is possible.  Let's back it up to the
24   very beginning of this clip.  You can keep it small, I think,
25   for now.  Okay.  Stop.  Go ahead and play.  And stop.
```

12:09 (line 5)
12:10 (line 10)
12:10 (line 15)
12:10 (line 20)
12:11 (line 25)

```
        1        Now, at this point, have you told or have you asked Agent
        2   Stypinski to have Mr. Summers open the trunk?
        3   A.  Are we after the alert that I said that the alert was and
        4   then flip back around?  Is that where we're at in the video?
12:11   5   Q.  Why don't we do this, let's start at 20:30:52.  Okay.  Stop
        6   it.
        7        Have you yet told Agent Stypinski, have him open the trunk?
        8   A.  No.
        9   Q.  Okay.  Go ahead and play.  Stop.
12:12  10        Now, have you told Agent Stypinski to have him open the
       11   trunk?
       12   A.  No.  I am pretty sure I am still focused on the dog there.
       13   Q.  Okay.  Play.
       14   A.  It is that point, right there, is when I am asking him if
12:12  15   we can look at the trunk.
       16   Q.  Wait.  Back up.
       17        Where?
       18   A.  Right there, where I am walking forward, right about there.
       19   See, probably right around there I am asking Sty -- Stypinski.
12:12  20   Q.  It is your testimony that you orally said to Agent
       21   Stypinski, have him open the trunk?
       22   A.  No.  I am saying that I asked him if we can take a look in
       23   the trunk.
       24   Q.  And we saw that on camera just now?
12:13  25   A.  Did you see it?  No, probably not.  But that is how I work.
```

1    My eyes are always going to be focused on my dog, and I am

2    going to communicate to the Primary agent -- because my job is

3    to keep my eyes on the dog at that point.

4    Q.   So tell us when you are saying this?

12:13   5    A.   Right about there, I am probably telling Sty -- Stypinski

6    if we can take a look in the trunk.

7    Q.   But your eyes are focused on the dog?

8    A.   At that point there, yes.

9    Q.   Okay.  Let's play it some more.  Now, we have to jump over

12:13   10   to the other.  Okay.  Play it.

11        Okay.  You are still walking?

12   A.   Yes, sir.

13   Q.   And your eyes are where?

14   A.   My eyes are now focused over here, as I am coming back

12:13   15   around here with Bo.  My eyes are over here.

16   Q.   Okay.  When you are taking that kind of swing around the

17   passenger side of the car, back and forth, according to your

18   testimony, that is when you said to Stypinski, have him open

19   the trunk, or can we look at the trunk, or whatever your words

12:14   20   are?

21   A.   Yes, sir.

22   Q.   And you heard him say something to Mr. Summers?

23   A.   Yes, I did.

24   Q.   But your eyes were on the dog, you said?

12:14   25   A.   Yeah, until this point, yes, my eyes were on the dog.

1    Q.  Now, Agent Miranda, didn't you testify on direct

2    examination something about looking through the window and

3    seeing Mr. Summers nodding?

4    A.  Yes, I did.

12:14   5    Q.  But that couldn't have been on the passenger side because

6    your eyes were on the dog?

7    A.  Correct.

8    Q.  And it can't be now because you are at the trunk, right,

9    looking at the trunk?

12:14   10    A.  No.  If you back up just a little bit, you'll see as I am

11    walking back this way, my eyes are focused over here on them.

12    Q.  Okay.  Let's see.

13    A.  Right there I am watching.

14    Q.  Let's play it again.

12:14   15       Tell us exactly when you are seeing Agent Stypinski talking

16    to Mr. Summers and Mr. Summers nodding and such.

17       Did we pass it?

18    A.  No.  It is right around there.  Right when I am coming

19    right around here, I am looking in, and he is asking him, and

12:15   20    he is trying to open the trunk at that point.

21    Q.  Are you looking out of the corner of your eye, sir?

22    A.  Yes, peripheral, yes.

23    Q.  So it is through your peripheral vision that you are seeing

24    Mr. Summers nodding.  Is that what you are saying?

12:15   25    A.  Correct, yes.

1    Q.   And through the passenger window as well?

2    A.   Yes.

3    Q.   Which was rolled up?

4    A.   Yes, sir.  I don't want to cause too much -- I don't want

12:15  5  to make them nervous either, like me staring at them, like I

6    don't want them to -- so I am watching them, watching my dog,

7    and doing all that at the same time.

8    Q.   Okay.  But suffice it to say, by the time you get back to

9    the trunk, you have already seen this consenting behavior by

12:15  10 Mr. Summers, according to your testimony?

11   A.   Yes, sir.

12   Q.   Okay.  Let's watch it one more time and tell us exactly

13   when.

14   A.   Okay.

12:16  15      Right about there.

16   Q.   Right there?

17   A.   Yes, sir.

18   Q.   Sir, that time you are stopped at the rear passenger corner

19   of the sedan; correct?

12:16  20  A.   Okay, yes.

21   Q.   So it is when you are at the rear passenger corner that you

22   are looking through your peripheral vision?

23   A.   Yes, sir.

24   Q.   But that would be --

12:16  25  A.   No, no, I am constantly -- like once we're circling around,

1   I am already, like, peripheral vision, but when I see him

2   trying to reach for the trunk is when I am already back here.

3   Q.  I am talking about the nodding.  I am talking about --

4   A.  Well, he was nodding throughout trying to open the trunk,

12:16   5   so when I saw it here, as I was flipping around, and then back

6   over here.

7   Q.  Okay.

8       MR. SCOTT:  All right.  I think that is all we have.

9   Thank you.

12:16   10      THE COURT:  All right.  Counsel, with respect to the

11   exhibits --

12      MR. SCOTT:  I think that they were largely sort of

13   ready marked for identification in the event of impeachment,

14   and we didn't end up using them.

12:17   15      THE COURT:  I am talking about the Government's

16   exhibits.

17      MR. SCOTT:  I'm sorry.

18      THE COURT:  I think those were 6, 7, 8, and 9.  Is

19   your objection hearsay?

12:17   20      MR. SCOTT:  It is, and lack of foundation.

21      THE COURT:  Well, it -- if you -- there is no dispute

22   as to authenticity.  And the hearing is about.  This hearing is

23   about the reliability of the dog; is that right?

24      MR. SCOTT:  Yes, sir.

12:17   25      THE COURT:  That is really a preliminary question of

1    fact as to whether evidence should be admissible; fair to say?

2             MR. SCOTT:  I agree.

3             THE COURT:  And do the Federal Rules of Evidence apply

4    in this context.

12:17    5             MR. SCOTT:  They don't, due process does, so I stand

6    by the objection, but I understand what the Court is saying.

7             THE COURT:  All right.

8             MR. PILCHAK:  And, Your Honor, our request would be

9    just that you consider Exhibit 10 for that purpose as well.  It

12:17   10    is the green sheets.

11             THE COURT:  All right.  So your objection is

12    overruled.  The documents will remain admitted.

13             MR. SCOTT:  Very good.

14             THE COURT:  And certainly in part on Federal Rule of

12:17   15    Evidence 1101(d).  All right.

16             Any redirect?

17             MR. PILCHAK:  Yes, Your Honor.

18             THE COURT:  All right.

19             MR. PILCHAK:  Thank you.

12:18   20                       REDIRECT EXAMINATION

21    BY MR. PILCHAK:

22    Q.  Agent Miranda, just to make sure it is clear in the record,

23    on cross-examination you testified about the numeric scoring

24    for the certification and for the green sheet training.  Do you

12:18   25    recall that?

```
        1   A.   Yes, I do.

        2   Q.   And you were asked whether you remember the cut off for the

        3   scoring to pass the certification; right?

        4   A.   Yes.

12:18   5   Q.   What is the cut off?

        6   A.   The cut off is that -- it has to be 3.5 or lower.

        7   Q.   So on the numeric score of one to six, you have to get an

        8   average between one and zero, if it goes to zero, and 3.5?

        9   A.   Correct.

12:18  10   Q.   You also testified on cross that you can call or announce

       11   when Boeli has alerted, right, but not anyone can do that?

       12   A.   Correct.

       13   Q.   Who can do that?

       14   A.   I can.

12:18  15   Q.   Anyone else?

       16   A.   No.

       17   Q.   Why is it that only you can do it?

       18   A.   Because I am the only one that has ever gone through the

       19   process with Bo.  After his eight weeks in the academy, it is

12:19  20   just me for the last five years.

       21   Q.   Okay.  You were also asked on cross-examination whether it

       22   is theoretically possible that Boeli could alert to, for

       23   example, pseudoephedrine and cold medicine; right?

       24   A.   Yes.

12:19  25   Q.   If your 5,000 hours plus experience with Boeli, has he ever
```

1    alerted to a bottle of cold medicine?

2    A.  No, sir.

3    Q.  Have you or Boeli ever been disciplined or gotten negative

4    feedback on his alerting to nonconcealed people, like visible

12:19  5    people in the car?

6    A.  No, sir.

7    Q.  So have you and Boeli ever been chastised for, you have to

8    stop alerting to these cars with only visible people in them?

9    A.  No, sir.

12:19  10   Q.  What about alerting to gym bags or dirty socks or something

11   else that smells like people, have you ever gotten negative

12   feedback about that?

13   A.  No, sir.

14   Q.  Then when you were going through the video frame by frame

12:19  15   with Mr. Scott, one of his questions was about when Boeli was

16   on the other side of the passenger door from the passenger of

17   the Jetta.  Do you remember that?

18   A.  Yes, I do.

19   Q.  And you were asked whether Boeli could smell that person.

12:20  20   What did you say?

21   A.  I said, yes, he could smell that person.

22   Q.  Did he alert to that person?

23   A.  No, he did not.

24   Q.  You also testified on cross-examination that you don't know

12:20  25   exactly what is required to get a one or a two or a three for

1    example on the certification score sheets; is that right?

2    A.   Correct.

3    Q.   But do you know what is required to pass in terms of the

4    numeric scoring that we discussed earlier?

12:20    5    A.   Yes.

6    Q.   And have you and Boeli always passed?

7    A.   Yes, we have.

8    Q.   You were also asked about deployment records that you do or

9    don't keep.  Do you remember that?

12:20    10    A.   Yes, I do.

11    Q.   One of the questions was whether you recorded what the

12    outcome was for each alert that Boeli had in the course of an

13    average day; correct?

14    A.   Right.

12:20    15    Q.   And I think one of the questions that I think he was trying

16    to identify was whether you record what could be referred to as

17    a false positive.  Do you remember that?

18    A.   Yes.

19    Q.   What about a false negative?  Would it be possible to make

12:21    20    a deployment record that recorded at the checkpoint when you

21    are in the field with 5,000 cars a day when Boeli doesn't alert

22    to the vehicle and nothing was present?  Could you create that

23    kind of record if you wanted to?

24    A.   No.

12:21    25    Q.   Why not?

```
      1   A.   It is just too much traffic.  It would be impossible.

      2   Q.   And when Boeli doesn't alert to a car in the field, and the

      3   citizen or whoever is released into the United States down the

      4   highway, do you have any way of knowing what is or isn't in

12:21 5   their car?

      6   A.   No.

      7   Q.   So let me ask you about this, you testified on direct and I

      8   believe on cross as well that in your view there is no such

      9   thing as a false indication; right?

12:21 10  A.   Correct.

     11   Q.   But you do have these blank trainings in the green sheet

     12   exercises and at certification; right?

     13   A.   Yes.

     14   Q.   How is it possible to know reliably that it is correct for

12:22 15  Boeli not to alert in a blank training environment but not to

     16   have a false positive in the field?

     17   A.   Because it is a controlled environment when you are

     18   trained, and when you are out in the field it is not

     19   controlled.  You don't know what is in or not in the car, sir.

12:22 20  Q.   You also walked through some numbers with Mr. Scott about

     21   how many days you've worked and roughly how many alerts you've

     22   called, and I think he added it on the back of an envelope to

     23   4,000 alerts as a very rough estimate for you and Boeli's

     24   career; right?

12:22 25  A.   Right.
```

1    Q.   And you were asked about that counter-posed with the five

2    to seven people in vehicles, and the 12 narcotics busts that

3    you and Boeli have brought in over your career.  Do you

4    remember that?

12:22   5    A.   Yes, I do.

6    Q.   And what could account for the difference between 19

7    concealed people in vehicles and narcotics busts and the

8    thousands of alerts that Boeli has made over the years?

9    A.   Well, it could be, you know, the remnants of odors in those

12:23   10   vehicles.

11   Q.   Have you yourself experienced anything that leads you to

12   believe that at least some of those alert situations are based

13   on a real odor that Boeli is smelling and not nothing?

14   A.   Yes.

12:23   15   Q.   What are some examples of those?

16   A.   Remnants in the, like, in the carpet of marijuana, things

17   like that.

18   Q.   And just to make sure I am understanding, what is a remnant

19   in the carpet?

12:23   20   A.   Little debris, seeds, little infinitesimal amounts of, you

21   know, that kind of drug.

22   Q.   And if you arrested -- let me back up.  If you encountered

23   someone at the checkpoint who had a, for example, a couple

24   joints in the cup holder and Boeli alerted to the car, would

12:23   25   you bring that into the US Attorney's Office as a narcotics

```
    1   bust?

