1

2

3

4

5

6

7 **UNITED STATES DISTRICT COURT**

8 **SOUTHERN DISTRICT OF CALIFORNIA**

9 UNITED STATES OF AMERICA,          CASE NO. 15cr716-WQH

10                          Plaintiff,   ORDER

    vs.
11 KENNETH DUANE SUMMERS,

12                          Defendant.

13 HAYES, Judge:

14       The matters before the Court are: (1) the motion to suppress evidence obtained

15 at an unconstitutional checkpoint; and (2) the motion to suppress evidence obtained by

16 an unconstitutional trunk search (ECF Nos. 53-1, 53-2 and 67-1, 67-2).

17 **I. Background Facts**[1]

18       The United States Border Patrol, El Centro Sector operates the Highway 86

19 checkpoint near Westmorland, California.  The Highway 86 checkpoint is a permanent

20 checkpoint staffed solely by Border Patrol agents.  During the past three-year period,

21 there were approximately 1,746 apprehensions at the checkpoint, approximately 1,579

22 were immigration related and approximately 167 were drug-related.

23       On February 28, 2015, at approximately 8:30 p.m., Defendant Kenneth Summers

24 approached the Highway 86 checkpoint in a black Volkswagen Jetta.  Defendant sat

25 behind the wheel, and his son sat in the passenger seat. Defendant pulled up to the

26 primary inspection point and stopped at the marked stop sign.  United States Border

27

28       [1] On December 8, 2015, the Court held an evidentiary hearing at which testimony
was taken and exhibits received.  (ECF No. 111).

1  Patrol Agent Stephen Stypinski identified himself as a Border Patrol agent and asked
2  Defendant for his citizenship status.  Defendant responded that he was a United States
3  citizen.

4  While Agent Stypinski questioned the Defendant, United States Border Patrol
5  Agent Aaron Miranda and his canine partner, Boeli, walked behind the vehicle.   A
6  video of the primary area shows that Boeli sniffed the trunk of the Jetta from the drivers
7  side to the passenger side and paused for a few seconds in front of Agent Miranda.
8  Agent Miranda and Boeli then proceeded toward the front passenger side of the vehicle.
9  Agent Miranda testified that he asked Agent Stypinski to have the Defendant open the
10  trunk as he approached the passenger side door.  Agent Stypinski testified that he
11  complied with Agent Miranda's request.  Agent Stypinski testified, "I don't remember
12  the exact words.  It was probably something like, can you open the trunk, can I search
13  the trunk, along those lines."  (ECF No. 111 at 15).  Defendant testified, "I am not
14  exactly sure. [Agent Stypinski] said, pop the trunk.  He said, roll down the back
15  window, roll down the back window, and then he said, pop the trunk or open the trunk."
16  *Id*. at 130.  Defendant testified that he interpreted Agent Stypinski's statement as an
17  order and that he did not feel that he had a choice.

18  Defendant attempted to open the trunk from the inside of his car, but he was
19  unable to do so.  While Defendant was attempting to find the lever insider the vehicle
20  to open the trunk, Agent Miranda and Boeli walked back to the rear of the vehicle.  The
21  video shows that Agent Miranda attempted to open the trunk as he arrived back at the
22  rear of the vehicle but that the trunk had not released.  The video shows that Boeli
23  stopped behind the driver side of the trunk and continued to sniff at the trunk area for
24  approximately twenty seconds.

25  Agent Stypinski requested that the Defendant move to the secondary area.  The
26  encounter at primary, recorded on the video, took approximately 40 seconds.
27  Defendant proceeded past the designated parking spots in the secondary area marked
28  with white lines and pulled over to the side of the road past the parking spots.  Agent

1   Eric Hanna walked over the driver's side of the vehicle and asked the Defendant to

2   open his trunk.  Agent Hanna testified,  "It is in a form of a request, along the lines of,

3   are you able to open the trunk from there?"  *Id.* at 31.  Defendant used his key fob to

4   release the trunk hatch.   Agent Hanna opened the trunk and found two persons

5   concealed in the trunk. Agent Hanna ordered Defendant out of his car, handcuffed him,

6   and frisked him.  Defendant was placed under arrest.