    2   A.   No, I would not.

    3   Q.   So that wouldn't be counted in the 12 narcotics busts over

    4   the five years?

12:23  5   A.   No.

    6   Q.   You were asked also asked on cross-examination whether you

    7   trained dogs besides Boeli; right?

    8   A.   Yes, sir.

    9   Q.   And whether you give speeches; right?

12:24 10   A.   Yes, sir.

   11   Q.   Whether you write books?

   12   A.   Yes.

   13   Q.   And you didn't do any of those things or you don't do them?

   14   A.   No, I do not.

12:24 15   Q.   Let me ask a slightly different question.  Are you paid to

   16   train other people's dogs?

   17   A.   No, I am not.

   18   Q.   Are you paid to give speeches?

   19   A.   No, sir, I am not.

12:24 20   Q.   Are you paid to write books?

   21   A.   No, sir.

   22   Q.   And are you being paid specially or extra for your

   23   testimony here today?

   24   A.   No, sir, I am not.

12:24 25             MR. PILCHAK:  No further questions.
```

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | THE COURT:  Any redirect?                                            |
|       | 2  | MR. SCOTT:  No, Your Honor.                                          |
|       | 3  | THE COURT:  May the witness be excused?                             |
|       | 4  | MR. SCOTT:  Yes, sir.                                                |
| 12:24 | 5  | THE COURT:  You may step down.                                      |
|       | 6  | Any additional witnesses?                                           |
|       | 7  | MR. PILCHAK:  Not from the Government.                              |
|       | 8  | THE COURT:  Mr. Scott, call your next witness.                      |
|       | 9  | MR. SCOTT:  We call Kenny Summers.                                  |
| 12:24 | 10 | THE CLERK:  Please raise your right hand.                          |
|       | 11 | (Oath administered.)                                               |
|       | 12 | THE WITNESS:  Yes, ma'am.                                           |
|       | 13 | THE CLERK:  Please take the stand.  Please state your              |
|       | 14 | full name for the record and spell your last name.                 |
| 12:25 | 15 | THE WITNESS:  Kenny Summers, K-E-N-N-Y S-U-M-M-E-R-S.              |
|       | 16 | KENNETH SUMMERS,                                                    |
|       | 17 | DIRECT EXAMINATION                                                  |
|       | 18 | BY MR. SCOTT:                                                       |
|       | 19 | Q.  Mr. Summers, were you driving that black Jetta that this       |
| 12:25 | 20 | morning we watched pull up to the checkpoint at Highway 86?        |
|       | 21 | A.  Yes, sir.                                                       |
|       | 22 | Q.  Was that on February 28th of 2015?                             |
|       | 23 | A.  Yes.                                                            |
|       | 24 | Q.  Do you remember what happened when you pulled up to the        |
| 12:25 | 25 | Primary booth there?                                                |

1    A.   Yes.

2    Q.   Tell us what happened.

3         THE COURT:   Please speak louder and pull your seat up

4    so you can speak right into the microphone.

12:25   5    BY MR. SCOTT:

6    Q.   Please tell us what happened.

7    A.   I pulled up there, and I rolled my window down, and the

8    gentleman said who he -- or Border Patrol, whatever.   I am not

9    sure exactly.   He said, pop the trunk.   He said, roll down the

12:26   10   back window, roll down the back window, and then he said, pop

11   the trunk or open the trunk.

12   Q.   Let me stop you there.   When he said, pop the trunk, did he

13   tell you that, you know, you didn't have to pop the trunk if

14   you didn't want to?

12:26   15   A.   No.

16   Q.   Did he ever use the word consent?

17   A.   No, sir.

18   Q.   Did he ever -- did you yourself feel like you had a choice?

19   A.   No.

12:26   20   Q.   Did you interpret it as a request or as an order?

21   A.   An order.

22   Q.   Did you try to do what he said?

23   A.   Yes.

24        MR. SCOTT:   All right.   No further questions.

12:26   25        THE COURT:   Cross.

```
 1              MR. PILCHAK:  Thank you, Your Honor.
 2                       CROSS-EXAMINATION
 3    BY MR. PILCHAK:
 4    Q.  Good afternoon, Mr. Summers.
 5    A.  Good afternoon.
 6    Q.  You own the Jetta that you were driving on February 28th;
 7    right?
 8    A.  Yes.
 9    Q.  It is a 2007, isn't it?
10    A.  Yes.
11    Q.  How long have you owned it?
12    A.  A year probably.
13    Q.  A year prior to February 28th?
14    A.  Right around there.
15    Q.  Okay.  In that year that you owned the car, how many times
16    would you say you've opened the trunk?
17    A.  No idea.
18    Q.  You had --
19    A.  I wasn't the only one that used it.  I let my roommates use
20    it too.
21    Q.  Okay.  You have opened the trunk before February 28th of
22    2015 though; right?
23    A.  Yes.
24    Q.  Would it be more than 100 times that you've done it?
25    A.  Probably.
```

12:26 (line 5)
12:26 (line 10)
12:27 (line 15)
12:27 (line 20)
12:27 (line 25)

1  Q.  Okay.  So probably more than 100 times you've opened the

2  trunk prior to February 28th.  How does the trunk mechanism

3  work?  How do you open it?

4  A.  It has a key, and it has a button on the thing, and then

12:27  5  plus it has a lever on the inside by the door.

6  Q.  So inside the car there is a lever to pull to open the

7  trunk?

8  A.  Yes.

9  Q.  And you can open it by pressing a button on the key fob?

12:27  10  A.  Yes.

11  Q.  And you can also put a key in the lock on the trunk to open

12  it?

13  A.  Yes.

14  Q.  Are there any other ways to get the trunk open?

12:28  15  A.  Not to my knowledge.

16  Q.  If the trunk is closed, can someone open the trunk from the

17  outside without your key?

18  A.  I seriously doubt it.

19  Q.  Your testimony is that, to the best of your recollection

12:28  20  today, that Agent Stypinski told you what exactly about your

21  trunk?

22      What did the agent at Primary tell you about your trunk?

23  A.  To open my trunk.

24  Q.  What were the exact words that he used?

12:28  25  A.  Open the trunk.

1  Q.  Your testimony is that you clearly remember him saying,

2  open the trunk, those three words?

3  A.  Yes, yes.

4  Q.  And you clearly remember that sitting here today from

5  February 28th of this year?

12:28

6  A.  Yes.

7  Q.  After he said that, what did you do?

8  A.  I tried to open the trunk by pulling the lever.

9  Q.  And how many times did you do that?

10 A.  Couple times.

12:28

11 Q.  How long would you say you were trying to open the trunk

12 using the lever at Primary?

13 A.  Couple seconds, not very long.

14 Q.  Did the trunk open when you did that?

15 A.  No, it did not.

12:29

16 Q.  You testified you didn't feel like you had a choice when

17 the agent asked you to open your trunk; is that right?

18 A.  Yes.

19 Q.  Did the agent shout at you when he was talking with you?

20 A.  No.

12:29

21 Q.  How would you characterize his tone of voice?

22 A.  I don't know how -- I don't know, just serious.

23 Q.  Serious.  Was it calm?

24 A.  It was -- yeah.

25 Q.  Did he seem excited?

12:29

```
      1  A.   Not really.

      2  Q.   Did he draw his weapon?

      3  A.   No.

      4  Q.   Was he making any kind of physical contact with you?

12:29 5  A.   No.

      6  Q.   Was he gesturing threateningly?

      7  A.   No, sir.

      8  Q.   And how many different agents were you talking with at

      9  Primary Inspection when you tried to open your trunk?

12:29 10 A.   Just one.

      11 Q.   And you were sitting in your car?

      12 A.   Yes.

      13 Q.   Was it in park or in drive at Primary?

      14 A.   It was in park.

12:30 15 Q.   So you parked your car at Primary Inspection.

      16 A.   No, no.  That is the first one?

      17 Q.   Yes.

      18 A.   No, I didn't.

      19 Q.   So you were in drive with your foot on the brake?

12:30 20 A.   Yes.

      21 Q.   Had the agents done anything to block your car in at

      22 Primary?

      23 A.   No.

      24 Q.   You also went to Secondary Inspection, is that right, that

12:30 25 is the parking spaces behind the inspection booth?
```

1    A.   Yes.

2    Q.   Did you encounter another agent there?

3    A.   Yes.

4    Q.   Did that agent talk with you?

12:30    5    A.   He told me to pop the trunk.

6    Q.   What is your best recollection of what he told you?

7    A.   He said, pop the trunk.

8    Q.   He said exactly -- well -- excuse me, excuse me.   Exactly

9    the same thing as the guy at Primary?

12:30   10    A.   Yes.

11    Q.   Okay.   So your -- go ahead.

12    A.   No.   That is it.

13    Q.   So your testimony today is that you clearly remember the

14    three words that the Secondary inspection agent told you in

12:31   15    addition to the three words that the Primary agent told you?

16    A.   No.   It was both the same, just open the trunk.

17    Q.   Okay.   After he said that, what did you do?

18    A.   I opened the trunk.

19    Q.   How did you open the trunk?

12:31   20    A.   With my keys.

21    Q.   Did you get out of the car and use your key on the outside?

22    A.   No, I pushed the button.

23    Q.   Did it work that time?

24    A.   Yes.

12:31   25    Q.   Do you have an understanding of why the lever didn't work

1    at Primary?

2    A.   Yes.  I -- I believe I pulled the wrong one.

3    Q.   What do you mean by that?

4    A.   They are side-by-side, the fuel, the gas.

12:31   5    Q.   The gas cap --

6    A.   Yes.

7    Q.   -- has a lever inside the car as well?

8    A.   Yes.

9    Q.   Why do you think that?  Did you see the gas cap open later?

12:31   10   A.   No.  It is the only thing it could have been.

11   Q.   So you just assume today that must have been it?

12   A.   Yes.

13   Q.   Okay.  Now, the agent at Secondary who said whatever he

14   said to you, did he have his gun out?

12:32   15   A.   No.

16   Q.   Was he shouting at you?

17   A.   No.

18   Q.   Gesturing threateningly?

19   A.   No.

12:32   20   Q.   Was he the only agent talking with you at Secondary

21   Inspection?

22   A.   Yes.

23   Q.   At any point before your trunk opened, did you tell anyone

24   at the checkpoint you didn't want them to look in your trunk?

12:32   25   A.   No.

```
 1              MR. PILCHAK:  No further questions.

 2              THE COURT:  Any redirect, Counsel?

 3              MR. SCOTT:  No, Your Honor.

 4              THE COURT:  All right.  You may step down.  Please

 5    call your next witness.

 6              MR. SCOTT:  The defense calls Andy Falco.

 7              THE CLERK:  Please raise your right hand.

 8         (Oath administered.)

 9              THE WITNESS:  Yes, I do.

10              THE CLERK:  Please take the stand.  Please state your

11    full name for the record and spell your last name.