7          Defendant is charged in an indictment with transportation of illegal aliens for

8   financial gain and aiding and abetting in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii),

9   (v)(II), and (a)(1)(B)(I). (ECF No. 19).

10          At the evidentiary hearing, Agent Miranda testified that he was trained as the

11   canine handler for Boeli and that he has been Boeli's handler for five years, including

12   5,000 hours of field experience.  Agent Miranda testified that he and Boeli initially

13   received an eight-week training course, and that he and Boeli train together on a

14   biweekly basis. Agent Miranda testified that he and Boeli have received a United States

15   Border Patrol Detection Team Certification for the years 2011, 2012, 2013 and 2014.

16   Plaintiff submitted Boeli's training records, including Performance Standard Score

17   Sheets.

18          Agent Miranda testified that Boeli is trained to find things by their odor,

19   including concealed humans, marijuana, heroin, methamphetamine, and all derivatives

20   of those drugs.  Agent Miranda testified that when Boeli comes across an odor that he

21   is trained to find "he changes posture, his demeanor.  His breathing changes.  He tenses

22   up, starts breathing out his nose, closes his mouth.  His whole body changes up."  *Id.*

23   at 41. Agent Miranda testified that he describes this change in Boeli's behavior as "an

24   alert." *Id.*  In addition to an alert, Agent Miranda testified that Boeli is trained to try to

25   "find exactly where the odor is coming from" which Agent Miranda describes as "an

26   indication."  *Id.*  Agent Miranda testified that he has tried to train Boeli to sit in order

27   to indicate that he smelled an odor he was trained to detect but that Boeli has been

28   unable sit in order to indicate. Agent Miranda testified that alert behavior is different

1   from indication behavior.   Agent Miranda testified that Boeli will try to sit for

2   indication behavior but that "he is a different kind of breed of dog, so he'll start back

3   peddling and is barking because he is ready for me to give him his toy."   *Id*. at 42.

4   Agent Miranda testified that indication behavior is not required to find an alert.

5          Agent Miranda testified that Boeli is trained to detect concealed people in

6   different scenarios including inside a moving vehicle.   Agent Miranda testified that

7   Boeli can "distinguish cars with people in them from cars with concealed people in

8   them." *Id.* at 44.   Agent Miranda testified that "I am not an instructor, so I don't really

9   know how they do the training or how he does it.   It amazes me too, but it works." *Id.*

10  Agent Miranda testified that on a typical day thousands of cars come through the

11  checkpoint  and that Boeli could alert "anywhere from two to six or seven" times.  *Id.*

12  at 46.   Agent Miranda testified that Boeli has found "five to seven human beings and

13  twelve narcotics busts" over their five-year career.   *Id*. at 105.

14         Agent Miranda testified that he is trained to recognize Boeli's alert.   Agent

15  Miranda testified that Boeli initially "seemed very interested" in the Defendant's

16  vehicle. *Id*. at 69.   Agent Miranda testified that Boeli alerted to the Jetta at the initial

17  encounter behind the trunk on the passenger side of the vehicle.   Agent Miranda

18  testified "his mouth closed, his body tensed, and just his whole demeanor changed."

19  *Id*. at 70.   Agent Miranda testified, "I continued to search to see if I could get him to

20  pinpoint it."   *Id*. at 71.   Agent Miranda testified that he and Boeli proceeded to the

21  passenger door of the vehicle, that he asked Agent Stypinski to "ask the [Defendant] if

22  we could look in the trunk," and that he and Boeli returned to the trunk area of the

23  vehicle.   *Id.*   Agent Miranda testified that Boeli did not sit at the trunk area of

24  Defendant's vehicle and did not back up and bark at the trunk area of Defendant's

25  vehicle.   Agent Miranda testified that he based his conclusion that he had probable

26  cause on the "preliminary alert behavior."   *Id*. at 91.   Agent Miranda testified that he

27  had probable cause to look in the trunk at the initial alert from Boeli and that he did not

28  have to wait for any indication behavior from Boeli.