12              THE WITNESS:  My name is Andre Falco Jimenez,

13    J-I-M-E-N-E-Z.

14                        ANDRE FALCO JIMENEZ,

15                        DIRECT EXAMINATION

16    BY MR. SCOTT:

17    Q.  Mr. Falco, good afternoon.

18    A.  Good afternoon.

19    Q.  What do you do for a living, sir?

20    A.  I own a company called Falco Canine Academy.

21    Q.  And what does -- what does that company do?

22    A.  Well, we train police dogs, detection dogs for all

23    different types of detection like bombs and narcotics and bed

24    bugs.  Peanuts, you name it.  If it has an odor, we train a dog

25    to find it, and then we train pet dogs.
```

1  Q.  All right.  In the interest of time, Mr. Falco, I have put

2  here on the screen a document.  Do you recognize that as your

3  CV?

4  A.  Yes.

12:33    5       MR. SCOTT:  And for the record, Your Honor, this has

6  been submitted in pleadings already.  It is in the docket

7  attached to one of our exhibits, but I'll just use it here for

8  reference, if that is permissible with everyone.

9       MR. PILCHAK:  No objection.

12:34   10  BY MR. SCOTT:

11  Q.  Could you briefly give us an overview of your employment

12  history?

13  A.  I was a police officer with the city of Anaheim for

14  24 years.  During that period of time, I obviously started in

12:34   15  patrol like everybody else.  About two years in I became a

16  canine handler.  As part of the canine team, my interest in

17  training dogs and humans not only became apparent to me but to

18  my supervision, because we're not that happy about the way that

19  we were being trained with our dogs.

12:34   20    I was fortunate enough that during my time as a handler,

21  they sent me to different countries like Canada and Europe, and

22  then again, throughout the United States to learn from other

23  trainers and other -- to learn other methods of training.

24    The training that we were using at the time was very harsh,

12:34   25  using shock collars and -- inappropriately, cattle prods and

         1   sticks to hit the dogs, and so in learning the other methods of

         2   reward-based training and that kind of thing, it led me to all

         3   over the planet, and I was very fortunate the city paid for a

         4   lot of that travel and experience.

12:35    5   Q.   You said "all over the planet."  Explain that briefly.

         6   A.   Well, in some cases, like in Canada, I would stay two weeks

         7   with a trainer out there.  His name was Bob Eaton.  He would

         8   later become, I guess I would say my boss, as I travelled in

         9   the International Police Canine Conference teaching, so Canada

12:35   10   would be one of those places.

        11       I would be in -- find myself in Germany, selecting dogs and

        12   learning from experts in Germany; Belgium, Czechoslovakia,

        13   Slovakia, Hungary, Poland.

        14   Q.   Do you train dogs or train handlers and dogs for law

12:35   15   enforcement agencies today?

        16   A.   Yes.

        17   Q.   Please tell us about that briefly.

        18   A.   As a handler that is the first time I was, I guess, seen as

        19   skilled at particularly training dogs.  Later on that skill

12:36   20   would show as I began to train human beings, so between those

        21   things, again, Bob Eaton in Canada saw that I had the skill at

        22   a competition that I was at, and again at a conference, and he

        23   asked me to become an instructor with his group.  That group is

        24   called the International Police Canine Conference, which were

12:36   25   some of the leading experts in police dog training at that time

1    and still today.

2         And as part of that team I began to travel with him in that

3    group and train police departments throughout the United

4    States, in patrol work, detection work and supervision on how

12:36   5    to handle their canine teams.

6    Q.   So at this point, as you sit here today, how long have you

7    been training dogs and dog handlers?

8    A.   Approximately 30 years.

9    Q.   And you -- you said that you've trained other law

12:37   10   enforcement agencies.  Is that still the case today?

11   A.   Yes.

12   Q.   What are some of the law enforcement agencies that you

13   provide training for today?

14   A.   Indio Police Department, Palm Springs, Cathedral City,

12:37   15   Tustin, Orange have all been under contract with our company.

16   Some come and go, like we trained for Disneyland.  We trained

17   for Long Beach Memorial Hospital, large security companies.

18        We've assisted in teaching seminars in Las Vegas.  North

19   Las Vegas Police Department has had me come up and teach a

12:37   20   seminar with them, so there is different levels, sometimes

21   under contract, sometimes just to come problem solve and help

22   solve -- help them solve a problem that they are having with

23   their canine unit.

24   Q.   I see here from your CV under the heading author that

12:37   25   you've written some books on working dogs and dog handling?

1  A.  Yes.

2  Q.  And apparently at least two of those books have made it to

3  the best seller list?

4  A.  Yes.

12:38   5  Q.  Where it says, Eight Week Basic Handler Manual, is that

6  what it sounds like?  Is that a -- you wrote some sort of a

7  course book or manual that other handlers use to train dogs?

8  A.  Yes.  To actually help them with their own dog, not to be a

9  dog trainer.  It would be two different things.

12:38   10  Q.  Okay.  I understand.  And you wrote the book called

11  Detection Dog Manual?

12  A.  Yes.

13  Q.  To your knowledge, do canine handlers use those

14  publications as part of their work?

12:38   15  A.  Yes.  And I know a couple places that use Modern Decoying

16  For the Patrol Dog as part of their required reading for their

17  police dog academies.

18  Q.  It is part of the curriculum in some places?

19  A.  Yes.

12:39   20  Q.  All right.  I'll skip down the resume and try to speed up a

21  little bit.  Are you regularly asked to speak and give

22  instruction at seminars and conferences for canine detection?

23  A.  Yes.

24  Q.  Let's keep going further, please.

12:39   25      Under certificates here can you just briefly, without going

             1    through each one, describe to us what that means to have

             2    certificates from these different entities?

             3    A.   Well, again -- I don't know why I said "again," but

             4    certificates can be a number of things.  Sometimes it is just

    12:39    5    that you attended a one day training session.  Sometimes like

             6    the reserve academy and the basic academy, those are

             7    eight-month, nine-month programs that you get a certificate

             8    for.

             9        Arizona Law Enforcement Canine Association would be like a

    12:39   10    three-day course that I went to in Arizona to learn whatever

            11    was new at that point.  Orange County Canine Association, I was

            12    actually the president of the association, but I would fly in

            13    or bring in experts in different areas, and for being there

            14    during that discussion we would hand out a certificate to

    12:40   15    everybody in attendance.  So the value of the certificates

            16    could be based on the amount of time that you are there and who

            17    is speaking.

            18    Q.   All right.  How many times have you been recognized by

            19    courts as an expert?

    12:40   20    A.   Unfortunately that is one of the things I didn't keep track

            21    early on and probably should do a better job at, but I would

            22    say at least 25 to 30 times.

            23    Q.   All right.

            24         MR. SCOTT:  Do I need to offer him formally as an

    12:40   25    expert at a hearing?

1           THE COURT:  What is the opinion that -- what opinions

2   do you intend for him to offer?

3           MR. SCOTT:  As to the reliability of this particular

4   dog under these circumstances, as to whether a person can --

12:41  5   whether a dog can be trained to detect concealed persons, and

6   he is going to opine on the behavior that we saw on Government

7   Exhibit 5 from that dog.

8           THE COURT:  Any objection to the witness giving

9   opinions in those three areas?

12:41  10          MS. RO:  Yes, Your Honor.  Lack of foundation as to

11  the specific witness can testify to those very specific

12  opinions.  He has certifications, but we don't know what --

13          THE COURT:  Just lay the foundation with each one

14  then.

12:41  15          MR. SCOTT:  Okay.

16  BY MR. SCOTT:

17  Q.  All right.  Mr. Falco, you were present in court during the

18  testimony of Agent Miranda; is that right?

19  A.  Yes.

12:41  20  Q.  Did you hear my discussion with him about the distinction

21  between alerting and indicating by a dog?

22  A.  Yes.

23  Q.  Are you familiar with that kind of a distinction between

24  dog behaviors?

12:41  25  A.  Yes.

1  Q.  All right.  Is the same language used everywhere that

2  people work with detector dogs?

3  A.  The same language is used, but depending on the region of

4  the United States and the police department, they can

12:42  5  interchange the words.

6  Q.  What do you mean by that?

7  A.  Like, for instance, here in California, other than maybe

8  the Border Patrol, indication and alert are the same thing.  It

9  is the final response that a dog gives when he takes you to

12:42  10  source.

11     In other parts -- I was just in South Dakota on another

12  case about four days ago, and they had them reversed.  It was

13  the other way around.  The indication was the -- was the

14  secondarily behavior of sniffing, and the tail wagging and that

12:42  15  type of thing and the alert was the primary response.

16     So just depending on who the trainer is and what their

17  belief system is, those words could be interchangeable or

18  actually be the same.

19  Q.  I want to make sure about our terms.  You said primary and

12:42  20  secondary behaviors.  Do you mean chronologically or do you

21  mean in terms of intensity?  Do you understand what I am

22  asking?

23  A.  Yes.  Primary in our usage, like again, in our area where

24  we train police dogs is what the dog does to give you the

12:43  25  indication that he found the odor and he knows where it is at,

             1    or at least where the source is coming from.

             2    Q.  If I could interrupt you.  Would that be consistent with

             3    what Agent Miranda described as indicating --

             4    A.  Yes.

    12:43    5    Q.  -- here today?

             6    A.  Yes.

             7    Q.  I'm sorry.  Continue.

             8    A.  And secondary behavior would be all the tail wagging, the

             9    excitement, the interest.  Again, that could be different

    12:43   10    levels.  It could be a slight interest.  It could be a strong

            11    interest, and would be a secondary behavior, but that doesn't

            12    necessarily mean that the dog is in odor, as he indicated in

            13    his testimony.

            14              THE COURT:  Excuse me, Counsel.  We'll take a 15

    12:43   15    minute break.  Can you give me some idea on scheduling, how

            16    much -- how long you have on your direct?

            17              MR. SCOTT:  I think 20 minutes with Mr. Falco with

            18    that.

            19              THE COURT:  Is that your final witness?

    12:43   20              MR. SCOTT:  It is.

            21              THE COURT:  Does the Government have any rebuttal

            22    witnesses?

            23              MS. RO:  No, Your Honor.

            24              THE COURT:  All right.  We'll be in recess for

    12:44   25    15 minutes.  Thank you.

```
        1          MR. SCOTT:  Thank you, Your Honor.

        2     (Recess ensued from 12:43 p.m. to 12:58 p.m.)

        3          THE COURT:  All right.  You may resume, counsel.

        4          MR. SCOTT:  All right.  Thank you, Your Honor.

12:59   5          MS. RO:  Your Honor, I withdraw my objection for lack

        6   of foundation.

        7          THE COURT:  All right.

        8   BY MR. SCOTT:

        9   Q.  Sir, we were just talking about the sort of hierarchy, if

12:59  10   you will, of alerting versus indicating the source of a trained

       11   scent.  Do you remember that?

       12   A.  Yes.

       13   Q.  And as I understood your testimony, it could be different

       14   nomenclature.  Some people call it indicating and then

12:59  15   alerting, but you are familiar with that -- with that concept?

       16   A.  Yes.

       17   Q.  Now, in your experience is it appropriate for canine

       18   handlers to use that preliminary -- that initial alert, to use

       19   Agent Miranda's language, as information during the course of

01:00  20   their duties?