1    At the evidentiary hearing, Defendant presented the testimony of an expert
2  witness who operates a business training dogs for law enforcement and security
3  organizations.  The expert testified that he was familiar with the distinction between
4  alert behavior and indicating behavior.  The expert testified, "that the initial alert . . . is
5  just an indication that the dog is interested in something . . . it could be the trained odors
6  that we have trained the dog to do in training, but it can also be any other – a number
7  of other things, from food, to urine on a tire, to road kill in the undercarriage.  Dogs
8  show that same behavior when they are interested in other things . . . closed mouth,
9  body language changes . . . ." *Id*. at 147.

10    Defendant's expert was asked, "In your opinion is it possible to train a dog to
11  alert to concealed human smell but ignore or differentiate other human smell in the
12  same vehicle?"  The expert answered, "Not inside the same vehicle.  If there is
13  somebody inside the vehicle and somebody in the trunk, or you take the person out of
14  the trunk, it doesn't matter.  It is all – it is the same to the dog." *Id*. at 151-52.
15  Defendant's expert viewed the video of Boeli encountering the Defendant's vehicle in
16  the primary area and was asked, "Do you have an opinion whether that dog was giving
17  – giving an indication to the trunk of that car?"  The expert answered, "No.  I saw a dog
18  appear as if he was sniffing the vehicle . . . Dogs are supposed to sniff the vehicles to
19  find the odor.  An alert would be for the dog to sit and put his nose where the source of
20  the odor is coming out." *Id*. at 155-56.

21    Defendant's expert testified that the training records and certifications in this case
22  cannot be relied upon.  Defendant's expert testified that the records did not include
23  necessary deployment records, and that the records did not adequately indicate the
24  source and quantity of narcotics used.  Defendant's expert testified that it is important
25  to have the certification done by someone other than the agency employing the dog
26  because "there is a vested interest in the failures or successes." *Id*. at 160.

27  **II.  Unconstitutional Checkpoint**

28    Defendant contends that the operation of the Highway 86 Border Patrol

1   checkpoint is unconstitutional in violation of the Fourth Amendment to the United

2   States Constitution.  Defendant contends that the checkpoint has outgrown the original

3   purpose of immigration enforcement and expanded into other areas of law enforcement

4   unrelated to immigration, including drug enforcement.  The Government contends that

5   the primary purpose of the Highway 86 Border Patrol Checkpoint remains immigration-

6   related.  The Government contends that immigration checkpoints do not violate the

7   Fourth Amendment, even where stops result in drug interdiction.

8   　　　　In *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976), defendants challenged

9   two permanent Border Patrol checkpoints on Fourth Amendment grounds, including a

10   checkpoint located near San Clemente, California, on Interstate 5, sixty-six miles from

11   the U.S.-Mexico Border.   The San Clemente checkpoint brought all northbound

12   vehicles to "a virtual, if not a complete, halt." *Id.* at 546.  Although most motorists

13   were allowed to resume their progress "without any oral inquiry or close visual

14   examination," an agent would direct a small number of vehicles to a secondary

15   inspection area for further inquiry. *Id.*  The United States Supreme Court recognized

16   a need for a "traffic-checking program in the interior . . . because the flow of illegal

17   aliens cannot be controlled effectively at the border." *Id.* at 556.  The Supreme Court

18   held that "the stops and questioning at issue may be made in the absence of any

19   individualized suspicion at reasonably located checkpoints." *Id.* at 562.  The Supreme

20   Court further held that "it is constitutional to refer motorists selectively to the secondary

21   inspection area at the San Clemente checkpoint on the basis of criteria that would not

22   sustain a roving-patrol stop." *Id.* at 563.  "As the intrusion here is sufficiently minimal

23   that no particularized reason need exist to justify it, we think it follows that the Border

24   Patrol officers must have wide discretion in selecting the motorists to be diverted for

25   the brief questioning involved." *Id.* at 563-64.