       21   A.  As information, yes.

       22   Q.  All right.  Now, when you are training handlers and dogs,

       23   do you train them that that initial alerting, again, under

       24   Agent Miranda's definition, that that establishes probable

01:00  25   cause for a warrantless search?
```

1   A.   No.

2   Q.   Why not?

3   A.   Because that is just an indication that the dog is

4   interested in something.  Now, granted, it could be the trained

01:00   5   odors that we have trained the dog to do in training, but it

6   can also be any other -- a number of other things, from food,

7   to urine on a tire, to road kill in the undercarriage.  Dogs

8   show that same behavior when they are interested in other

9   things.

01:01   10   Q.   When you said "that same behavior," is that the increase in

11   breathing and the change in body posture, is that consistent

12   with what Agent Miranda was saying?

13   A.   Yes, closed mouth, body language changes -- we call it

14   dancing with the paws, and sometimes even becoming completely

01:01   15   stationary is one of those things that a dog will do.

16   Q.   So you said that dogs will exhibit that behavior when they

17   first pick up the scent of something that they've been trained

18   to detect?

19   A.   Sometimes.

01:01   20   Q.   Will they also exhibit that behavior when they are picking

21   up some different scent?

22   A.   Yes.

23   Q.   Like what?  Can you give us some examples?

24   A.   Like if you have a pet dog, you see it when you are on your

01:01   25   walk.  As you are going down the sidewalk, your dog will

1    suddenly give you a big head turn and go toward a tree,

2    especially if you have a male dog, because they are interested

3    in the urine on the tree, or they will suddenly stop in the

4    middle of a park, and on the grass where a female has urinated,

01:02   5    the dog will give you that behavior change.  Those are the

6    exact same things.

7    Q.   So what Agent Miranda is describing as an alert is also

8    consistent with a dog smelling urine or smelling food or

9    whatnot?

01:02   10   A.   Stuff in a trash can, a diaper, all that stuff, yes.

11   Q.   Now, about what he described as an indication, is that

12   something different?

13   A.   Yes.

14   Q.   Can a dog be trained to -- when you train a dog, anyway --

01:02   15   I'll just ask you about your experience.  When you train a dog,

16   can you train a dog to not indicate, meaning sit or whatever,

17   unless they smell a particular smell they've been trained to

18   detect?

19   A.   Yes.

01:02   20   Q.   All right.  So if the dog, you know, smells the urine or

21   the trash can in your example, would one of the dogs you

22   trained sit in that situation?

23   A.   No.

24   Q.   But would they alert and do the breathing and the closed

01:03   25   mouth and the tense body posture?

A.   Yes.   We just had that yesterday in an exercise that we had

with a bomb dog.

Q.   Briefly tell us about that.

A.   It is a new dog that we're training for a security company.

As we're training the handler, I advised them to watch for

these things to happen while we're doing a search.   It happens

in our training facility where we -- the facilities that we use

for training because, obviously, dogs have been in there

before, there's been food spilt, there's been other

distractions that we've used in different areas, so I am fairly

confident that at some point we're going to see these secondary

behaviors when it is not on the trained odor that we're looking

for.

     And this happened to be an old dog bed that was kind of

leaning against the wall, and as I am instructing this new

handler his dog stops and gives the head turn and goes toward

the dog bed that has been kind of chewed on and ratty and

dirty, and he actually stops and says, what do you got, and

begins to give the dog some encouragement, and I stopped him

and said, no, you are seeing the changed behavior, but if you

are doing your job as the handler, you are identifying what it

is he is smelling.   You can obviously see that he is actually

alerting on the dog odors that are on an item, and he is not

giving you those secondary behaviors on a trained odor.

     I said correct your dog, tell him no, and move on so the

1    dog will get to the trained odor and give us the final

2    response.

3    Q.   Now, you were just telling us that in terms of the training

4    that you provide to these police departments that hire you and

01:04    5    your own dogs over the years, that interest short of the sit

6    indication or whatever the formal indication is would not

7    justify -- would not create probable cause or justify a

8    warrantless search.  Do I have that right?

9    A.   Absolutely not.

01:04    10   Q.   Now, do you know, based on your experience and your work

11   with other police departments and other detector dog

12   organizations, is that true of other agencies and organizations

13   that work with detector dogs also?

14        Is that the prevailing standard, or is this something that

01:05    15   is just kind of department by department?

16   A.   It is -- I would say it is department by department.  It

17   depends on who the trainer is.  There is a lot of factors.  If

18   your training is for many years, it doesn't make it right, so

19   there are many departments training for years to do something

01:05    20   that is actually been incorrect.

21        And so as I travel around the United States now mostly

22   testifying in limited court cases, unfortunately there is still

23   many that are using the secondary alert as probable cause to go

24   inside of a vehicle.

01:05    25        Here in California we don't have as much of a problem with

1    our police departments because of the California Narcotics

2    Canine Association, which I have been a part of and have been a

3    judge at their competitions where we have been really strong in

4    training, that if on a search you only get that secondary

01:06  5    behavior, look and don't get that final response, then before

6    you go inside, you need something else.  You need to look in

7    the window of the vehicle and see a scale, for instance, or

8    little tiny plastic baggies or a syringe.

9        And so if you only have the secondary behaviors without the

01:06  10   primary alert then you don't go inside, but having, you know,

11   permission to search the vehicle, having something else to go

12   along with it, I would not go inside the vehicle.

13   Q.   Just so we're real clear, when you are saying the secondary

14   behavior, that is the first initial interest that the smell is

01:06  15   somewhere but short of the pinpointing?

16   A.   A smell is somewhere.

17   Q.   Okay.  All right.  You were present when Agent Miranda was

18   asked questions about how can a dog differentiate between a

19   concealed human smell and a not concealed human smell.  Do you

01:07  20   remember him being asked those questions?

21   A.   Yes.

22   Q.   In your opinion is it possible to train a dog to alert to

23   concealed human smell but ignore or differentiate other human

24   smell in the same vehicle?

01:07  25   A.   Okay.  Not inside the same vehicle.  If there is somebody

1    inside the vehicle and somebody in the trunk, or you take the

2    person out of the trunk, it doesn't matter.  It is all -- it is

3    all the same to the dog.

4    Q.   Why do you say it is all the same to the dog?

01:07   5    A.   Again, because as you mentioned during the questioning is

6    that there is no way of separating the odors or making the odor

7    different for the person that is in the trunk, even in

8    training.  You can't -- you can't take in training and only say

9    use male Hispanics, you know, in the trunk and put males whites

01:08  10    in the driver seats.  We can't do that.  It wouldn't be right,

11    number one, but it wouldn't even matter.  There is no way of

12    interchanging it.

13        As we're driving in a vehicle, whether you are in the trunk

14    or in the front, almost always the odor is pushed to the rear

01:08  15    of the vehicle, given air-conditioning, given the movement.

16    This are studies that we've done with vehicles over the years

17    that we've been training narcotics dogs and patrol dogs to find

18    human beings that there is no way to differentiate to a dog.

19        Again, the dog is simply wanting his reward, his toy.  As

01:08  20    soon as he smells human odor coming from a vehicle.  Whether it

21    is a patrol dog looking for a suspect or a dog that is looking

22    for something that is hidden in the vehicle, if there are

23    people in the driver seat, he is going to indicate; if there is

24    somebody in the trunk, he is going to indicate.

01:08  25        It doesn't matter where they are at.  Again, it is all the

1    same to the dog.

2    Q.  To be fair, could we -- we hear about Saint Bernards

3    finding somebody out in an avalanche or Blood Hounds chasing a

4    fugitive, can that happen?  Is that an appropriate use of dogs?

01:09   5    A.  Yes.

6    Q.  But somebody in the trunk with a driver and passenger, the

7    dog cannot differentiate that?

8    A.  Yes.  It is the same -- it is the same item that the dog is

9    searching.  If you are searching a home and you are inside the

01:09   10   home and you have your backup officers with you and there is

11   somebody hiding in the closet, that is entirely different.

12   Because that closet would essentially be the vehicle, the dog

13   is able to do that, if there are people on the outside.  But

14   when you are talking about a single unit thing, like a vehicle,

01:09   15   everything inside it is the odor coming out of the vehicle.

16   Q.  Is that also true for the examples about what we gave for

17   gym socks or a bag of laundry, is there any way to teach a dog

18   to ignore that and only find hidden people?

19   A.  Yes.  I would say that that is not as big an issue.  Odor

01:09   20   changes as it leaves the body.  It begins to degradate --

21   degrade, sorry, and we do know for sure that that does change,

22   because in tracking dogs -- you brought up Blood Hounds a

23   minute ago.  A dog knows the direction of a track by the

24   older -- you know, the farther away from the source, the track

01:10   25   is older, and as soon as you get closer, the track is newer, so

1    we know that.

2        So I wouldn't say that would be as big a factor as actually

3    somebody being in the vehicle as compared to somebody in the

4    trunk.  Again, that is all the same.

01:10    5    Q.  All right.  You heard Agent Miranda say words to the effect

6    of he doesn't know how they are able to find concealed people

7    only, you know; it is amazing but they are able to do it.

8        Do you have an opinion on that testimony?  Is that

9    consistent with your training and experience?

01:10   10    A.  Well, that is -- I have opinions on it, but I am not sure

11    it is exactly what you want to -- or asking me to give you is

12    that it is unfortunate that the handlers aren't trained better

13    on the Border Patrol -- I've had experience with Border Patrol

14    over the years -- as compared to what we get trained in police

01:11   15    departments.

16        And so I believe the handler should know about -- as much

17    as possible about how dogs do things and why they do things.  I

18    don't think the handler is necessarily lying.  I think he is

19    only telling us what he's been told.  So as a fact of, I think,

01:11   20    training he's been told limited information so that he may not

21    really know the difference or even why.

22    Q.  I am not going to replay it because you were here in the

23    courtroom, but have you seen the video of the dog's behavior

24    around the black Jetta?

01:11   25    A.  Yes.

```
          1              MS. RO:  Excuse me, Your Honor.  The defendant didn't

          2   give us any notice that he was going to opine specifically to

          3   the video.  The video was provided to the defense back in

          4   April, and we had no notice, and we do not know what his

01:11     5   opinion is going to be.

          6              MR. SCOTT:  I think experts can clearly testify as to

          7   what they see in the courtroom.  He was here in the courtroom.

          8   That is Rule 703, if the Rules of Evidence do apply.

          9              THE COURT:  Is there anything on the letter that

01:12    10   indicates that he was going to offer an opinion as to whether

         11   the dog alerted or not?

         12              MR. SCOTT:  I think it is the reliability of the dog

         13   in general.  I think it is --

         14              THE COURT:  I'll hear the testimony.  I have to hear

01:12    15   the testimony first, and then it can always be subject to a

         16   motion to strike.  So let me hear the testimony first.

         17              MS. RO:  Yes, Your Honor.

         18              THE COURT:  All right.

         19   BY MR. SCOTT:

01:12    20   Q.   So you saw the video here in the courtroom?

         21   A.   Yes.

         22   Q.   Have you -- how many dogs have you personally worked with

         23   over the years?

         24   A.   About 1500 dogs.

01:12    25   Q.   Do you have an opinion whether that dog was giving -- was
```

1    giving an indication to the trunk of that car?

2    A.   No.   I saw a dog appear as if he was sniffing the vehicle.

3    Q.   And how was that different from a, quote-unquote, alert?

4    A.   That is what the dog is supposed to do.   The dogs are

01:12    5    supposed to sniff the vehicles to try to find the odor.   An

6    alert would be for the dog to sit and put his nose where the

7    source of the odor is coming out.

8    Q.   All right.   You wrote a report where you described

9    deployment records.

01:13   10    A.   Yes.

11    Q.   What are deployment records, and why are they significant,

12    if they are significant?

13    A.   Yes.   Deployment records are those reports that we keep as

14    canine handlers that we turn into our supervision of what is

01:13   15    done on a day-to-day basis, how many times a dog was used in a

16    search, how many times he alerted, and what was the outcome of

17    the -- after the alert, you know; when we search, did we find

18    something or not; and if we found something, what was it, and

19    how much was it.

01:13   20        And that gives us a good picture of how the dog is working,

21    if we have any problems we need to work on.   In addition, it is

22    just telling us how effective we are as a canine unit.

23    Q.   Is it problematic in your view to not keep deployment

24    records of what the dog is actually doing when on duty?

01:14   25    A.   Absolutely.

1    Q.   Why?

2    A.   Because you have no idea how well your training is.  Is it

3    creating a dog that is being effective?  Is the dog reliable?

4    We have many dogs over the years that I've seen, even a couple

01:14    5    of our own, that do really well in training but do horribly in

6    actual deployments.  There is a lot of factors why that is.

7        But we have -- just as in human beings, a similar situation

8    as what we used in the academy, even in school, some people can

9    be really good test takers, but not good at practicality on the

01:14   10    job stuff, and we find the same with dogs.

11        Some dogs are attuned to training and solve problems in

12    training because things are different in training, but when

13    they get in among the street, they fail, and we have to take

14    the dog out of service.

01:14   15    Q.   Does the lack of deployment records for this dog in this

16    case have any effect on your opinion as to whether the dog

17    could be considered reliable for alerting to narcotics and to

18    concealed people?

19    A.   Minus what I heard in the testimony, it is impossible.  You

01:15   20    can't tell unless you had that information how reliable a dog

21    is.

22    Q.   You said before that you would want to know the source and

23    forms and quantity of narcotics that are used in training?

24    A.   Yes.

01:15   25    Q.   Why would you want to know that information?

1    A.   You want to make sure and, again, this is something with

2    the California Narcotics Canine Association also -- has also

3    agreed with, and that is that you want to train on a substance

4    that is greater than a gram.  You want somewhere in the

01:15    5    neighborhood of an ounce to six ounces or greater of narcotics,

6    so that you have a threshold for your dog to know, you know,

7    what is actual substance and what is residual.

8         If you train under that, a dog can become very efficient at

9    alerting on things that aren't present, and you talked about

01:16    10   cough syrups and things like that.  In our training we want to

11   make sure that we're not creating a dog that is going to find,

12   you know, a transfer on the hand from somebody that has smoked,

13   you know, a marijuana cigarette and then opened the car door,

14   because you would get an alert on the car, but yet there is

01:16    15   nothing inside.

16        So to guard against that and to try to keep that from

17   happening, you want to train on a regular basis of at least I

18   said an ounce to six ounces is preferable or more on a regular

19   basis, to create that threshold to where the dog will only

01:16    20   alert when there is something substantial for us to seize.

21   Q.   And that information wasn't provided in the green sheets

22   and the certification records that we were provided; is that

23   right?

24   A.   Correct.

01:16    25   Q.   Would you want to know whether other people were present

```
 1   during training?

 2   A.  Yes.

 3   Q.  Why?

 4   A.  Well, we want to know who is present, again, the trainers

 5   and that kind of stuff, so we know if they are acting as

 6   trainer what are their -- what is their experience, are they

 7   people that have reliability in doing what is right and that

 8   kind of thing.

 9       We want to know what people are being used to hide in the

10   cars because dogs can get very proficient at finding the same

11   person every training day, and we found that in our training

12   where we would use a particular gentleman that wants to get in

13   the canine program, for instance, and we would use him for

14   about a year.  In our training the dog would be great at

15   finding him, but if he tried to find John Doe in the street,

16   the dog would miss him.

17       So keeping track of who is present, who you are using as

18   decoys, who is making your hides because the dog becomes very

19   attuned to smelling for that person who normally makes the

20   training hides as he enters the room.