26   　　　　In *United States v. Soto-Camacho*, 58 F.3d 408 (9th Cir. 1995), the Court of

27   Appeals for the Ninth Circuit rejected a Fourth Amendment challenge to a Border Patrol

28   checkpoint located near Jacumba, California.  The Court of Appeals explained, "its

1   primary purpose is to check for aliens, all vehicles are stopped, the checkpoint is well

2   identified, Border Patrol agents exercise no discretion over the checkpoint's operation,

3   and the stop itself involves a minimal intrusion." *Id*. at 411.  The Court of Appeals

4   concluded, "We . . . hold that the Jacumba checkpoint stop itself was not infected, . . .

5   by the fact that the Border Patrol bases the timing of its decision to set up the

6   checkpoint in part on drug intelligence." *Id.* at 412.

7          In *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000), the United States

8   Supreme Court decided the constitutionality of a traffic checkpoint, where the

9   program's primary purpose was interdiction of illegal narcotics.  The Supreme Court

10  "decline[d] to approve a program whose primary purpose is ultimately indistinguishable

11  from the general interest in crime control." *Id.* at 44.  The Supreme Court concluded

12  that the general rule of individualized suspicion should apply to traffic stops in the

13  general crime control context.

14         In this case, the Highway 86 checkpoint is a permanent checkpoint operated

15  solely by Border Patrol agents.  During the past three year period, there were

16  approximately 1,746 apprehensions at the checkpoint, including 1,579 immigration-

17  related apprehensions and 167 drug-related apprehensions.[2]  The record shows that the

18  primary purpose of the checkpoint is to check for aliens, and all vehicles are stopped.

19  The record shows that the checkpoint is well-identified, and the stop involved minimal

20  intrusion.  There is no evidence that the checkpoint was operated for any purpose other

21  than immigration enforcement.  There is no evidence that Defendant in this case was

22  stopped for any purpose other than immigration enforcement.  *See Soto-Camacho*, 58

23  F.3d at 411 ("There was no evidence here to suggest that the Jacumba Checkpoint was

24  operated solely for the purpose of drug interdi ction, or that Soto himself was stopped,

25  referred to secondary, or asked for permission to search his  vehicle solely to look for

26  drugs."). Defendant's Fourth Amendment rights were not violated as a result of his stop

27

28         [2] Declaration of Richard Ransdell, Acting Assistant Chief Patrol Agent, United
   States Border Patrol, El Centro Sector, (ECF No. 60).

1  at the Highway 86 checkpoint.

2       Defendant's motion to suppress evidence obtained from an unconstitutional
3  checkpoint is denied.

4  **III.  Unconstitutional Trunk Search**

5  **a.  Consent**

6       Defendant asserts that the search of his trunk was carried out without a warrant,
7  without his consent, and without probable cause.  Defendant contends that he did not
8  consent to the search of his trunk, that Agents Stypinski and Agent Hanna ordered him
9  to open the trunk, and that the agents did not inform him that he could refuse the order.
10  The Government contends that Defendant voluntarily consented to the search because
11  agents asked Defendant for consent, in both the primary inspection area and the
12  secondary inspection area.  The Government asserts that Defendant had not been seized
13  at the time he was asked to consent.

14       The Government bears "the heavy burden of demonstrating that the consent [to
15  search] was freely and voluntarily given."  *United States v. Chan-Jimenez*, 125 F.3d
16  1324, 1327 (1997) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)).  "Among
17  the factors that tend to show a lack of voluntariness are: (1) the person was in custody;
18  (2) the officer had his weapon drawn; (3) the officer failed to administer *Miranda*
19  warnings; (4) the officer did not inform the person of his right to refuse to consent; and
20  (5) the person was told that a search warrant could be obtained."  *Id.*

21       The record in this case does not establish that Defendant affirmatively consented
22  to the search of his trunk.  The testimony of the agents indicates that the Defendant was
23  directed to open his trunk.  While the agents did not draw their weapons, the agents did
24  not inform the Defendant that he had the option to refuse to consent or inform the
25  Defendant that a search warrant could be obtained.  The record is not sufficient to meet
26  the Government's heavy burden to show that the Defendant was asked for consent to
27  search his trunk and that Defendant freely and voluntarily consented to the search of his
28  trunk.