21       So when we're talking about a blank room, for instance, if

22   you have five blank rooms and one of the rooms is where the

23   hide is, the dog can go in those other four rooms and not smell

24   the person who normally hides them and just go "there is

25   nothing in there" and will basically walk out.  The dog will
```

1    walk in the room where the guy that makes the hides often,

2    smells him, and oh, it has to be here and starts searching.

3        It is problematic if you are not keeping track of who is

4    there, who is helping, for all the reasons I described.

01:18    5    Q.   Is it important to have certification done by someone other

6    than the agency actually employing the dogs?

7    A.   Absolutely.

8    Q.   Explain that.

9    A.   There is a vested interest in the failures or success,

01:18   10    especially when your job is providing the dogs, selecting the

11    dogs, training the handlers, and training the dog.

12        If -- and, again, this is not something I think that always

13    happens consciously.  I think it also happens subconsciously

14    where because these are all part of your world, you want them

01:19   15    to be successful.

16        And the worst thing that can happen, if you have a bunch of

17    failures of your dogs that you are importing and purchasing and

18    selecting and that kind of stuff, so the unfortunate thing that

19    can happen is we pass marginal teams and don't look at it

01:19   20    independent of our own success and failure.

21        And so to guard from that, to make sure it is not

22    happening, we bring in other organizations like the California

23    Narcotics Canine Association, the United States Police Canine

24    Association, and there is others, in to look.  They don't have

01:19   25    a vested interest on the failures or success and will often

1    have an independent opinion.

2        And that would weigh more not only in the Court of law as

3    far as being making sure that we're saying that dog is reliable

4    but also in the eyes of the handler.  If the handler can

01:20    5    perform in front of somebody that he does not know, that is

6    even better.  Any of us would perform better in front of

7    somebody that we feel comfortable with, whether we're speaking

8    publically or if we're doing something that is difficult.  If

9    we can do it in front of somebody that we don't know that,

01:20   10    again, adds reliability and confidence.

11    Q.  So in your mind is the fact that Customs and Border Patrol

12    essentially certifies their own dogs, does it have an affect on

13    your conclusion as to whether or not this dog is reliable for

14    the stated purposes?

01:20   15    A.  Definitely.

16    Q.  What is that effect?

17    A.  That you can't rely on that type of certification.

18            MR. SCOTT:  That's all I have.

19            THE COURT:  Cross-examination.

01:20   20            MS. RO:  Yes, Your Honor.  Thank you.

21            Your Honor, before I start, I would like to renew my

22    motion to strike the testimony regarding the sniffing of the

23    vehicle.

24            THE COURT:  Overruled at this point.

01:20   25                        CROSS-EXAMINATION

```
        1   BY MS. RO:

        2   Q.   Good afternoon, Mr. Falco.

        3   A.   Hello.

        4   Q.   You've been retained in this case; correct?

01:21   5   A.   Yes.

        6   Q.   You charge a fee?

        7   A.   Yes.

        8   Q.   And how much do you charge at an hourly rate?

        9   A.   $250 an hour.

01:21  10   Q.   And how many hours have you billed to this case?

       11   A.   I have not sent them the bill.  I only sent -- they've only

       12   paid the retainer, which is a $3,000 retainer.

       13   Q.   So it is a $3,000 retainer, $250 an hour.  Is there a

       14   special rate to testify as well?

01:21  15   A.   Yes, but not in this case.  I waive it sometimes.

       16   Q.   Okay.  And you also get expenses, like travel --

       17   A.   Yes.

       18   Q.   -- milage.  You came from Orange County?

       19   A.   I only live in Orange County, so yes, I might.

01:22  20   Q.   Okay.  And approximately how many hours have you put in

       21   this case even though you haven't billed them yet?

       22   A.   Unfortunately I have to look at the records, but I would

       23   guess somewhere around 12 hours.

       24   Q.   My math isn't that great, but $250 times 12 plus $3,000 is

01:22  25   the approximation of how much you would make on this case
```

1    alone?

2    A.   It is not plus the $3,000 retainer.  I would go through

3    that --

4    Q.   It is not just a retainer?

01:22    5    A.   -- hourly, and whatever is after that.

6    Q.   How many cases have you testified as an expert?  I think

7    you said 25 to 30; correct?

8    A.   20, somewhere in that neighborhood.

9    Q.   And how many of those have you testified for the Government

01:22    10    or the prosecution team?

11    A.   Well, I would have to know the exact number, but I would

12    say somewhere around 19 to 20, so there's been about five in

13    regard to narcotics detection dogs or police dogs that were for

14    the prosecution.

01:23    15    Q.   Okay.  So -- actually, can I use your CV list?  Can we put

16    it on the screen?

17            MR. SCOTT:  Sure.

18            THE WITNESS:  And I'm sorry.  You are talking about

19    over my entire career?

01:23    20    BY MS. RO:

21    Q.   No.  The specific times you were listed as an expert on

22    those court cases, how many times have those been for the

23    prosecution team?  I think you list -- right here,

24    court-recognized canine expert.

01:23    25    A.   Yes.  Like I said, I was horrible in the beginning of

```
 1   keeping track because I really didn't know I was going to do

 2   this very often.  But I am not sure if any of the prosecution

 3   cases are listed on there.  That would be before '05.  As you

 4   probably can guess, once I -- a police officer starts

 5   testifying as on a defense case, it becomes probably more

 6   difficult to be looked at.

 7   Q.  So out of all of these listed where you've been designated

 8   as a court-recognized canine expert, none of them have been for

 9   the prosecution team; correct?

10   A.  Not that I can remember.  I don't believe so.

11   Q.  And you also have a successful, pretty lucrative canine

12   academy since 1995; isn't that true?

13   A.  Yes.

14   Q.  You've actually published quite a number of books.

15       I'm sorry.  Can we scroll up far enough so I can access it

16   on the screen?  Right here.

17       The author of six books.

18   A.  Yes.

19   Q.  But you've also authored another number one seller.  If I

20   can show you -- or do you remember if you published any other

21   books -- while I am grabbing the --

22   A.  Yeah.  I think there are two or three that aren't on there.

23   Q.  Would one be Dog Training For Fun and Profit?

24   A.  Yes.

25            MS. RO:  Your Honor, may I approach the witness?
```

```
 1              THE COURT:  Yes.

 2              MS. RO:  Actually, I'll show defense counsel first.

 3    Okay.

 4    BY MS. RO:

 5    Q.  So I am showing you what has been premarked as Government

 6    Exhibit Number 11?

 7    A.  Yes.

 8    Q.  And what is that a photograph of?

 9    A.  That is the book cover of -- it is actually a Kindle book,

10    so it is not really in print.  That is the cover that we came

11    up with.

12    Q.  And what is the name of the book again?

13    A.  Dog Training For Fun and Profit.

14    Q.  What is that a photograph of on your book, the Kindle book?

15    A.  The illustration is of US currency.

16    Q.  Okay.

17              MS. RO:  Your Honor, may I introduce Exhibit 11 into

18    evidence?

19              THE COURT:  Sure.  Any objection?

20              MR. SCOTT:  No objection.

21              THE COURT:  Received.

22         (Exhibit 11 was admitted.)

23    BY MS. RO:

24    Q.  There we go.

25         So here is a stack of $100 bills to show you can train a
```

```
 1   dog for fun and profit; correct?  That is what you authored?
 2   A.  Yes.
 3   Q.  If fact, in that book it actually states, I believe, you
 4   can get up to -- or you've gotten $2,500 just to give a
 5   40-minute lecture; correct?
 6   A.  Yes.
 7   Q.  Which included three hotel nights in Aspen, Colorado?
 8   A.  Yes.
 9   Q.  And even a stay at Caesars Palace, when Caesars Palace used
10   to be great in Vegas?
11   A.  Yes.
12   Q.  Okay.  You also list some of your affiliations.  You
13   provided us a declaration.
14       I don't believe the Court received it.  It is not marked as
15   an exhibit, but if I can show you -- do you remember writing a
16   declaration for us stating your opinion?
17   A.  Yes.
18           MS. RO:  Your Honor, the Government doesn't want to
19   introduce this into evidence, but if I can just publish it.
20           THE COURT:  Just mark it.
21           MS. RO:  Yes.
22           THE COURT:  Mark it.
23           MS. RO:  Mark it as Government Exhibit 12.
24           THE COURT:  Okay.
25   BY MS. RO:
```

1    Q.   You write, "I am or have been a member of numerous

2    associations in the detector and/or dog field, including," and

3    you list maybe five organizations; correct?

4    A.   Yes.

01:27    5    Q.   However, you actually changed that language because in the

6    previous declaration you wrote to us you said you were current

7    members of those organizations; isn't that true?

8    A.   Yes.   Those -- that is -- at the time I think I used a

9    cut-and-paste type of situation where it depended on whether I

01:27   10    kept them up-to-date or not.   So the old version was that I was

11    current, and since then I just let them lapse.

12    Q.   Okay.   Because currently you are not a member nor have you

13    been a member since 2011 for the North American Police Working

14    Dog Association; isn't that true?

01:28   15    A.   Yeah, but I still get the publication, and I no longer a

16    handler, so that doesn't qualify me for being in the

17    association.

18    Q.   Okay.   And you are no longer a current active member for

19    the National Police Canine Association either; isn't that true?

01:28   20    Have you ever been a certifying official actually?

21    A.   No.

22    Q.   You've also never been a certified instructor for the World

23    Detector Dog Organization either; correct?

24    A.   No.   I created it.

01:28   25    Q.   You created it?

```
         1   A.   Yes.

         2   Q.   If I showed you an e-mail from --

         3   A.   Steve.

         4   Q.   -- I believe the secretary --

01:28    5   A.   Yes.

         6   Q.   -- saying that you have no current association?

         7   A.   No.   I created the curriculum and the certifications

         8   standard.

         9   Q.   But you are currently not a member?

01:28   10   A.   No.

        11   Q.   And you've never been a certified instructor because there

        12   is no such thing as a certified instructor for the World

        13   Detector Dog Organization?

        14   A.   I've been an instructor at their organizations -- the

01:29   15   conferences and their certified -- their certifications in

        16   Alabama.

        17   Q.   Okay.  Also you've never been part -- or since 1990 you've

        18   never been part of the United States Police Canine Association

        19   either?

01:29   20   A.   Yes.   I was an instructor at that time, and then again, I

        21   was never a handler member.   I was an instructor.

        22   Q.   Okay.   So you are not currently a member today?

        23   A.   No.

        24   Q.   You mentioned you worked with 1500 dogs.   I believe that

01:29   25   was your direct testimony; correct?
```

```
 1   A.   At least.  It is probably more, but that is --

 2   Q.   But how many of those have you trained from selection

 3   testing of the dog through the certification as a working team?

 4   A.   Probably 150 to 170.

 5   Q.   And under which standards were these teams tested, under

 6   national certification or your own?

 7   A.   Both.  Myself, mine, and then I am a POST evaluator for the

 8   state of California, and have POST evaluators that do it when

 9   they are my dogs or my teams.

10   Q.   I am going to go into your opinion, the declaration that

11   you drafted and provided to the prosecution team for this case.

12   A.   Yes.

13   Q.   You reviewed the training and certification records from

14   March 3rd, 2010, to August 21st, 2014; correct?

15   A.   I'm sorry.  Can you repeat the --

16   Q.   Yeah, sure.  You reviewed the training and certification

17   records for this specific case while you are here today --

18   A.   Yes.

19   Q.   -- from March 3rd, 2010, to August 21st, 2014?  That is

20   what you listed in your declaration; correct?