1  **B.  Probable cause to search the trunk**

2      Defendant contends that Boeli, the canine, did not give a positive alert sufficient

3  to support probable cause.  Defendant challenges the evidence of Boeli's qualifications

4  and performance, the adequacy of Boeli's training program, and the circumstances

5  surrounding Boeli's alert behavior.  Defendant contends that the Government may not

6  rely on Boeli's alert because the Government has not come forward with sufficient

7  evidence of Boeli's reliability.   Defendant asserts that all of the evidence in this case

8  must be suppressed because it derives from an unconstitutional trunk search.

9      The Government contends that Boeli's alert behavior constituted probable cause.

10  The Government asserts that Agent Miranda and Boeli are a certified Border Patrol

11  detection team and successfully completed the certification requirements for the

12  detection of concealed humans and the odors of certain controlled substances. The

13  Government asserts that the training and certification records and the testimony of

14  Agent Miranda establish the reliability of Boeli's alert behavior as a basis for probable

15  cause to search the trunk.

16      "The automobile exception permits police to search a vehicle as long as the

17  vehicle is 'readily mobile' and 'probable cause exists to believe it contains

18  contraband.'" *United States v. Davis*, 530 F.3d 1069, 1084 (9th Cir. 2008) (quoting

19  *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam)).  "[P]robable cause is

20  a fluid concept—turning on the assessment of probabilities in particular factual

21  contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v.*

22  *Gates*, 462 U.S. 213, 231 (1983).  "Probable cause exists when, under the totality of the

23  circumstances, there is a fair probability that contraband or evidence of a crime will be

24  found in a particular place." *Davis*, 530 F.3d at 1084 (internal quotations omitted).  In

25  *Florida v. Harris*, _ U.S._, 133 S. Ct. 1050, 1055 (2013), the Supreme Court explained,

26      [E]vidence of a dog's satisfactory performance in a certification or training
        program can itself provide sufficient reason to trust his alert. If a bona fide
27      organization has certified a dog after testing his reliability in a controlled
        setting, a court can presume (subject to any conflicting evidence offered)
28      that the dog's alert provides probable cause to search. The same is true,
        even in the absence of formal certification, if the dog has recently and

1   successfully completed a training program that evaluated his proficiency in locating drugs. After all, law enforcement units have their own strong
2   incentive to use effective training and certification programs, because only accurate drug-detection dogs enable officers to locate contraband without
3   incurring unnecessary risks or wasting limited time and resources.

4   A defendant, however, must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying
5   officer or by introducing his own fact or expert witnesses. The defendant, for example, may contest the adequacy of a certification or training
6   program, perhaps asserting that its standards are too lax or its methods faulty. So too, the defendant may examine how the dog (or handler)
7   performed in the assessments made in those settings. Indeed, evidence of the dog's (or handler's) history in the field, although susceptible to the kind
8   of misinterpretation we have discussed, may sometimes be relevant, as the Solicitor General acknowledged at oral argument. And even assuming a
9   dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog
10  (consciously or not), or if the team was working under unfamiliar conditions.

11
12  The question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would
13  reveal contraband or evidence of a crime.

14  *Id.* at 1057-58 (citations omitted).  *See United States v. Thomas*, 726 F.3d 1086, 1096

15  (9th Cir. 2013) ("*Harris* explained that a defendant must be afforded the opportunity

16  to challenge 'evidence of a dog's reliability, whether by cross-examining the testifying

17  officer or by introducing his own fact or expert witnesses.'").