21   A.   Yes.

22   Q.   So you didn't even review the most recent logs from

23   August 21st, 2014, to February 3rd, 2015?

24   A.   Okay.

25   Q.   Sow didn't review the complete record of the entire life
```

01:30 (line 5)
01:30 (line 10)
01:30 (line 15)
01:30 (line 20)
01:31 (line 25)

1   span of this specific canine team, did you?

2   A.  I reviewed what I was given.

3   Q.  Okay.  Did you review anything else specific to this canine

4   team?

01:31   5   A.  The video that we just watched.

6   Q.  Today?

7   A.  Yes.

8   Q.  Have you seen this canine teamwork in person?

9   A.  No.

01:31   10   Q.  And you would agree, based on your testimony on direct,

11   that it is necessary to spend time with a dog to interpret its

12   behavior; correct?  That is why training dogs take time, like

13   your book, eight weeks?

14   A.  That, and I get sent videos all the time, much like the

01:31   15   video I watched today, to help problem solve and help address

16   certain issues that I see.

17   Q.  A 10-second video that you saw just today before you

18   testified in court?

19   A.  Yes, and the testimony of the officer that was up on the

01:31   20   stand.

21   Q.  And the best person to interpret a dog's behavior is

22   usually the person who spends the most time with the dog, for

23   example, the officer who testified on the stand today or the

24   dog handler; correct?

01:32   25   A.  No.

1    Q.   So when you were working at the Anaheim Police Department

2    in the field you wouldn't say -- you wouldn't -- when you were

3    the canine handler, you weren't the best person to identify and

4    interpret your specific canine's alerts?

01:32   5    A.   Correct.  I was probably better than most because I had

6    found that I had a passion for this particular field, and

7    even -- even then I would miss certain things and behaviors

8    that my trainer, which is why we need trainers and evaluators

9    and judges to look at what it is we are doing --

01:32   10   Q.   But you --

11                THE COURT:  Just one at time.

12                THE WITNESS:  -- but often we're too close to the

13   situation and become again, it is like certifying your own

14   dogs; you miss things; you interpret things that are actually

01:32   15   false.

16   BY MS. RO:

17   Q.   I am not talking about certifying your own canine.  I am

18   talking about interpreting the specific canine's behavior.  The

19   person who spends the most time with that canine would be the

01:33   20   best person to interpret the behavior; correct?

21   A.   No.

22   Q.   So when you were an Anaheim Police Officer would you let --

23   or would you delegate some other officer to interpret your

24   canine's behavior?

01:33   25   A.   I would ask them to watch and see if I am developing any

1   bad habits.  We would videotape or training.  I would see

2   things on the video that I didn't see while handling the dog.

3   It is necessary to have somebody else watch that has

4   experience, because they will see things that I miss.

01:33   5   Q.  That is for training purposes, but I am talking out on the

6   field when you don't have other instructors and trainers that

7   are with you, who is the best person to interpret the dog, you

8   as the handler or some outside source at the later end?

9   A.  I am not trying to be argumentative.  I am saying in an

01:33   10   experienced -- in a situation where you have experienced

11   person, they are often going to see things that a handler

12   doesn't see.

13   Q.  How long had you been a canine handler with the Anaheim

14   Police Department?

01:34   15   A.  As a handler with my dog, it was eight years.

16   Q.  So with eight years you didn't feel confident enough that

17   you would feel you could interpret your own canine's behavior?

18   A.  No.  Even up to the end there were times I made a mistake,

19   and the trainer would point it out.

01:34   20   Q.  Okay.  On page 2 of your declaration -- you may not have it

21   in front of you, but I'll just put it on the screen to publish.

22   It is, again, Government Exhibit Number 12.

23       You mentioned it that this team is unreliable because the

24   training records lack the source for the training narcotics;

01:34   25   correct?

1    A.    That's one of the reasons, yes.

2    Q.    So you are expecting where the -- if it was created in

3    Guatemala or Mexico or the cocaine was handled, that would tell

4    you if a canine team would be reliable?

01:35    5    A.    No.    It depends on what narcotics they are using.    If it is

6    always theirs, is there a specific location where they keep the

7    narcotics, say, at the training field, they keep it in a safe,

8    and that is where it is always kept, a dog will become very

9    attuned to finding the training narcotics because, again, it

01:35    10    has the trainer's odor on it; it has the people that hide it.

11        Is that the only source that they are using, because if

12    they are, then that is problematic.

13        Are they changing out the narcotics on a regular basis to

14    make sure that they are training on narcotics that have

01:35    15    different kinds of cuts, that has different types of

16    distractions on it.

17        It would be great if we could keep track of where it was

18    manufactured.    That is something that would be good to know.

19    We want the dog to focus on that one part of narcotics that is

01:35    20    the same in every narcotic of that source.    So if it is

21    methamphetamine -- you know, methamphetamine could be ice.    It

22    could be brown.

23        It could be a number of different things, and so you don't

24    want to always be just training on ice, because then when you

01:36    25    get confronted with something else, the dog may miss it, and it

1    becomes a problem.

2    Q.  So it would be great if they listed all the source

3    information of all the different types of narcotics that are

4    listed in the training records, but -- you've trained dogs.

01:36    5    You've been an instructor for the Anaheim Police Department.

6        It is pretty impossible to keep track of what every single

7    narcotics that has been on the training field, where the source

8    of that narcotic actually stems from; correct?

9        It would be great, but it is -- it is -- it doesn't really

01:36   10    affect the reliability of the canine team; correct?

11    A.  It does, and it was not that hard.  Unfortunately back when

12    I was a handler, we were using paper and pencil.  Now that we

13    have a computer, it is far easier to keep track of what we're

14    doing, especially using a canine software that is called CAPS

01:36   15    or something like that.

16        It is drop-down menus.  You put in your source where it

17    came from.  We would use narcotics from BLM.  We would use

18    narcotics from DEA.  We would use narcotics from Tustin Police

19    Department, from Orange Police Department, from La Palma Police

01:37   20    Department, and in our training records we would list what

21    narcotics we were using for that particular training event, and

22    that allowed us to understand that we were using different

23    types of narcotics.

24    Q.  When you were working for the Anaheim Police Department

01:37   25    or -- I'm sorry.  When have you listed all the sources?

1    A.   When I was at Anaheim Police Department that would be

2    the -- we would list where the narcotics came from that we were

3    using.

4    Q.   With the paper and pen that you just --

01:37    5    A.   Yes.

6    Q.   Okay.

7    A.   Unfortunately not a computer.

8    Q.   Okay.  You also list -- you were missing the trainer's

9    notes and opinions, has the extinction training been conducted,

01:38   10    and I believe on direct you also mentioned that they need to

11    have the substance and the amount of substance listed in the

12    training records, and because the training records and green

13    sheets for the Border Patrol terminologies, they did not have

14    any of those information, right?  That is what you testified to

01:38   15    on your direct?

16    A.   Yes.

17    Q.   I believe there is a Government exhibit binder in front of

18    you.  If you can turn to Number 10 tab, please.  If you could

19    turn to page 543.

01:38   20    A.   Sorry 500 --

21    Q.   43.

22    A.   Here it is.  Okay.

23    Q.   It has the date January 24th, 2012, on the right-hand

24    corner?

01:39   25    A.   Yes.

1   Q.   It actually lists -- do you see those three lines that has

2   been tested for the specific team?

3   A.   Yes.

4   Q.   Do you see the column where it says substance, amount?

01:39   5   A.   Yes.

6   Q.   So the training records do indicate what type of substance.

7   It says ice meth for one of them, and the cocaine that was

8   listed as one kilograms, and the meth was 50 grams.  Do you

9   also see comments listed at the comment section on that page?

01:39   10   A.   Yes.

11   Q.   So all of this information was provided to you, which you

12   just stated on direct that it wasn't -- Border Patrol failed to

13   note this, but it is here; correct?

14   A.   Yes, on a few of the records.  On some of the records it is

01:39   15   just very not a lot of information.

16   Q.   Okay.  Can you go through the next five pages for me and

17   see if there is comments, if there is a substance, and the

18   amount listed as well?

19   A.   Yes, there are.

01:40   20   Q.   There are.  You opined that a canine -- it is impossible

21   for a canine to differentiate the odor of a human in a vehicle

22   because it is one unit; correct?

23   A.   Yes.

24   Q.   But you also trained patrol canines; correct?

01:40   25   A.   Yes.

1    Q.   And isn't the purpose of a patrol dog to identify and

2    differentiate different human scent to locate that specific

3    human?

4    A.   Yes.

01:40   5    Q.   So taking a patrol dog, for example, how would you train a

6    patrol dog to search in a building?

7    A.   You want all the procedures that we go through?

8    Q.   Sure.

9    A.   Obviously, it starts in the selection process.  I won't go

01:41   10   through all the details, but you want a dog that -- well, let's

11   get to the bite part.  We have a dog that we have trained to do

12   bite on a sleeve.

13   Q.   And I'm sorry to interrupt.  I know I am getting in trouble

14   for interrupting.  I will be specific.

01:41   15       How do you train dogs to identify someone inside a single

16   house unit or the house situation that you were talking on

17   direct?  I'll limit it to that.

18   A.   So the dog has been trained to bite the equipment.  In the

19   beginning we train the dog to watch as the person that is

01:42   20   wearing this equipment -- again, in the beginning it is visual.

21   The dog sees this man, usually.  At times it is a woman wearing

22   a piece of equipment that he recognizes as his bite equipment

23   run into a building.

24       The dog in the excited moment is taken to the front door,

01:42   25   and we let the dog go in there and find the person which is

1    usually standing right in the middle of the hallway.  We repeat

2    that.

3        As time goes on the dog gets better at it.  We stop doing

4    the part where the guys or girl is being seen in front, and we

01:42  5    just put them inside, usually again in the hallway.  We send

6    the dog in.  The dog has success and finds them.

7        Once they've done that successfully over a few days usually

8    or maybe sometimes even a shorter period of time.  We will then

9    hide the person a little bit better, and we just continue that

01:42  10   until we have them completely concealed in a closet or under a

11   bed or something like that.

12       And then it is necessary to take the equipment away because

13   at that point the dog only wants to find people that are

14   wearing equipment, so then we have to change and put the dog in

01:43  15   a muzzle and teach the dog to find in a muzzle so that he

16   begins search for people that aren't wearing equipment because

17   if you don't, the dog will never find anybody for you.  If

18   there is nobody in there wearing equipment, then he won't do

19   it.

01:43  20       So then we have to change decoys, so we find a different

21   person to hide inside so make sure that he is looking for a

22   human being, not a specific human being, and you repeat that

23   exercise over and over again, until you hit the street and hope

24   that the dog will find somebody for real on the street.  Often

01:43  25   they don't.  It takes time, and eventually the dog will find a

1    bad guy inside of a house.

2    Q.   And through that process, the dog is then trained to ignore

3    their own canine scent and just alert or indicate or however

4    you classify it to that specific bad guy; correct?

01:43    5    A.   Bark, usually growl and snarl.

6    Q.   Okay.   They are also trained to ignore the scent on a bed

7    of another human to locate that bad guy under the bed; correct?

8    A.   Correct.

9    Q.   And so based on what you went through with us, under the

01:44    10   same theory, it is possible to -- for a canine to ignore other

11   human scent to locate a specific human, for example, concealed

12   under a bed; correct?   That was your testimony just a minute

13   ago; isn't that true?

14   A.   Yes.

01:44    15          MS. RO:   No further questions.

16          THE COURT:   Any redirect?

17          MR. SCOTT:   Just very briefly.

18                    REDIRECT EXAMINATION

19   BY MR. SCOTT:

01:44    20   Q.   You were just asked a couple questions about how in your

21   declaration you said certain weights weren't made available or

22   the types and sources of narcotics.   Do you remember being

23   asked that?

24   A.   Yes.

01:44    25   Q.   Do you recall whether or not that declaration was drafted

1    while we were litigating the issue of whether the Government

2    should give us unredacted copies or not?

3    A.   Yes.

4    Q.   And was that -- were you reacting to redacted records when

01:44   5    you wrote that declaration?

6    A.   Yes.

7              MR. SCOTT:  Okay.  Thank you.

8              THE COURT:  All right.  Anything else?

9              MS. RO:  Just one last question, Your Honor.

01:45   10                    RECROSS-EXAMINATION

11   BY MS. RO:

12   Q.   I am publishing the same declaration that Mr. Scott just

13   referenced.  Is that your signature?

14   A.   Yes.

01:45   15   Q.   What is the date here?

16   A.   11/12/15.

17             MS. RO:  No further questions.

18             THE COURT:  Anything else, Mr. Scott?

19             MR. SCOTT:  No, Your Honor.

01:45   20             THE COURT:  You may step down.

21             THE WITNESS:  Thank you.

22             THE COURT:  Does the Government have any rebuttal

23   evidence?

24             MR. PILCHAK:  No, Your Honor.  Will you hear the

01:45   25   parties in argument?

1    THE COURT:  No.  I will -- although, you know, the

2  testimony is far more expansive than I anticipated.  We've had

3  over a four-hour hearing.

4    MR. PILCHAK:  Yes.

01:45    5    THE COURT:  So there is no way -- I am not going to be

6  able to issue a ruling tomorrow.  I will have to vacate the

7  trial date, because I can't make a ruling in the next couple of

8  hours and still go forward tomorrow, so I'll hear the parties

9  in argument, but I am going to have to give you a different

01:46   10  trial date of January 12th.

11    Does that work for both sides?  I have a number of

12  other cases set that day, but you know, some go, some don't.

13    MR. PILCHAK:  That is the 12th of January, Your Honor?

14    THE COURT:  Yes.  That is a Tuesday.

01:46   15    MR. SCOTT:  Yes, Your Honor.

16    THE COURT:  Does it work for the Government as well?

17    MR. PILCHAK:  Just bear with us one moment, please.

18    THE COURT:  Certainly.

19    MR. PILCHAK:  That works for the Government, Your

01:47   20  Honor.  We'll contact the material witnesses to reschedule.  I

21  believe, if all went well, they should be on their plane now.

22  I understand.

23    THE COURT:  There is nothing that I can do now.  It is

24  just the case that I didn't anticipate -- originally we thought

01:47   25  we were going to have the hearing earlier --

1          MR. PILCHAK:  Yes.

2          THE COURT:  -- far in advance, and I certainly tried

3     to schedule it more than once well before the day before the

4     trial, and there is just too much information now to go ahead

01:47   5     and have the trial tomorrow.

6          Do you want to argue?

7          MR. PILCHAK:  Yes, Your Honor.

8          THE COURT:  All right.

9          MR. PILCHAK:  Do you prefer to hear from the defense

01:47  10     first on their motion or the Government?

11          THE COURT:  You can argue first.

12          MR. PILCHAK:  And thank you, Your Honor, for hearing

13     us just briefly, Your Honor.

14          So the three issues for today's hearing are whether

01:47  15     the canine is trained to detect humans and particularly humans

16     in the trunk of vehicles, whether the canine is reliable for

17     that, and whether the defendant consented.

18          Having heard the evidence, I think the consent

19     argument is relatively straightforward but also fact specific,

01:48  20     so I won't walk through the facts in detail for Your Honor and

21     rehash all the evidence that we heard.  I do want to note from

22     the video evidence that we reviewed that is now in the record

23     as Government Exhibit 5, it is a very brief interaction at

24     the -- at the checkpoint.

01:48  25          Your Honor, if part of the factor the Court is going

1   to weigh is whether the defendant felt free to open or not open

2   his trunk.  I think the duration of his time at the checkpoint

3   bears very closely on that, and it is just, you know,

4   30 seconds at Primary or thereabouts, and a very brief

01:48   5   interaction at Secondary before the defendant's trunk is

6   opened.

7          And so I think that is, you know, among all the many

8   other factors that indicate the defendant wasn't being

9   threatened or coerced or in custody.  It is a very brief

01:48   10   interaction.  I think it is a good fact pattern for consent.

11          THE COURT:  Is it the case -- if an officer says, you

12   know, would you open the trunk, or open the trunk, and the

13   individual does, is that consent?

14          MR. PILCHAK:  Well, I think the wording does matter,

01:49   15   Your Honor, and I think -- maybe we all wish that the witnesses

16   had a crystal clear memory of exactly the words that came out,

17   but I think if an officer of the law says, would you open your

18   trunk, can you open your trunk, and the individual does, unless

19   there are coercive factors -- and I submit, every car that

01:49   20   comes through the checkpoint that is detained momentarily at

21   Primary, it is not a coercive environment that invalidates

22   every consent that the agents get every day at the checkpoint.

23   Absent some coercive circumstances beyond that, I think it is

24   consent.

01:49   25          THE COURT:  Is it fair to say then the argument -- I

01:50

    1    understand that people won't recall the exact words or not very

    2    likely that they would be able to considering the number of

    3    vehicles that they come in contact with, but if a car comes in

    4    at the Primary, the officer says open the trunk and somebody

    5    says okay and they do, was that consensual?

    6          MR. PILCHAK:  Yes, Your Honor.  I think that is the

    7    United States' position.  Otherwise, you know, the alternative,

    8    I think, is not consistent with the consent regime which is,

    9    you ask whether the individual is making a free choice.  There

    10   is no case law holding that simply an officer being present

    11   and -- you know, officers are always armed; they are almost

    12   always in uniform.

    13         When they say, would you please empty out your

    14   pockets, I have no doubt that many people would interpret that

    15   as, I better empty out my pockets, but the case law doesn't

    16   hold that simply because there is an armed officer

    17   present people are --

    18         THE COURT:  I am not so much focused on that, as

    19   opposed to, for you is there no difference between somebody who

    20   says would you, are you willing, or would you open your trunk

    21   versus open the trunk.  To you, are they both the same with

    22   respect to consent?

    23         MR. PILCHAK:  No, they are not, Your Honor, and I

    24   think intelligently it is a spectrum, and if the Court finds

    25   that the testimony was -- or that the comment from Agent

1    Stypinski was, open the trunk, as opposed to a question, I

2    think it does matter for the analysis.  I don't know that it

3    automatically tips the scales, but I think that does matter.

4         THE COURT:  In your view what should the Court

01:51   5    conclude what was said to the --

6         MR. PILCHAK:  There is conflicting testimony.  I think

7    the Court has to evaluate --

8         THE COURT:  I'm sorry.  Go ahead.

9         MR. PILCHAK:  -- evaluate the credibility of the

01:51   10   witnesses.  The United States called two agents who I believe

11   their testimony was consistent.  None of the evidence appeared

12   from the video that the Court viewed to be, you know, posturing

13   or threatening the defendant.  I know you can't read the lips

14   or hear what they are saying, which is unfortunate.

01:51   15        THE COURT:  What is your understanding as to what the

16   Government witnesses said as to what the exact words were?

17        MR. PILCHAK:  Without a transcript, Your Honor, I even

18   can't be perfectly certain the words that came out of the

19   witnesses' mouths, but my recollection that the two agents said

01:51   20   they were trained to, it was their practice to, and they recall

21   that they did issue requests, and the orders came when the

22   trunk was opened at Secondary and they determined that they had

23   probable cause to arrest the defendant.

24        THE COURT:  What is your recollection as to what they

01:52   25   said as to how they conveyed the request?