18        In this case, Defendant has challenged the reliability of the training program and

19  the circumstances surrounding the alert behavior. Defendant challenged Boeli's ability

20  to distinguish cars with people inside from cars with people concealed inside during the

21  cross examination of  Agent Miranda.  Agent Miranda was not able to provide any

22  evidence to support Boeli's training to detect concealed people in moving vehicles.

23  Agent Miranda testified "I don't really know how they do the training or how [Boeli]

24  does it.  It amazes me too, but it works."  (ECF No. 111 at 44).  Agent Miranda stated,

25  "I trained with my dog on these odors, but the actual training that goes into him

26  knowing the difference is something that the . . . instructors do that and stuff.  I don't

27  know how the dog would know the difference, but they just do.  It is pretty amazing."

28  *Id*. at 84-85.

1    Defendant presented evidence from an expert who testified that it is not possible
2  to train a dog to alert to concealed human smell but ignore or differentiate other human
3  smell in the same vehicle.  Defendant's expert testified,

4       there is no way of separating the odors or making the odor different for the
        person that is in the trunk, even in training. . . . As we're driving in a
5       vehicle, whether you are in the trunk or in the front, almost always the
        odor is pushed to the rear of the vehicle, given air-conditioning, given the
6       movement. . . . Again, the dog is simply wanting his reward, his toy.  As
        soon as he smells human odor coming from a vehicle.  Whether it is a
7       patrol dog looking for a suspect or a dog that is looking for something that
        is hidden in the vehicle, if there are people in the driver seat, he is going
8       to indicate; if there is somebody in the trunk, he is going to indicate.

9  *Id*. at 152.  The Government did not present evidence to establish that Boeli's was
10 trained to distinguish cars with concealed human smell but ignore or differentiate other
11 human smell in the same vehicle.  While the Government presented Performance
12 Standard Score Sheets indicating that the team practiced finding concealed humans,
13 Defendant presented evidence that the training records were not reliable and the
14 certifications were not completed by an independent agency.

15    In this case, Agent Miranda based his determination of probable cause solely
16 upon Boeli's initial alert behind the trunk as shown on the video.  Agent Miranda
17 testified that Boeli indicated interest in Defendant's vehicle when his body tensed and
18 his demeanor changed.  Agent Miranda testified that he continued to search to see if he
19 could get Boeli to pinpoint  the source of his interest.  Agent Miranda testified that
20 Boeli did not sit at the trunk area and did not back up and bark at the trunk area.
21 Defendant's expert testified that the initial alert behavior shown on the video is no more
22 than interest behavior and does not indicate that dog has found the odor that he is
23 trained to find.  The Government presented no further evidence to rebut or otherwise
24 explain this testimony.

25    "The question . . . is whether all the facts surrounding a dog's alert, viewed
26 through the lens of common sense, would make a reasonably prudent person think that
27 a search would reveal . . . evidence of a crime."  *Florida*, 133 S.Ct. at 1058.   In this
28 case, the Court concludes that the Defendant has presented a credible challenge to the

15cr716 WQH

1  alert behavior and the reliability of the dog training by cross examining the testifying

2  officer and by introducing expert testimony.  The Court concludes that the Government

3  has not proven that the evidence of Boeli's behavior at the trunk of Defendant's vehicle

4  meets the probable cause standard.

5  **IV.  Conclusion**

6        The Court concludes that the search of Defendant's trunk without a warrant,

7  without consent, and without probable cause was unconstitutional.  All evidence derived

8  from this search must be suppressed.

9        IT IS HEREBY ORDERED that (1) the motions to suppress evidence obtained

10  at an unconstitutional checkpoint (ECF Nos. 53-1 and 67-1) are denied; and (2) the

11  motions to suppress evidence obtained by an unconstitutional trunk search  (ECF Nos.

12  53-2 and 67-2) are granted.

13  DATED:  December 22, 2015

14                                                        *William Q. Hayes*
                                                  **WILLIAM Q. HAYES**
15                                                United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28