```
 1              MR. PILCHAK:  Can you open the trunk, I think is

 2    probably the most accurate.

 3              THE COURT:  All right.

 4              MR. PILCHAK:  And, of course, the defendant did

 5    ultimately open his trunk at Secondary Inspection.  There is no

 6    dispute about that in the record, so I think that does it for

 7    the consent argument from the United States' perspective.

 8              As to the reliability of the canine, you know,

 9    obviously, Mr. Falco has a very impressive resume.  He's been

10    doing this for a long time.  With all due respect to him and --

11    first of all, with respect to the issue of expert notice, I

12    believe there are some opinions he rendered on the stand that

13    should have been rendered in advance consistent with the rules

14    relating --

15              THE COURT:  You objected to one.

16              MR. PILCHAK:  Right.  So that is the --

17              THE COURT:  That is the -- go ahead.  I'm sorry.

18              MR. PILCHAK:  That is the opinion on the video

19    behavior, right.  His review of Agent Miranda's conduct in the

20    field.

21              THE COURT:  And I haven't seen -- I would have to go

22    back and look at the letter to see.  Is that in the record,

23    what the proposed opinions were going to be?  I have no way of

24    knowing.

25              MR. PILCHAK:  It is Government's 12, right?  That is
```

1    the one that you marked as the November 12th, 2015, report that

2    we received.

3              THE COURT:  So the letter that was objected to was

4    the -- or the opinion -- the only opinion that was objected to

01:53    5    was the opinion as to whether or not there was actually a real

6    alert.

7              MR. PILCHAK:  Although the terminology by now is a bit

8    garbled because Mr. Falco has a different view of which is

9    which, and evidentially there is a divergence of opinion about.

01:53    10   And that, in fact, is the other thing that we would quarrel

11   with.  I recognize there was not a contemporaneous objection to

12   that, but he opined that an alert or what Agent Miranda

13   described alert is not probable cause itself, which I think is

14   a legal conclusion.  It is inconsistent with the case law.

01:54    15             THE COURT:  I agree.  That is a legal issue.

16             MR. PILCHAK:  Okay.  I would also like to argue the

17   case, United States vs Thomas, discusses behavior that is

18   almost a direct match to what Agent Miranda described what his

19   canine was doing.  I don't have the cite right in front of me,

01:54    20   but of course, Thomas is in the briefing.  The pin site for the

21   briefing is page 1087.

22             So I think you know it is interesting that Mr. Falco

23   has that opinion.  I don't think that it is, you know,

24   particularly legally relevant.

01:54    25             THE COURT:  I agree with that.  What is your position

1    with respect to the testimony or the issue that was raised a

2    number of times, that, you know, a dog can't differentiate

3    between people that are in the trunk and people that are in the

4    car?

01:54    5         As I understand it, the agent's testimony was they can

6    definitely do it; I don't know how; I don't know why, but they

7    can do it.  And, you know, the expert's testimony suggests,

8    well, they really can't do it.

9         Does that factual issue, does it matter?  I mean, if

01:54    10   the dog can't -- theoretically the dog is going to alert all

11   the time.  What is your answer that -- what should I rely on?

12        MR. PILCHAK:  Well, the answer in a nutshell is the

13   proof is in the pudding.  Boeli and Agent Miranda are at the

14   checkpoint day in day out, 5,000 cars a day coming through, and

01:55    15   that the alerts that Boeli is returning is not this car, this

16   car, this car, or this car all day, which if he is smelling

17   people, the empirical evidence would be that there is a person

18   in every car.

19        So I understand no one can cross-examine the dog.

01:55    20   Even Agent Miranda can't have a conversation with Boeli about

21   what he is doing.  What he can do is day in day out for

22   thousands of hours evaluate the dog's performance in the field,

23   and that is the same thing that Border Patrol is doing with the

24   green sheet tests every two weeks for the entire year and 15 or

01:55    25   16 certification tests at the end of the year.

1    So what they are doing is they are evaluating Boeli's

2    ability to do his job even though we can't ask him, you know,

3    what is going on through his mind while conducting the

4    searches.

01:56    5    THE COURT:  I am not suggesting that the alternative

6    was to cross-examine a dog.  What my question was, was that

7    because I -- it would seem to me that the extent that the

8    Government believes and certainly the agent believes -- I don't

9    think that he is making it up -- that he believes that there is

01:56   10    a way to determine the difference, that there is a way that the

11    dog can determine a difference between a dog that is in a trunk

12    and people.

13    And he's indicated that he is quite confident that

14    there is a basis -- there is a reason as to why the dog and how

01:56   15    the dog can differentiate, and -- but there is no evidence in

16    the -- like, whatever he is relying on, I mean, there is no

17    evidence of that, and I am assuming that there is a source of

18    that information other than the dog itself.  I am not

19    suggesting that you bring the dog here.

01:56   20    MR. PILCHAK:  Respectfully, I disagree that there is

21    no evidence.  I think that there was no person who took the

22    stand that said I can explain -- maybe the psychological is the

23    wrong word -- but I can explain the mental theory for what we

24    think the dogs are doing when they do this, so that testimony

01:57   25    obviously wasn't presented.

1    But there is evidence of how he does it in the sense

2  of the repeated green sheet testing for five years and the

3  annual certifications where he is called on, for example, to

4  find concealed humans in trunks, and he does it in the context

01:57    5  of those tests.

6    So we would submit respectfully, Your Honor, even

7  without a theory of here's the back-end processes of how the

8  dog finds concealed people, that the evidence of what he does

9  when called upon to do so in the training environment, which

01:57   10  Florida vs Harris, the Supreme Court itself says is the most

11  important environment for assessing dog reliability because it

12  can be controlled, and there aren't so many variables that you

13  have in live training, that that evidence, it is evidence that

14  the dog can do what it is being put forward as reliable to do.

01:57   15    THE COURT:  All right.  Anything else?

16    MR. PILCHAK:  No, Your Honor.

17    THE COURT:  All right.  Mr. Scott.

18    MR. SCOTT:  Thank you, Your Honor.  As to consent, I

19  think the legal issue is, first, that it is a warrantless

01:58   20  search, so it is the Government's burden.  Has the Government

21  met their burden showing a legally effective consent under the

22  law?

23    The legal issue within the legal issue, I think is not

24  was Mr. Summers' will overborne?  Was it a voluntariness issue

01:58   25  where he felt so threatened by the guns and, you know, the

1   trappings of authority that he consented when he didn't want

2   to?  That is a little bit of a red herring with all that line

3   of questioning.  That is not the legal issue.

4        The legal issue, I suggest to the Court is, did he

01:58   5   acquiesce to a show of legal authority?  And that really is the

6   test.  I would cite to the Court the case of United States vs

7   Pope, which is 686 F.3d 1078.  The fact pattern in that case

8   was the officer asked somebody to empty out their pockets, you

9   know, and there is -- there was, I am sure, a factual dispute

01:59   10   in this case about, can you empty your pockets, or would you

11   empty your pockets.

12        But the point is, being told to do something by an

13   officer who has just introduced himself as an officer as

14   presenting a show of legal authority just isn't consent as a

01:59   15   matter of law.  That case relied upon the en banc Windsor case

16   which is where police officers -- this is an en banc case --

17   police officers knocked and said, police, open the door or

18   words to that effect.

19        So I part company with the Government.  If even if we

01:59   20   agree that the testimony was -- or that the facts were, can you

21   open the trunk, you know, can you open the trunk, that is

22   simply not a request under the law.  That is -- that is a

23   directive.

24        Again, it may not be threatening.  Mr. Summers, who

02:00   25   knows, he may have been willing to if he was asked nicely and

1   presented with the options, but as a matter of law when an

2   officer says, would you pop the trunk, or can you pop the

3   trunk, or pop the trunk, that is not consent, just as matter of

4   law.

02:00   5        When we think about it from a policy standpoint, what

6   message do we want to send?  I think in general we want people

7   to do what they are told, to not quarrel with officers, to not,

8   you know, disregard their directives, and I think that is a

9   little bit of a dangerous game to play to say, oh, well, when

02:00   10  the officer says, you know, keep your hands away from your

11  body, that is an order, not a request, but when an officer says

12  open the trunk, that is a request not an order.

13       I think -- I think that is cutting it pretty thin, and

14  it is a little convenient for the Government to suggest one is

02:00   15  an order and one isn't.

16       I don't know if the Court took any stock in Agent

17  Miranda -- Agent Miranda, I think, was the most outlier in

18  terms of, you know, I think his description of it was --

19  sounded the most like a request, and he told us a story about

02:01   20  seeing through the window and seeing Mr. Summers agree, and I

21  think, at least my opinion, is that the videotape pretty

22  soundly impeached him.

23       I don't know if the Court took any stock on his story

24  that he was looking through his peripheral vision and that

02:01   25  whole thing, but I just submit that that is not particularly

1    credible.

2         Briefly as to the dog search, it is Supreme Court law

3    that a dog alert -- and we'll talk about what that means,

4    alert -- can establish probable cause if the dog has been

02:01    5    demonstrated to be reliable.

6         The Court asked a very pointed question to the

7    Government, how do you account for this sort of, you know,

8    almost faith-based magical thinking that the dog can discern

9    concealed humans versus other humans, the agent had no answer

02:01    10   for that.  The Government had no answer for that, and the

11   Government's best response to the Court was the proof is in the

12   pudding.

13        I agree with the Government 100 percent.  Let's look

14   at the proof in the pudding.  The proof in the pudding is just

02:02    15   by the back of the envelope math, which I skewed to -- or at

16   least tried to make it more fair of, let's say, three alerts in

17   a working shift, Agent Miranda told us that this dog has

18   alerted 4,000 times give or take in his career, and the dog

19   found 19 busts.

02:02    20        You know, if you figure the five or seven human beings

21   and a dozen dogs -- excuse me -- a dozen narcotics, well, you

22   want to talk about proof in the pudding.  That is 19 verified

23   successes out of 4,000 alerts.  I mean, that is -- that is an

24   infinitesimally small success rate for the dog.

02:02    25        THE COURT:  Although, when you say the success rate,

1    isn't the success rate in the controlled training where you can

2    say, okay, here's -- here's where we have it, and that is

3    controlled because the other, it is uncontrolled; it is

4    unknown?

02:03  5         Isn't that when you are considering the reliability of

6    the dog?  Isn't that what I would look to, the training

7    records, to say, okay, here's what they did when the dog was

8    evaluated, not, you know, the numbers that say, well, look at

9    these numbers, they can't be right?

02:03  10         MR. SCOTT:  I don't think that you can -- no, I don't

11   think you can look at the training records to the exclusion of

12   the real world performance.  I think the real world performance

13   is, to borrow the Government's phrase, the proof is in the

14   pudding.

02:03  15         THE COURT:  So is it your position that, well, the dog

16   has alerted falsely, I don't know what those numbers are, 20

17   over 4,000, or whatever the alert number is?

18         MR. SCOTT:  Right.

19         THE COURT:  Are you saying then that the dog has been

02:03  20   wrong 99 percent of the time?  99 percent of those are false

21   alerts.

22         MR. SCOTT:  Let's give -- let's not say it is all

23   4,000 minus 20.  Let's give the agent some credit for, okay,

24   maybe somebody smelled like marijuana; maybe there was some in

02:04  25   the floorboard.

1          THE COURT:  But that is a big guess, so what is your

2     guess as to how many were false and how many were --

3          MR. SCOTT:  I couldn't begin to guess, and frankly,

4     that is really the point.

02:04    5          THE COURT:  But isn't it the case that, well, because

6     the numbers are -- because it is not a controlled environment

7     that the only numbers that really matter are the -- are the --

8     are the training records where it is not -- where it is a

9     controlled environment?

02:04   10          I mean, because for argument sake, suppose the dog is

11     just so reliable it alerts on everything, which I think is part

12     of your argument, look, there is people in every car, so if it

13     can't tell a difference statistically, you know -- maybe it is,

14     you know -- the dog is hungry or something, it just alerts, and

02:04   15     there is always going to be people in the car so it is not

16     alerting based on any smell, so that if that is the case, then

17     the numbers of these false alerts would be -- because there is

18     so many, you know, 8,000 cars go by a day, that it is going to

19     be very, very high, right, wouldn't you think?

02:04   20          MR. SCOTT:  Yeah, and apparently it is very high.

21          THE COURT:  But so if the dog is just wrong because it

22     can't smell the difference, then what would explain when it

23     gets in the controlled environment, that, you know -- I

24     understand that there is some debate about whether the training

02:05   25     is right, whether they should be doing things or not doing

1    things.

2         But the dog seems to pass all the training, and so if

3    the dog is inherently unreliable and doing it almost at a

4    random basis at the checkpoint, why when it gets tested, it

02:05    5    seems to do pretty well -- it seems to do much better on the

6    test?  It doesn't seem to be random on the test.

7         MR. SCOTT:  Apparently the dog is trained to test, and

8    it is trained to train.  In -- I simply disagree with the

9    Court, respectfully, of course.

02:05    10        THE COURT:  I am asking questions.  I am not really --

11        MR. SCOTT:  What was that?

12        THE COURT:  I am asking questions, not making

13    statements.

14        MR. SCOTT:  Fair enough.  I can't see how we can throw

02:05    15    up our hands and say we'll only look at the training records

16    because it is a controlled environment.  Really that is sort of

17    my argument, that the controlled environment is distinct.  It

18    is substantively different.  It is fundamentally different than

19    the real-world questions that we're asking.

02:06    20        As I understand it anyway, the Supreme Court and the

21    legal test isn't this establishes probable cause, you know.  A

22    dog can establish probable cause if it has performed, you know,

23    to the level of three in controlled setting trainings.

24        What the law is, as I understand it, is the dog has to

02:06    25    be demonstrated to be reliable.  And reliability in this

1   setting is not can the dog, you know, consistently find the

2   prehidden hides in a training exercise, that is not the

3   question.

4          If Mr. Summers was hiding out in the brush in

02:06  5   conditions exactly like the training exercise, or if this was a

6   fact pattern identical to the training exercise, that might be

7   a different issue, but I think this is not.  What we have is

8   when the chips are down, when it is game time so to speak, we

9   have a dog that was right, you know, for sure 19 out of 4,000

02:07  10   times, again, just using the rough numbers, and you are right,

11   we're just left to scratch our heads and say, well, how many

12   times was there a roach in the ashtray?  How many times was

13   there residue?

14          It is almost like a faith-based -- it is like an

02:07  15   article of faith by the -- we have an agent who is literally

16   telling us, there is no such thing as false alert.  I think

17   that says quite a bit.  How can you say that?  He can say,

18   well, because you don't -- you don't know that there was never

19   anything there.  Well, equally, you don't know that there was

02:07  20   something there, so I don't see how that can cut against the

21   defense when it is the Government's burden of demonstrating

22   reliability.

23          You know, the Government said, and I know it wasn't

24   meaning to be glib, we can't cross-examine the dog, and that is

02:07  25   true, so it is really kind of troubling to have a dog with such

1    low objective reliability in game time, real-world settings,

2    and to have an officer who literally says there is no such

3    thing as a false alert.

4         And then add to that the notion that the -- in the

02:08    5    handler's opinion, he is the only one in the world that knows

6    what his dog -- when his dog is alerting, him and the

7    instructors, you know, that dog becomes like a divining rod.

8    It is like, well, trust me my -- I know when my dog alerts, you

9    know; there is only objective evidence to that 19 out of 4,000

02:08    10    times, but trust me, I know.  I mean, that is really almost

11    literally what it boils down to.

12         I also think what we're seeing here is a little bit of

13    linguistic slight of hand, whether purposely or inadvertently,

14    Customs and Border Protection has utilized here.  The reason

02:08    15    that I talked about alerting versus indicating, it has to be

16    the law, that the dog has to pinpoint a source of either

17    narcotics or people in order to establish probable cause.

18         I think what we have here is these two stages of the

19    dog has picked up some sort of a scent, doesn't know where it

02:09    20    is from, wants to go and find it, and then when it feels like

21    it is located where the scent is coming from, then it will

22    indicate.  Then it will give sort of a final answer by sitting

23    or barking or whatever it is that, look, this is -- there is

24    some contraband or concealed people here.

02:09    25         That is why we talked about the nose cone -- or the

1    scent cone spreading out.  It cannot be the law that a dog that

2    is trained to smell people -- and again, there is no difference

3    in smell between concealed people and regular people, a dog

4    that is trained to smell people, derivatives down to the, you

02:09    5    know, dollar bill that may or hay not have cocaine on it, that

6    that first initial interest and indication is probable cause as

7    matter of law, that can't be the law.

8            THE COURT:  Although, is the Government suggesting

9    that?  I don't --

02:10    10            MR. SCOTT:  Agent --

11            THE COURT:  -- I don't believe that to be the

12    argument.

13            MR. SCOTT:  Agent Miranda did.  Agent Miranda did.

14    And the Government has to in this case because the only

02:10    15    testimony in this case is that dog never indicated.  You know,

16    that is the nomenclature here.  I think what we have been

17    describing here is indication, the sitting or the barking, I

18    think that is what the rest of the world would understand as

19    alerting, the dog communicating in an objective and definitive

02:10    20    fashion there is contraband here or there are concealed people

21    here, if you want to believe that story.

22            That is an objective indication that the dog has found

23    a scent.  Everything before that is the dog is interested.  It

24    is some information.  It may -- there is a scent somewhere in

02:10    25    this cone, but it hasn't found it, and so it is -- yeah, that

1    has to be the Government's argument that not the indication,

2    what the rest of the world understands is an alert, but that

3    preliminary interest, that preliminary interest establishes

4    probable cause, and then that just cannot be the law.

02:11    5         You know, I that is why I think it is more a

6    linguistics slight of the hand for Customs and Border

7    Protection to idiosyncratically call that preliminary secondary

8    demonstration of interest, the one that is preliminary to an

9    actual finding of source smell.  It is a linguistics slight of

02:11    10   hand to call it an alert.  I think that that is -- whether --

11   again, whether purposefully or not, it is taking advantage of

12   the case law in calling that an alert, when it is really sort

13   of a preliminary gesture, and that can't establish probable

14   cause.

02:11    15        If that were the case, then there was probable cause

16   to search all 4,000 of those cars, and I just don't think that

17   the Constitution permits that.  I don't think that is the state

18   of the law.  I don't think that based on the record that we've

19   heard today, you know, if a judge was sitting in chambers, you

02:12    20   know, neutrally and dispassionately weighing the record in

21   front of them, whether they would say, yeah, I would issue a

22   search warrant on these facts.

23        I can't imagine a judge in good conscience doing that.

24   I don't know if I am speaking out of school.  That is the

02:12    25   standard.  Is there enough reliability here to establish

1    probable cause?  I don't think the record supports that.

2             THE COURT:  All right.  Anything else?

3             MR. SCOTT:  No.  Thank you.

4             THE COURT:  Any comments, final comments from the

5    Government on the last arguments?

6             In your view of the record, there was -- is it your

7    view that there was -- to use the term, as I think it was used

8    interchangeably on occasion, an indication and an alert?

9             MR. PILCHAK:  No, Your Honor.  I think the testimony

10   of Agent Miranda is that Boeli alerted to the vehicle, and to

11   be crystal clear, he testified that Boeli alerted to the

12   vehicle when he was standing with his nose adjacent to the

13   vehicle's trunk.  He did testify that Boeli did not indicate.

14            His testimony was that Boeli's indication is barking

15   and backing up, and he didn't testify that Boeli did that, and

16   Boeli didn't do that on the video, but he alerted to the

17   vehicle by demonstrating behavior that I would just note to the

18   Court is pretty much identical to the alert behavior that the

19   Ninth Circuit describes in Thomas, which is at that 1087 pin

20   cite that I mentioned in my opening argument, which is in that

21   case for that dog, specific for that dog and handler, the dog's

22   tail and ears went up, his posture and breathing pattern

23   changed, and he started air scenting, which the Court accepted

24   as testimony that was what the officer referred to as alert

25   behavior.

1    And there was no suggestion in that case that because

2    the dog's alert behaviors were -- those particular behaviors

3    were insufficient under a dog sniff pattern.

4    So I understand Mr. Scott's argument.  I think it is

02:13  5    inconsistent with the case law.  I think the case law is clear

6    that a dog alert as described in Thomas can be sufficient to

7    support probable cause, provided the dog is reliable, and we

8    heard a bunch of argument on that.

9    THE COURT:  Thank you.  Your presentations are

02:14  10   helpful, and I'll issue a written decision.  It is not going to

11   be by the morning, so we'll have a new trial date.

12   Anything else?

13   MR. PILCHAK:  We requested that, Your Honor, receive

14   the documents under seal for this proceeding.  Will Your Honor

02:14  15   address that in --

16   THE COURT:  I will receive them under seal.  There is

17   no objection to them being under seal.  So they will be

18   received in the record under seal.  I don't think that there

19   will be an issue with respect to the order and the documents

02:14  20   under seal.  I don't anticipate that there will be such an

21   issue.

22   MR. PILCHAK:  Very good.

23   THE COURT:  Thank you.

24   (Proceedings concluded at 2:14 p.m.)

25   ---000---

1

2                         C-E-R-T-I-F-I-C-A-T-I-O-N

3

4            I hereby certify that I am a duly appointed, qualified

5    and acting official Court Reporter for the United States

6    District Court; that the foregoing is a true and correct

7    transcript of the proceedings had in the aforementioned cause;

8    that said transcript is a true and correct transcription of my

9    stenographic notes; and that the format used herein complies

10   with the rules and requirements of the United States Judicial

11   Conference.

12           DATED:   December 11, 2015, at San Diego, California.

13

14                                  /s/ Melinda S. Setterman
                                   _____
15                                  Melinda S. Setterman,
                                    Registered Professional Reporter
16                                  Certified Realtime Reporter

17

18

19

20

21

22

23

24

25